**EXHIBIT B**
**PART 1**

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

---o0o---


LONNIE SMITH and CHERYL SMITH,

        Plaintiffs,

vs.                                    NO. 4:13CV10841-TGB-LJM

NORCOLD, INC., ALCOA, INC.; ALCOA

ENERGY SERVICES, INC., & BURNER

SYSTEMS, INC.,

        Defendants.

_____/


---o0o---

VIDEOTAPED DEPOSITION OF CHRISTOPHER J. BLOOM

MEDFORD, OREGON

MONDAY, FEBRUARY 3, 2014

9:58 A.M. - 3:41 P.M.

---o0o---




LAURA L. SMITH, RPR, OR CSR #97-0340, CA CSR #2731

Page 2

```
 1              APPEARANCES
 2
 3  For the Plaintiffs:
 4  LEGER ADKINS LLP
    BY:  BRADLEY L. LEGER, Attorney at Law
 5  With Co-Counsel:  PIERCE ADKINS, Attorney at Law
    The Bellevue Tower
 6  2323 S. Shepherd Drive, Suite 915
    Houston, Texas 77019
 7  713-574-5558
 8
 9
    For the Defendant Alcoa, Inc.:
10
    K&L GATES
11  BY:  MICHAEL J. R. SCHALK, Attorney at Law
    K&L Gates Center
12  210 Sixth Avenue
    Pittsburgh, Pennsylvania 15222-2613
13  412-355-6500
14
15
    Also Present:
16
    PAUL KALEVICOGLU, Videographer
17

18

19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  EXAMINATION BY:              PAGE
 3  Mr. Leger                  6, 212
 4  Mr. Schalk               185, 254
 5
 6
 7
 8
 9
10           E X H I B I T S
11  EXHIBIT              PAGE
12   1  Five-page Plaintiffs' Notice of Oral      11
        Deposition of Chris Bloom
13
     2  Two-page photocopy of Christopher Bloom's   53
14      Oregon Driver's License
15   3  Two-page Curriculum Vitae      55
16   4  Fourteen-page cover letter and Report of    93
        Findings
17
     5  Four pages of e-mails          110
18
     6  Two color photocopies of photographs   123
19
     7  Two-page Expedited Investigation Request    134
20
     8  Twenty-three page Defendants' Objections    186
21      And Responses to Plaintiffs' Notice of
        Oral Deposition of Chris Bloom
22
     9  Eight-page parts list          200
23
    10  One-page color photocopy of photograph    202
24
    11  One-page color photocopy of photograph    203
25
```

Page 4

```
 1              E X H I B I T S
 2  EXHIBIT    (Continued)          PAGE
    13   One-page color photocopy of photograph    207
 3
    14   One-page color photocopy of photograph    211
 4
    15   One-page color photocopy of photograph    233
 5
    16   One-page color photocopy of photograph    236
 6
    17   One-page Vore/Lonnie Smith Coach and      256
 7        Structure Fire Highlights
 8
 9            CERTIFIED QUESTIONS
10  Page 17/9**Q.   Do you -- are you refusing here today
11  to recognize the authority of the honorable Terrence G.
12  Berg?
13
14  Page 170/2   **Q.   What section are you looking at?
15
16  Page 180/8   **Q.   Sir, I'll ask you again:  How many
17  times in your professional career have you ever determined
18  the cause and origin of a fire by reviewing screws no bigger
19  than the tip of my pinkie?
20
21
22              ---o0o---
23
24
25
```

Page 5

```
 1              February 3, 2014
 2              Medford, Oregon
 3           P R O C E E D I N G S
 4       THE VIDEOGRAPHER:  On the record, this is
 5  Videographer Paul Kalevicoglu.  I'm not financially
 6  interested in this action nor am I a relative or employee of
 7  any attorney or any of the parties.
 8       The date is February 3rd, 2014, the time is 9:58
 9  a.m.  The deposition is taking place at the Courtyard
10  Marriott in Medford, Oregon.
11       The caption is Smith, et al versus Norcold, et al,
12  in the United States District Court, Eastern Division of
13  Michigan, Ann Arbor Division.
14       This deposition is being taken on behalf of the
15  plaintiffs.
16       The deponent is Chris Bloom, the court reporter is
17  Laura Smith.
18       Counsel, will you please introduce yourselves for
19  the record.
20       MR. LEGER:  Brad Leger for the plaintiffs.
21       MR. ADKINS:  Pierce Adkins, plaintiffs.
22       MR. SCHALK:  Mike Schalk for Norcold Alcoa.
23       THE VIDEOGRAPHER:  Madam Reporter, will you please
24  swear in the witness.
25              ---o0o---
```

Maxene Weinberg Agency
(800) 640-1949

Page 6

1    BE IT REMEMBERED, that on MONDAY, FEBRUARY 3, 2014,
2    commencing at the hour of 9:58 A.M., at the Courtyard
3    Marriott Hotel, 600 Airport Road, Medford, Oregon, before
4    me, LAURA L. SMITH, a Certified Shorthand Reporter in and
5    for the states of Oregon and California, there personally
6              appeared:
7              CHRISTOPHER J. BLOOM,
8    a witness called by the plaintiffs in the above-entitled
9    action, who, being by me first duly sworn, was examined and
10             testified as follows:
11             EXAMINATION
12   BY MR. LEGER:
13       Q.   Mr. Bloom, do you understand the oath that you
14   just took?
15       A.   Yes.
16       Q.   Okay.  Do you understand the most important
17   thing for you to do today is to tell the truth?
18       A.   Yes.
19       Q.   You agree to do that; correct?
20       A.   Yes.
21       Q.   Regardless of that, if adversary to your
22   employer's position?
23       A.   My employer?  I'm self-employed, sir.
24       Q.   Norcold.
25       A.   Norcold's position, yes.

Page 7

1        Q.   Okay.  Or Alcoa.
2        A.   Or Alcoa.
3        Q.   Okay.  You understand that you are here today
4    as ordered by the court to attend, not only to attend but to
5    answer my questions.
6        MR. SCHALK:  Objection.
7        THE WITNESS:  I understand that I was advised that
8    there was a deposition today, for me to show up and to
9    attend the deposition.
10   BY MR. LEGER:
11       Q.   So, in layman's terms, you understand that the
12   judge ordered you to attend and answer my questions?
13       MR. SCHALK:  Objection.
14       THE WITNESS:  I was never served with a subpoena in
15   this case.  I was advised that there was a deposition, to
16   show up and to give testimony at that time.
17       MR. LEGER:  Objection, nonresponsive.
18       Q.   Are you aware that the court ordered you to
19   attend this deposition today?  Yes or no?
20       A.   Sir, the answer to that is I was advised of
21   the deposition notice, I was never served with paperwork;
22   therefore, I have no knowledge of anything having to do with
23   that.
24       Q.   Okay.  So you have no knowledge, your lawyers
25   didn't tell you that the court ordered you to be here today?

Page 8

1        MR. SCHALK:  Objection.
2        THE WITNESS:  Again, I had no knowledge of it, I was
3    not served the subpoena, I was just advised to be here today
4    at 10:00.
5        MR. LEGER:  Objection, nonresponsive.
6        Q.   Did anybody ever tell you that the judge
7    ordered you to be here today to testify?
8        A.   I have answered your question three times, I'm
9    not answering it again.
10       Q.   You didn't answer, sir, and you have to answer
11   my questions; okay?
12       Let me tell you how a deposition works.  I'll be
13   asking the questions and you will be answering the
14   questions.
15       You make no legal objections, your lawyer makes the
16   legal objections.
17       You answer my questions unless he instructs you not
18   to answer my questions.
19       If you don't answer my questions, you are in
20   violation of a court order and we are going to seek
21   sanctions.
22       MR. SCHALK:  Objection.
23   BY MR. LEGER:
24       Q.   Do you understand that, sir?
25       A.   I understand that I have not received any

Page 9

1    notice of a court order for me to be here today.
2        Q.   Okay.  Did you understand what I just said?
3        A.   I understood what you said.
4        Q.   Okay.  Did anybody at any time, including your
5    lawyers, tell you that the judge ordered you to attend this
6    deposition?
7        A.   No.
8        Q.   Well, I'd like to advise you, as an officer of
9    the court, that you are under court order to be here; you
10   understand that; right?
11       MR. SCHALK:  Objection, misstates the record.
12   BY MR. LEGER:
13       Q.   Do you understand that?
14       A.   I understand that's your interpretation of
15   that, sir.
16       Q.   Okay.  Were you present when we had a hearing
17   with Judge Berg about your deposition?
18       A.   No.
19       Q.   Okay.  You do understand, Mr. Bloom, that this
20   court-ordered deposition will be filed with the court, it
21   will be read to the judge, and it will be read to the ladies
22   and gentlemen of the jury.
23       A.   Yes, it will.
24       Q.   You understand that?
25       A.   Yes, I do.

3 (Pages 6 to 9)

Page 10

1    Q.   Okay.  Mr. Bloom, have you ever been arrested
2  or convicted of a crime?
3    A.   No.
4    Q.   Have you ever been deposed or testified at
5  trial before?
6    A.   Yes.
7    Q.   Do you have a list of your depositions and
8  testimony?
9    A.   Yes, I do.
10    Q.   Can I have that, please?
11    A.   I don't have that with me.
12    Q.   Why did you not bring that with you today?
13    A.   Again, I was just advised to show up, sir.  I
14  was not under any subpoena or anything else to show up.
15    MR. LEGER:  Objection, nonresponsive.
16    MR. SCHALK:  I need to interject.
17    This is Mike Schalk on behalf of Alcoa.
18    We filed a notice of objections to the subpoena
19  issued in this case.
20    Our understanding is there's no court order for this
21  deposition.  We did have a status conference with the judge
22  who said that the plaintiffs could take the deposition of
23  Mr. Bloom on fact issues only as it relates to alleged
24  spoliation of evidence.
25    MR. LEGER:  We'll agree to disagree to that, and we

Page 11

1  have the judge on standby.  If we need to call him, we'll
2  give him a call.
3    MR. SCHALK:  Absolutely.
4  BY MR. LEGER:
5    Q.   So you did not bring a list of your deposition
6  testimony or your trial testimony with you here today; did
7  you?
8    A.   No.
9    Q.   Okay.  And you were asked to do that; weren't
10  you?
11    A.   Again, sir, I was not issued a subpoena in
12  this case, I do not know what I was asked to bring.  I was
13  told to be here at 10:00.
14    Q.   All right.  So is your testimony here today,
15  under oath, that you were not issued a subpoena; is that
16  correct?
17    A.   I was not served a subpoena, no, sir.
18    Q.   All right.  Let me remind you that you are
19  under oath, sir.
20    Go ahead and mark this as Deposition Exhibit
21  Number 1.
22    (Whereupon Exhibit No. 1 was marked for
23    identification.)
24  BY MR. LEGER:
25    Q.   I'll give you an opportunity to review that

Page 12

1  document and then I'll ask you the question again, and I
2  would like to remind you that you are under oath.
3    Have you ever seen Deposition Exhibit Number 1
4  before today, sir?
5    A.   Yes.
6    Q.   Okay.
7    MR. SCHALK:  At this point, Brad, sorry to
8  interrupt, but I would like to attach our notice of
9  deposition --
10    MR. LEGER:  Why don't you wait, you are interrupting
11  my ability to question the witness.  I'll give you an
12  opportunity to respond and you can attach any exhibits that
13  you want; okay?
14    MR. SCHALK:  Perfect.
15  BY MR. LEGER:
16    Q.   Would you agree with me, sir, that you have
17  received and reviewed Exhibit A to your deposition notice,
18  which is a subpoena duces tecum?
19    A.   I received --
20    MR. SCHALK:  Objection.
21    THE WITNESS:  I received a copy of the entire
22  subpoena via e-mail, sir, yes.
23  BY MR. LEGER:
24    Q.   Okay, so you did, in fact, receive a subpoena
25  before your deposition today; correct?

Page 13

1    A.   As I said, sir, I was never served with a
2  subpoena in this case.
3    Q.   But in fact you did receive a subpoena from
4  your attorneys in this case; correct?
5    A.   I received a copy of that subpoena via e-mail
6  approximately a week ago.
7    Q.   From your attorneys?
8    A.   From -- I don't know who I got it from.
9    Q.   You don't remember --
10    A.   I don't remember if it was Mike or if it was
11  Brian.
12    Q.   Okay, but you did, in fact, receive a subpoena
13  before your deposition today --
14    MR. SCHALK:  Objection.
15  BY MR. LEGER:
16    Q.   -- requiring you to bring documents to your
17  deposition; correct?
18    A.   Again, sir, I was never served, key word,
19  served with a subpoena in this case for any documents
20  relating to this matter.
21    Q.   Mr. Bloom, do you have a hearing problem?
22    MR. SCHALK:  Objection.
23    THE WITNESS:  Nope.
24  BY MR. LEGER:
25    Q.   Are you on medication today?

4 (Pages 10 to 13)

Page 14

1    A.   Nope.
2    Q.   Did, anywhere in my question, did I ask you if
3 you were served with a subpoena?
4    A.   In the state of Oregon, service has to be done
5 by a process server --
6    (Inaudible.)
7    MR. LEGER:  Objective, nonresponsive.
8    Q.   Are you aware that this case is filed in
9 federal court in Michigan?
10   A.   Yes, I am.
11   Q.   Okay.
12   A.   I have spoken to federal court attorneys who
13 say that it is not valid in this state, that it was not
14 served upon me --
15   MR. LEGER:  Objection, nonresponsive.
16   Q.   When did you speak to these attorneys and who
17 are they?
18   A.   Last week, I spoke to Frohnmayer, Deatherage,
19 I spoke to Tracy McGovern, I have spoken to -- I forgot the
20 name of the firm but I've spoken to James Wallan, I've
21 spoken to Patrick Kelly, and I've also spoken to -- I've got
22 the gentleman's name at the office.
23   Q.   About this particular --
24   A.   About the specifics in this case, yes.
25   Q.   Okay.  And is it your testimony here today

Page 15

1 that a deposition notice and a subpoena duces tecum filed
2 and served in the United States District Court for the
3 Eastern District of Michigan is invalid; is that your
4 testimony under oath today?
5    MR. SCHALK:  Objection.
6    THE WITNESS:  Under my testimony today, the issue is
7 that the subpoena has to be issued through an Oregon court
8 to an Oregon citizen, it has to be hand-process served.
9 Until that point in time, it is not a valid subpoena per the
10 four attorneys I've spoken to who are licensed to practice
11 in federal court.
12   BY MR. LEGER:
13   Q.   Do you understand that I'm not asking you
14 about what you think the process is?  That wasn't my
15 question; you understand that, right?
16   A.   I've spoken and I've told you what I said.
17   Q.   I know you've told me what you said, but my
18 question is this:  This is a federal court case in the
19 eastern district of Michigan, Judge Thomas D. Berg is the
20 judge presiding over this matter.
21   A.   Correct.
22   Q.   This is a deposition notice that was served in
23 that case pursuant to the federal rules of civil procedures.
24   A.   It was not served upon me, sir.
25   Q.   You just said your lawyer sent it to you last

Page 16

1 week.
2    A.   E-mail service is not valid in the state of
3 Oregon.
4    Q.   It's not my job to give it to you.  I give it
5 to your lawyers, your lawyers give it to you; do you
6 understand that?
7    A.   Not in this state, sir.
8    Q.   Do you understand the federal rules of civil
9 procedure?
10   A.   Yes, I do.
11   MR. SCHALK:  Objection.
12   BY MR. LEGER:
13   Q.   You do?  Okay, explain to me Federal Rules of
14 Civil Procedure 30(b)2 and 34.
15   MR. SCHALK:  Objection.
16   THE WITNESS:  Well, the issue is that the subpoena
17 was issued by whoever, and I didn't see a judge's signature
18 on it; it was your signature, sir, and it was served upon
19 counsel, not to me.
20   BY MR. LEGER:
21   Q.   If you --
22   A.   Again, I was given a copy of the subpoena a
23 week ago and I spoke with the attorneys at the
24 aforementioned about whether or not it was a valid service,
25 they said it was not.  I relied upon legal interpretation in

Page 17

1 this state with attorneys licensed to practice in federal
2 court, and they said it is not, and that's why we're here.
3    Q.   Do you understand that this case was not filed
4 in Oregon?
5    A.   Yes, sir.
6    Q.   Do you understand that this case is filed in
7 federal court in Michigan?
8    A.   Yup.
9    **Q.   Do you -- are you refusing here today to
10 recognize the authority of the honorable Terrence G. Berg?
11   MR. SCHALK:  Objection.
12   THE WITNESS:  I'm not going to answer that, sir.
13   BY MR. LEGER:
14   Q.   You have to answer my questions.  If you
15 don't, you are going to be held in contempt of court.
16   MR. SCHALK:  Objection.
17   THE WITNESS:  I am not going to answer your
18 question.
19   BY MR. LEGER:
20   Q.   You're not going to answer my question?
21   A.   No.
22   MR. LEGER:  Certify that question, please.
23   Q.   In any instance, whether you think it's valid
24 or not -- and you are not a lawyer; are you?
25   A.   No.  I asked for legal advice and I received

5 (Pages 14 to 17)

Page 18

1  legal advice.
2      MR. LEGER:  Objection, nonresponsive.
3      Q.  Is your personal lawyer here today?
4      A.  No.
5      Q.  Okay.  You are not a lawyer; correct?
6      A.  No.
7      Q.  You did not go to law school; correct?
8      A.  No.
9      Q.  Okay.  In fact, you don't have any degree
10 above a bachelor of science; do you?
11     A.  I'm working on my masters right now.
12     MR. LEGER:  Objection, nonresponsive.
13     Q.  Do you have any degrees above a bachelor of
14 science as you sit here today?
15     A.  No, I'm working on my masters degree.
16     Q.  Okay.  So let me get this straight.  You
17 received this subpoena, which earlier you testified you
18 never received a subpoena, you received a subpoena from your
19 lawyer.
20     This is your lawyer sitting right here; right?
21     A.  Not my lawyer; Norcold's lawyer, yes.
22     Q.  Okay.  So you don't have a lawyer here today?
23     A.  No.
24     Q.  Okay.
25     MR. LEGER:  Are you his lawyer here today, Mike?

Page 19

1      MR. SCHALK:  He's my expert but we are presenting
2  him as a fact witness on the spoliation.
3      If we can get to that issue, that would be terrific.
4      MR. LEGER:  Well, we'll get to it, trust me.
5      Q.  And you received this list, this subpoena,
6  asking for you to bring documents to your deposition today;
7  correct?
8      A.  Yes, I saw a document requesting items from
9  me.
10     Q.  Okay.  And did you consult your lawyer that's
11 here today about providing these documents or bringing these
12 documents to your deposition today?
13     A.  I did not consult with Mr. Schalk about that,
14 no.
15     Q.  Did you consult with any Norcold or Alcoa
16 lawyer about responding to this subpoena today?
17     A.  Yes.
18     Q.  What lawyers did you speak to at Alcoa and
19 Norcold about the subpoena that was sent to you last week?
20     A.  Brian Rohn, co-counsel, I believe.
21     Q.  I'm sorry, who?
22     A.  Brian Rohn, co-counsel.
23     Q.  Brian Rome?
24     A.  R-o-h-n, co-counsel.
25     Q.  Co-counsel.  Brian works with Mike; correct?

Page 20

1      A.  Right.
2      Q.  And did Brian advise you not to abide by this
3  subpoena?
4      MR. SCHALK:  Objection.
5      THE WITNESS:  No, he did not.  Actually, he told me
6  that I was being presented as a fact witness and that
7  objections would be filed with the court over the subpoena
8  result.
9  BY MR. LEGER:
10     Q.  Okay.  You know, you can call yourself a fact
11 witness, you can call yourself an expert witness, you can
12 call yourself Bozo the Clown, I really don't care.  When I
13 ask you questions, do you agree to answer those questions
14 fully and truthfully?
15     A.  I am answering fully and truthfully, sir.
16     Q.  And you agree to continue to do that
17 throughout this deposition regardless of what hat you want
18 to wear?
19     MR. SCHALK:  Objection.
20     THE WITNESS:  I have been providing factual and
21 truthful statements so far and I'll continue to.
22 BY MR. LEGER:
23     Q.  Well, not necessarily.  Early, you said you
24 never received a subpoena and, in fact, you did.
25     A.  Actually, sir, I said I was never served with

Page 21

1  a subpoena.  If you want the court reporter to read it, she
2  can read it.
3      Q.  No, we'll go back through it later.
4      Okay.  You have testified on behalf of Norcold in
5  the past; have you not?
6      A.  Yes, I have.
7      Q.  Okay.  And what cases?
8      MR. SCHALK:  Objection.
9      THE WITNESS:  One would be -- I want to be clear on
10 which Norcold we are talking about.  Norcold in general, or
11 the two companies, or Norcold Alcoa?
12 BY MR. LEGER:
13     Q.  Again, I don't care who the master over there
14 is, waving his wand, you know who we are talking about,
15 Norcold.
16     A.  Fair enough.  Under Norcold, all of it, I have
17 spoken -- let's see, deposed -- testified one time in the
18 Reis case, that's R-e-i-s, and Hose, I believe, two or three
19 times, I'm not sure, including the Reis case.
20     Q.  Is that Joseph Reis, III versus Thedford
21 Corporation?
22     A.  That would be correct.
23     Q.  Is that the case you would be talking about?
24     A.  That would be correct.
25     Q.  Who else?

6 (Pages 18 to 21)

Page 22

1     A.   I don't remember the other cases offhand, sir.
2     **Q.   Have you testified in a case, State Farm**
3  **Mutual Automotive Insurance versus Norcold, Inc.?**
4     A.   Give me case captions.
5     **Q.   There's a photograph; is that you?**
6     A.   That is me.
7     **Q.   Okay.  Did you testify in that case?**
8     A.   Okay, Ogden County, yes, that is correct.
9     **Q.   Okay.**
10    A.   That was called the Dubose, D-u-b-o-s-e.
11    **Q.   This was taken June 11, 2013?**
12    A.   Correct.
13    **Q.   You don't recall that deposition?**
14    A.   Now, I do.
15    **Q.   Any other depositions, trial testimony?**
16    A.   Again, sir, I don't have the list in front of
17 me, I cannot give you an accurate representation on that.
18    **Q.   Will you agree to give me a list?**
19    MR. SCHALK:  Objection.
20    THE WITNESS:  If counsel so instructs it or the
21 court so instructs it, then I will provide whatever
22 documentation I am required to provide.
23 BY MR. LEGER:
24    **Q.   Okay.  Have you ever testified at trial**
25 **involving an alleged defect in a Norcold or Alcoa**

Page 23

1  refrigerator?
2     A.   Yes.
3     **Q.   These cases that you just mentioned that you**
4  **were deposed in, did those cases go to trial?**
5     A.   Joseph Reis did go to trial, yes.
6     **Q.   Okay.  And did you testify as an expert**
7  **witness in that case?**
8     A.   Yes, I did.
9     **Q.   Okay.  What was your opinion in that case?**
10    MR. SCHALK:  Objection, relevance.
11    THE WITNESS:  The opinion in the case was the cause
12 was undetermined based upon the amount of damages sustained.
13 BY MR. LEGER:
14    **Q.   And what was the outcome of that case?**
15    A.   Defense verdict.
16    **Q.   And are there any other cases where you**
17 **testified as an expert witness for Norcold at trial?**
18    A.   No.
19    **Q.   Okay.  That's the only one?**
20    A.   That's the only one that's gone to trial so
21 far, yes.
22    **Q.   Okay.  How many investigations -- scratch**
23 **that.**
24    **And that case that you are referring to, that you've**
25 **testified at trial, that involved a different defect failure**

Page 24

1  mechanism than the issue that we are here today on; correct?
2     A.   That's correct.  It was a completely different
3  model.
4     **Q.   Norcold 1200 model series?**
5     A.   That's correct.
6     **Q.   And just briefly -- I don't want to get into**
7  **your expert opinions in that case but -- what was the issue**
8  **with that refrigerator?**
9     MR. SCHALK:  Objection.
10    THE WITNESS:  At this point, sir, I know there's a
11 protective order on some of the documents.  I do not know
12 what the protective order is so I'm just going to stick with
13 my original opinion on what -- the cause is undetermined
14 based upon the (inaudible).
15    **Q.   Okay, well, I'm not talking about that case in**
16 **general.  Just what -- there's published documents, recalls.**
17 **That part was recalled by Norcold; correct?**
18    A.   That unit was subject to a potential recall,
19 correct.
20    **Q.   And you read the recall notice; right?**
21    A.   Yes.
22    **Q.   Why did Norcold recall that model?**
23    MR. SCHALK:  Objection.
24    THE WITNESS:  The 1200 series were defective in some
25 models and in some cases for a cooling unit failure in the

Page 25

1  boiler, causing potential fires under a specific set of
2  circumstances.
3  BY MR. LEGER:
4     **Q.   So you do agree that those refrigerators, some**
5  **-- at least some of those refrigerators are defective and**
6  **could potentially cause fire?**
7     MR. SCHALK:  Objection.
8     THE WITNESS:  I agree that some of those could cause
9  fire, correct, and there are potential defects.
10 BY MR. LEGER:
11    **Q.   Okay.  Have you ever testified at trial or by**
12 **way of deposition in a case involving a -- dealing with**
13 **Sourdillion valve defects?**
14    A.   No.
15    **Q.   Okay.  This is your first deposition in a case**
16 **involving a Sourdillion valve defect?**
17    A.   That's correct.
18    MR. SCHALK:  Objection, assumes facts.
19 BY MR. LEGER:
20    **Q.   How many times have you investigated fires on**
21 **behalf of Norcold and/or Alcoa?**
22    A.   I cannot give you an accurate number on that
23 right now without research, sir.
24    **Q.   What's your best guess?**
25    A.   I cannot give you an accurate number, even

Maxene Weinberg Agency
(800) 640-1949

Page 26

1  best guess, without research on that.
2      Q.  Over a hundred?
3      A.  Easy.
4      Q.  Two hundred?
5      A.  Easy.
6      Q.  Five hundred?
7      A.  Again, I can't give you an accurate number.  I can
8  tell you it's over 200.
9      Q.  Over 200.  That will work.  And over those --
10  and in those -- scratch that.
11      And in those 200-plus investigations where you were
12  hired by Norcold or Alcoa to investigate whether their
13  product caused a fire, how many times did you determine that
14  the defect in those products actually caused the fire?
15      MR. SCHALK:  Objection.  You're going really far
16  afield here, Brad.  I mean, this is expert-related
17  testimony, which you will have the opportunity to depose
18  this witness as an expert.
19      MR. LEGER:  It's going to make sense in a minute.  I
20  get to go over bias.  He's a witness, I get to talk about
21  bias.
22      THE WITNESS:  Yeah, please re-question.
23  BY MR. LEGER:
24      Q.  Sure.  In those 200-plus fires that you
25  investigated on behalf of Alcoa and Norcold, in how many of

Page 27

1  those did you determine that a defect in an Alcoa or Norcold
2  refrigerator was the cause of a fire?
3      A.  Obviously, I cannot give you an accurate
4  answer to the number.
5      I need to be very clear about something before we go
6  any further.  When you ask about Alcoa and Norcold, are you
7  speaking of Alcoa Norcold or Alcoa -- sorry, or Thedford
8  Norcold?  That makes a difference.
9      Q.  Any of them.
10      A.  No, it needs to be -- you have to be very
11  specific.
12      Q.  On behalf of any of -- don't tell me what all
13  I need to be.
14      On behalf of any of those defendants, on behalf any
15  of those defendants or those parties, Thedford Alcoa,
16  Norcold, any of those guys, in the 200-plus investigations
17  that you participated in on their behalf, how many of those
18  investigations did you come back and say, hey, the defect in
19  your product caused the fire?
20      A.  Again, I cannot give you an accurate
21  representation without going through all the files, but I
22  can tell you this, now that you have clarified your
23  question, the number of actual investigations is well over
24  600 --
25      Q.  Okay.

Page 28

1      A.  -- because you are including Thedford Norcold
2  in with Alcoa cases.
3      Q.  Okay.  And the 600-plus -- well, scratch that.
4      So let me get this right.  So those entities,
5  including Norcold and Alcoa, called you up 600 times and
6  said, hey, we have allegations of our product catching on
7  fire?
8      A.  Allegations, correct, sir.
9      Q.  Six hundred times?
10      A.  About 600 times.
11      Q.  What year span?
12      A.  1997-'98 through current.
13      Q.  1997 to current.  Okay.
14      A.  And that would be of all various types and
15  models.
16      Q.  Well, aren't you aware, sir, that there have
17  been over 2,000 fires caused by the 1200 series since 1998?
18      MR. SCHALK:  Objection.
19      THE WITNESS:  I'm aware that there are allegations
20  that there are 2,000 fires, correct.
21  BY MR. LEGER:
22      Q.  So people have made claims or complaints to
23  Norcold, Alcoa, Thedford, whatever you want to call them,
24  about refrigerators catching on fire?
25      A.  And sometimes they are Norcold and sometimes

Page 29

1  they are not; they make a mistake when we get out to the
2  scene.
3      Q.  Approximately 2,000; correct?
4      A.  Again, that's the number you threw out, sir.
5  I'm just saying there are allegations.
6      Q.  And where did you get that 2,000 number?
7      A.  From you.
8      Q.  You are not aware of class actions filed
9  against Norcold where it alleges 2,000 fires have been
10  caused by Norcold refrigerators?
11      MR. SCHALK:  Objection.
12      THE WITNESS:  I'm aware of a class action lawsuit
13  filed where there's allegations, but I do not know anything
14  about the documents themselves.
15  BY MR. LEGER:
16      Q.  Have you read the actual complaint?
17      A.  I have not been provided a copy of the
18  complaint.
19      Q.  Have you been hired by Norcold to be their
20  expert in that case?
21      A.  To my knowledge, not yet.
22      Q.  Okay.  So you do agree, though, that there
23  have been over -- approximately 2,000 complaints made to
24  Norcold since 1997, 1998, regarding allegations of Norcold
25  refrigerators catching on fire?

8 (Pages 26 to 29)

Page 30

1    A.   Again, sir, that's the number you said. 2,000.
2    I'm aware of a number of allegations relating to
3    refrigerators catching fire.
4        Q.   You personally, you are just one person, are
5    aware of over 600; correct?
6        A.   For two different companies over a period of
7    approximately 20-something years, yes.
8        Q.   And those two companies are?
9        A.   Thedford Norcold and Alcoa Norcold. They are
10   two completely different companies.
11       MR. LEGER: Object to the nonresponsive portion.
12       Q.   Are you a lawyer, sir?
13       A.   No.
14       Q.   Do you understand the law regarding the
15   formation of corporations?
16       A.   No.
17       Q.   Okay. And in those 600-plus fires where a
18   Thedford or Norcold refrigerator was alleged to have caused
19   a fire, how many times did you determine that a defect in
20   those refrigerators actually caused a fire?
21       A.   Again, I cannot give you an accurate number
22   without reviewing the case file, sir.
23       Q.   Okay. You did not review any case files
24   before you came here today?
25       A.   No.

Page 31

1        Q.   Okay. Was it -- have you ever --
2        Let me ask you this: Have you ever identified a
3    defect in a Thedford or Norcold refrigerator as being the
4    cause of a fire?
5        A.   Yes.
6        Q.   Okay. One time?
7        A.   No.
8        Q.   More than one time?
9        A.   Yes.
10       Q.   More than five times?
11       A.   Yes.
12       Q.   More than 50 times?
13       A.   Yes.
14       Q.   More than a hundred times?
15       A.   Yes.
16       Q.   More than 200 times?
17       A.   After 100, I cannot give you an accurate
18   number.
19       Q.   Okay. So at least one in six of the
20   assignments that you went on to investigate allegations of
21   defects in Norcold refrigerator fires, you identified that
22   defect as being the cause of the fire; correct?
23       MR. SCHALK: Objection, misstates testimony.
24       THE WITNESS: My answer is yes, at least one in six.
25   BY MR. LEGER:

Page 32

1        Q.   Whenever you go out to investigate a fire on
2    behalf of Norcold, Alcoa, Thedford, whoever you want to call
3    them, and you determine that the defect -- there was a
4    defect in their product that caused damage, whether it be
5    property damage or personal injuries or death, what do you
6    do next? Who do you report to and what do you tell them?
7        A.   For Alcoa cases, I report either to counsel or
8    to John Schlesman directly. And for Thedford cases, I
9    report to John Fitzsimons, counsel.
10       Q.   And what do you tell them?
11       MR. SCHALK: Objection.
12       THE WITNESS: I can't reply to what I have reported
13   to John Fitzsimons but I can tell you what I have reported
14   to John Schlesman, and that is that in my opinion, based
15   upon the facts of the case -- here we go -- the origin of
16   fire, the cause of the fire, and the mitigating
17   circumstances surrounding the fire.
18   BY MR. LEGER:
19       Q.   And in those cases, do you believe it is the
20   moral and just thing to do for the corporations to
21   compensate those families for the damages?
22       MR. SCHALK: Objection.
23       THE WITNESS: Sir, again, my job is to determine the
24   origin and cause of the fire, not to get into any of the
25   other aspects of the case.

Page 33

1    BY MR. LEGER:
2        Q.   I'm just asking you, as a person, do you feel
3    morally that the corporation should compensate the families
4    for damages that their defective product caused?
5        MR. SCHALK: Objection, beyond the scope.
6        THE WITNESS: Again, sir, my job is origin and
7    cause, and that is also identifying mitigating
8    circumstances.
9        I don't deal with any other aspects of it. That is
10   between the other parties.
11       MR. LEGER: Objection, nonresponsive.
12       Q.   For the jury, for the judge, one more time:
13   Do you, as a person, as you sit here today -- if you want to
14   be a fact witness, you can put your fact witness hat on. As
15   a fact witness, as a human being on this planet, do you
16   believe that a corporation such as Thedford or Norcold or
17   Alcoa should compensate families for damages that their
18   defective product causes them?
19       MR. SCHALK: Objection, asked and answered.
20       THE WITNESS: If the product is defective, then they
21   should probably pay at least a portion of it but, again, the
22   mitigating circumstances in the cases have to be taken into
23   consideration.
24   BY MR. LEGER:
25       Q.   What mitigating -- what are you talking about,

9 (Pages 30 to 33)

Page 34

1  mitigating circumstances?
2      A.   There are mitigating circumstances in many RV
3  fires, especially involving Sourdillion refrigerators, where
4  owners' issues come into play as far as the direct proximal
5  cause of the fire, such as --
6      I'll just leave it at that.
7      Q.   Are you talking about contributory negligence?
8      MR. SCHALK:  Objection.
9      THE WITNESS:  There are mitigating factors in a fire
10 investigation.
11 BY MR. LEGER:
12     Q.   What mitigating factors are you talking about?
13     My question to you is, simply:  Do you feel these
14 families deserve to be compensated for damages that
15 defective products cause to them --
16     MR. SCHALK:  Asked and answered.
17 BY MR. LEGER:
18     Q.   -- when you even identify the defect as being
19 the cause; it's a simple question.
20     A.   And I've already answered the question, sir.
21 I said yes, depending upon the mitigating factors of the
22 case.
23 BY MR. LEGER:
24     Q.   Okay.  Have you ever testified -- scratch
25 that.

Page 35

1      Are you aware that Thedford, Norcold, Alcoa receive
2  one to two complaints per day for their refrigerators
3  allegedly causing fires?
4      MR. SCHALK:  Objection.
5      THE WITNESS:  I am not aware of that, sir.  I am
6  aware that they do receive complaints.
7  BY MR. LEGER:
8      Q.   And do you have any idea how many complaints
9  they receive?
10     A.   No.
11     Q.   Were you involved in a case in Arkansas where
12 a woman's husband died as a result of smoke inhalation and
13 burns in a camper fire resulting from a refrigerator defect
14 in a Norcold refrigerator?
15     MR. SCHALK:  Objection, beyond the scope of this
16 deposition.
17     THE WITNESS:  And without any more information, I
18 can't answer that question, sir.
19 BY MR. LEGER:
20     Q.   Okay.  Have you ever investigated Norcold
21 refrigerator fires in Arkansas?
22     MR. SCHALK:  Same objection.
23     THE WITNESS:  Again, sir, I can't answer that
24 question without having more research or more specifics.
25 BY MR. LEGER:

Page 36

1      Q.   You don't know if you've investigated fires
2  for Norcold in Arkansas?
3      A.   Sir, I have worked in 34 states and four
4  countries, and I do not recall if I worked in Arkansas for
5  Norcold or not without more information.
6      MR. LEGER:  Objection, nonresponsive.
7      Q.   Are you aware that Norcold paid a widow seven
8  million dollars as far as a product liability settlement in
9  Arkansas as a result of a defective Norcold refrigerator
10 catching on fire and killing her husband?
11     A.   No.
12     MR. SCHALK:  Objection, beyond the scope of this
13 deposition.
14 BY MR. LEGER:
15     Q.   You are not aware of that?
16     A.   No.
17     MR. SCHALK:  Same objection.
18     THE WITNESS:  To my knowledge, no.
19 BY MR. LEGER:
20     Q.   How long have you been doing -- working for
21 Norcold, working with Norcold?
22     A.   Working with Norcold since about 1997;
23 opposite Norcold since about 1992.
24     Q.   So since 1997, you have been working with
25 Norcold?

Page 37

1      A.   With Alcoa Norcold.
2      Q.   Alcoa Norcold, Thedford, whoever.  And no one,
3  in all those years, has ever told you that a man has died as
4  a result of a defect in a Norcold refrigerator?
5      MR. SCHALK:  Objection, beyond the scope.
6      THE WITNESS:  Yes.
7  BY MR. LEGER:
8      Q.   Somebody told you that?
9      A.   No.  You said no one has told me; yes, no one
10 has ever told me that.
11     Q.   Okay, no one has ever told you that.  Okay.
12     Mr. Bloom, do you agree that Thedford, Norcold, and
13 Alcoa have a problem with their refrigerators catching on
14 fire?
15     MR. SCHALK:  Objection.
16     THE WITNESS:  I agree that there are potential
17 problems with their refrigerators catching on fire, in some
18 models, under some circumstances.
19 BY MR. LEGER:
20     Q.   Well, you have investigated over 600 of them;
21 right?
22     A.   Six hundred allegations, correct, sir.
23     Q.   Okay.  And one in six, according to you, and
24 you work for Norcold, you have identified a defect as a
25 cause; right?

10 (Pages 34 to 37)

Page 38

1    A.    As the most probable cause of the fire, yes.
2        Q.    And you don't -- you don't consider that or
3    classify that as a problem with their refrigerators catching
4    on fire?
5        MR. SCHALK:  Objection.
6        THE WITNESS:  Again, sir, you have to take into
7    consideration the mitigating circumstances.
8        No, I do not, because if the owner ignores recall
9    notices, that's a risk that they decided to take.
10   BY MR. LEGER:
11       Q.    What are you --
12       A.    (inaudible).
13       Q.    Hold on, excuse me, hold on.
14       A.    -- that the owner does not do servicing --
15       THE COURT REPORTER:  I'm sorry, wait a minute.  Talk
16   one at a time.
17   BY MR. LEGER:
18       Q.    What owner are you talking about?
19       A.    You asked, in 600-plus cases.
20       I said if an owner does not do the required
21   servicing or maintenance and it causes a potential fire,
22   then they are also responsible for this.
23       If an owner does not do the recall notice, that is a
24   mitigating factor in determining the investigation.
25       Q.    How do you know an owner is responsible if

Page 39

1    they receive a recall notice from Norcold?  How do you know
2    that?
3        A.    From the origin and cause aspect of an
4    investigation, if an owner receives a recall notice and does
5    nothing to abate it, then they are somewhat responsible for
6    the fire, themselves.
7        Q.    How do you know that?
8        A.    I have answered your question.
9        Q.    No, you haven't.  That's a legal principle.
10   Are you a lawyer?
11       A.    That is a fire investigative principle, sir.
12       Q.    It absolutely is not.  Contributory negligence
13   is a legal principle.
14       Are you a lawyer, sir?
15       MR. SCHALK:  Objection.
16       THE WITNESS:  No, by fire investigative standards,
17   sir.
18   BY MR. LEGER:
19       Q.    Okay.  So one more time for the judge and the
20   jury:  Do you believe that Norcold, Alcoa, and Thedford have
21   a problem with their refrigerators catching on fire?
22       MR. SCHALK:  Objection.
23       THE WITNESS:  I have already answered that.
24       I do believe that there are problems with some
25   models of refrigerators, in some cases, catching on fire,

Page 40

1    correct.
2    BY MR. LEGER:
3        Q.    Okay, thank you.  At this time, do you do
4    anything other than testify for and investigate fires for
5    Norcold?
6        A.    Yes, I work for and against Norcold.
7        Q.    Okay.  When is the last time where you
8    testified in a case against Norcold?
9        A.    I have not testified against Norcold yet.
10       Q.    You have never testified in a case against
11   Norcold?
12       A.    Not yet.
13       Q.    Not yet.  So are you currently working on a
14   case where you're working for the plaintiffs in a case
15   against Norcold?
16       A.    Four cases.
17       Q.    Four cases.  What are those cases?
18       A.    I cannot discuss them right now because we
19   have active investigations and attorneys are involved.
20       I can tell you that one --
21       Q.    What are the names of the cases?  You can tell
22   me that?
23       A.    Moncovich --
24       Q.    Sorry, what?  Moncovich?
25       A.    Moncovich, M-o-n-v-i-c-h.

Page 41

1        Q.    Where is that case?
2        A.    That one will be filed in the Hayward area,
3    Hayward, California area.
4        Q.    California, okay.  And the next one?
5        A.    There is another one that I am working with.
6    Um, again, I will have to go back and give -- and get you
7    the actual case names and case numbers and all that.  I'm
8    currently working on four active cases against Norcold.
9        Q.    Will you agree to do that and give that
10   information to your lawyer so he can give it to me?
11       A.    If counsel so instructs me, I'll be happy to
12   provide it to you.
13       Q.    Do you, as you sit here today, recall any
14   other cases where you are working for the plaintiffs other
15   than Moncovich?
16       A.    Moncovich.
17       There was a case that was settled out of Texas, I do
18   not know the name of.
19       I worked for Cozen O'Connor opposite Norcold; that
20   was approximately two years ago.
21       Um, and again, I don't know what happened to those.
22       And then I have two more investigations coming up
23   where Norcold is one of the parties involved and I'm the
24   insurance representative.
25       Q.    So you work -- scratch that.

11 (Pages 38 to 41)

Page 42

1    The firm of Cozen O'Connor was a firm located in
2  Houston?
3        A.   In Dallas.
4        Q.   In Dallas.  Do you recall the attorney's name
5  that you are working for?
6        A.   I do not.
7        Q.   Do you recall the name of that case?
8        A.   I do not.
9        Q.   And in your opinion, in these cases, is that a
10  defect in Norcold's refrigerator caused the fire?
11        MR. SCHALK:  Objection, relevance.
12        THE WITNESS:  In the Moncovich case, we have an
13  active investigation going on in approximately two weeks.
14        The Texas case, yes.
15  BY MR. LEGER:
16        Q.   So in that Texas case, it was your opinion
17  that the defect in -- is it a Norcold refrigerator?
18        A.   Yes.
19        Q.   A defect in the Norcold refrigerator caused
20  the fire?
21        A.   Yes.
22        Q.   Did you write a report?
23        A.   Yes.
24        Q.   All right.  Can you give me a copy of that
25  report?

Page 43

1        A.   I cannot, without counsel's permission.
2        Q.   And who is counsel?
3        A.   Again, Cozen O'Connor out of Dallas.  I'll
4  have to pull the file and try to find the name for you.
5        Q.   Okay.  And you don't recall the name of the
6  plaintiff?
7        A.   I do not.
8        Q.   Okay.  Has the case been filed?
9        A.   Again, I don't know, sir.
10        Q.   All right.  Mr. Bloom, how much are you being
11  paid to testify here today?
12        A.   Actually, I don't know.
13        Q.   Aren't you going to submit a bill for your
14  time today?
15        A.   Well, as a fact witness, I'm being paid, what,
16  a $35 fee, and as a expert witness, I don't know.  So I
17  don't know what's happening yet until the court decides what
18  my position is.
19        Q.   You keep saying "fact witness," and again, let
20  me just make something clear:  I don't care what you call
21  yourself, you can call yourself a fact witness, you can call
22  yourself an expert witness.  I think you have already
23  answered some questions that probably would require expert
24  knowledge, um, so it doesn't matter today.
25        The only thing that matters is that you answer my

Page 44

1  questions and answer them truthfully.  Do you understand
2  that?
3        A.   I have answered truthfully, sir.
4        Q.   Okay.  I'm not saying you haven't, except for
5  the subpoena.
6        So do you understand that it doesn't matter what hat
7  you put on, fact witness or expert witness?
8        A.   It makes a difference in compensation, yes, it
9  does, sir.  One's a hourly rate and one is a $35 flat fee.
10        Q.   Well, that's between you and him.  If you want
11  to bill him for testifying as an expert, I don't care.  So
12  if your -- okay.
13        Let's do this.  If you are being -- if you are going
14  to send him a bill for testifying as an expert, how much are
15  you going to send him a bill for?
16        MR. SCHALK:  Objection.
17        THE WITNESS:  One hundred an hour for investigation,
18  report, and prep time; 225 an hour for testimony time.
19  BY MR. LEGER:
20        Q.   Two-twenty-five an hour for deposition time?
21        A.   Yep.
22        Q.   How much prep time did you put in before
23  today's deposition?
24        A.   About 30 minutes.
25        Q.   And then however many hours this deposition

Page 45

1  takes, you are going to bill Norcold or Alcoa $225 an hour?
2        A.   Unless I'm called a fact witness, then I'm
3  going to get the $35 fee, sir, as required by law.
4        Q.   Okay.  Again, are you interpreting, trying to
5  interpret laws?
6        A.   No.
7        Q.   Okay.
8        A.   If I'm to understand, you are saying I'm an
9  expert and they are saying I'm a fact, and so --
10        Q.   I'm not saying you are a expert.  I'm just
11  saying I don't care what you call yourself.  Like I said,
12  you can call yourself Bozo the Clown, I don't care, just
13  answer my questions.
14        A.   I did.
15        Q.   Okay.
16        A.   I was instructed I was a fact witness today.
17        Q.   Well, I didn't instruct you of that.  This is
18  my deposition.
19        So a hundred bucks an hour for prep, 225 an hour for
20  sitting here today and answering my questions?
21        A.   If I'm an expert, yes.
22        Q.   Okay.  Whatever you want to call yourself.
23  Who hired you?
24        A.   In this case, from the outset, I was hired by
25  John Schlesman; at that time, it was Specialty Risk

12 (Pages 42 to 45)

Page 46

1  Services.
2      Q.   And who does he work for?
3      A.   I have no idea.  He's a third-party
4  administrator, I believe, for Alcoa, but I can't swear to
5  it.
6      Q.   He's like the claims adjuster guy for Alcoa;
7  right?
8      A.   He's a claims adjuster and I know he handles
9  accounts; Alcoa is one of them.
10     Q.   Does he handle accounts for Norcold?
11     A.   That is Alcoa.
12     MR. LEGER:  Objection, nonresponsive.
13     Q.   You understand that there's two different
14  entities -- actually, there's multiple entities in this
15  lawsuit named as defendants; one of them is Norcold, one of
16  them is Alcoa; do you understand that?
17     A.   No, I did not know that until now.
18     Q.   Okay, all right.  So again, my question:  Does
19  this John Schlesman guy hire you to work on behalf of
20  Norcold?
21     A.   On behalf of Alcoa Norcold, correct.
22     MR. LEGER:  Objection, nonresponsive.
23     Q.   Again, one more time:  You understand that
24  this is a lawsuit against Norcold, Inc.; right?  Okay?
25     A.   Okay.

Page 47

1      Q.   And we have also -- the plaintiffs in this
2  case have also -- let's see, the other defendants are
3  Norcold Inc., Alcoa Inc., Alcoa Energy Services, Inc.
4      Does Mr. Schlesman ever hire you to work on behalf
5  of those three entities?
6      MR. SCHALK:  Objection.
7      THE WITNESS:  On behalf of Alcoa Norcold, correct.
8  BY MR. LEGER:
9      Q.   Alcoa and Norcold?
10     A.   Alcoa Norcold is one company.  They were sold
11  to Thedford Norcold and that became a different company.
12     That's why I've asked you at the very beginning to
13  be very specific on what you are asking.
14     MR. LEGER:  Objection --
15     THE WITNESS:  To my knowledge, to my knowledge, I'm
16  being hired by Alcoa Norcold in this case.
17  BY MR. LEGER:
18     Q.   Okay.  You don't really understand the
19  corporate structure of Alcoa and Norcold; do you?
20     A.   That's correct.  I was instructed to work for
21  Alcoa Norcold as one entity by Mr. Schlesman.
22     Q.   Okay.  So they just told you, hey, we are
23  Alcoa Norcold, we are going to hire you?
24     A.   Correct.
25     Q.   And when were you hired by Alcoa and Norcold

Page 48

1  to work on this -- this case?
2      A.   I received an e-mail assignment from John
3  Schlesman on March 10th, 2010, which I did not open until
4  March 11th.  I don't know if I was out on inspection or if I
5  was out of the office.
6      Q.   Okay, I have that.  We are going to go back to
7  that but I'm going to skip out of order here.
8      Earlier, you said you can answer my questions with
9  Norcold but you couldn't answer it with Thedford, is that
10  correct, with respect to being hired to investigate these
11  fires?
12     A.   That's correct.  I'm reporting to counsel
13  directly, John Fitzsimons, on Thedford matters, in all
14  cases.
15     Q.   Okay.  So that's who you report to?
16     A.   Yes.
17     Q.   Directly to him?
18     A.   (Witness nods head.)
19     Q.   Okay.  And did you talk to him about this
20  case?
21     A.   No.
22     Q.   Okay.  Did he not -- he did not hire you to
23  work on this case?
24     A.   No.
25     Q.   Do you have a fee retention agreement with

Page 49

1  Norcold or Thedford?
2      MR. SCHALK:  Objection.
3      THE WITNESS:  With Thedford, yes.
4  BY MR. LEGER:
5      Q.   Do you have one with Norcold?
6      A.   With Alcoa Norcold, no.
7      Q.   They just say, hey, we've got an inspection,
8  we want you to go take a look at it and send us a bill?
9      A.   Correct.
10     Q.   And with Thedford, do you have a fee retention
11  agreement?
12     A.   No.
13     Q.   You don't?
14     A.   Not a fee retention agreement.
15     Q.   What do you have?
16     A.   Just a retention -- in all cases, I'm
17  reporting to John Fitzsimons.
18     Q.   Okay, explain that to me:  In all cases you
19  report to John Fitzsimons; what does that mean exactly?
20     A.   When I receive an assignment from Norcold,
21  which would be from Allen Fogt or George Strasburg or Dave
22  Roberts, I go out to the scene, I do a full investigation,
23  if possible, depending on the circumstances of the case, and
24  then I report back directly to John Fitzsimons.
25     Q.   What is the substance of that agreement?  What

13 (Pages 46 to 49)

Page 50

1 does it say?
2      MR. SCHALK: Objection, beyond the scope.
3      THE WITNESS: Basically, that I'm reporting to him
4 in these investigation matters.
5 BY MR. LEGER:
6      Q.   On all Thedford matters?
7      A.   On all Thedford matters that I'm retained by
8 them.
9      Q.   So you -- well, are you retained by Thedford
10 on -- for all of their fires?
11     A.   No.
12     Q.   Are you an employee of Thedford?
13     A.   No.
14     Q.   Do they pay you a certain amount of money per
15 year to handle their investigations?
16     A.   No. They pay me an hourly wage.
17     Q.   How much do they pay you for per hour?
18     A.   Same, a hundred dollars an hour for
19 investigation, $95 an hour for travel time, and 225 an hour
20 for depositions.
21     Q.   Okay.
22     A.   And maybe 250, I'm not sure, but it's in that
23 ballpark.
24     Q.   Okay. And John Fitzsimons -- Fitzsimons?
25     A.   I get it confused as well.

Page 51

1      Q.   So John Fitzsimons or Fitzsimons, he's the
2 guy who has entered into this retention agreement with you
3 on behalf of Thedford?
4      A.   Yes.
5      Q.   And you report to John Fitzsimons for
6 Thedford?
7      A.   Yes.
8      Q.   Do you report to him prior to investigating
9 claims for Thedford or after?
10     A.   After I'm done with the investigation, sir.
11     Q.   Do you tell him your results?
12     A.   Correct.
13     Q.   Do you have a copy of this retention agreement
14 in your file?
15     MR. SCHALK: Objection.
16     THE WITNESS: Not in my file, but I provide a copy,
17 no problem.
18 BY MR. LEGER:
19     Q.   Okay. You can give me a copy of that?
20     A.   Yes.
21     Q.   Would you give that to your attorney, please?
22     A.   I'd be happy to.
23     Q.   Okay. How much money did Norcold, Alcoa, and
24 Thedford pay you last year?
25     A.   No idea.

Page 52

1      MR. SCHALK: Objection.
2 BY MR. LEGER:
3      Q.   Over a hundred thousand dollars?
4      A.   No idea.
5      Q.   You have absolutely no idea?
6      A.   Absolutely zero idea. I have not even started
7 my taxes yet.
8      Q.   Okay. How much did they pay you in 2012?
9      A.   No idea.
10     Q.   How much have they paid you this year?
11     A.   No idea.
12     Q.   How much have you billed them for this year?
13     A.   I have no idea.
14     Q.   Do they pay you over a million dollars a year?
15     A.   No, I wish.
16     Q.   Yeah. That would be nice, wouldn't it.
17 Do they pay you a half million dollars a year?
18     MR. SCHALK: Objection, beyond the scope.
19     THE WITNESS: No, I would say.
20 BY MR. LEGER:
21     Q.   Two-fifty?
22     A.   No, that's about what my taxes were, so --
23     Q.   Okay. Exhibit 1 of the subpoena asked you to
24 bring a copy of your driver's license.
25     Did you bring a copy of your driver's license with

Page 53

1 you here today?
2      A.   Yes.
3      Q.   Can I see it, please?
4      MR. LEGER: Mark that as Exhibit Number 2, we'll
5 make a copy of it. You'll get your driver's license back, I
6 promise you.
7           (Whereupon Exhibit No. 2 was marked for
8            identification.)
9 BY MR. LEGER:
10     Q.   What is the last four of your Social, Mr.
11 Bloom?
12     A.   3496.
13     Q.   Do you have a copy of your most recent
14 curriculum vitae with you today?
15     A.   No.
16     Q.   And you are aware that we asked you to bring a
17 copy of that before your deposition today; are you not?
18     A.   I'm aware there was a request in the document,
19 yes.
20     Q.   And you refused to bring it with you?
21     MR. SCHALK: I'm going to object. We filed our
22 objections here. It's -- they are on file with the court,
23 they were served on plaintiff's counsel.
24     MR. LEGER: How in the world is his c.v. not
25 relevant to his deposition?

14 (Pages 50 to 53)

Page 54

1        MR. SCHALK:  To his deposition on the spoliation
2   issue.
3        MR. LEGER:  You keep saying spoliation issue --
4        MR. SCHALK:  That's why we are here for this
5   deposition.
6        MR. LEGER:  Absolutely, Mike, but I get to -- I get
7   to go into bias, I get to go -- you know, his c.v. is
8   absolutely relevant to this deposition.
9        MR. SCHALK:  We can provide you with a copy.
10       MR. LEGER: I'm sorry?
11       MR. SCHALK:  We'll provide you with a copy.
12       MR. LEGER:  You'll provide me with a copy?
13       MR. SCHALK:  Sure.
14   BY MR. LEGER:
15       Q.   Okay.  Take a look at that.  Is that your most
16   recent curriculum vitae?
17       A.   No.
18       Q.   When was this curriculum vitae drafted?
19       A.   You took this off of my website and this would
20   have been back around somewhere in 2007.
21       Q.   Sir, I didn't take this off your website.
22       A.   That is from my website, sir.
23       Q.   Okay.  And you haven't updated your website
24   since 2007?
25       A.   No, I have updated my c.v. since then, sir.

Page 55

1        Q.   When did you update your c.v.?
2        A.   Approximately two months ago.
3        Q.   So if we go to your website, we can get an
4   updated c.v.?
5        A.   No.
6        Q.   No?  Why not?
7        A.   Because I haven't put it on my website yet.
8        MR. LEGER: So let's mark this as Exhibit 3.
9        Exhibit 3 is Chris Bloom's c.v. that is currently up
10   on his website.
11       Q.   Correct?
12       A.   I guess. I don't know.
13       Q.   Well, you just said I got that from your
14   website; did you not?
15       A.   At some point since 2007, but I don't know if
16   I've updated it since then, sir.  That's why there's no
17   context.
18       MR. LEGER:  In any instance, can we mark that as
19   Exhibit 3?
20            (Whereupon Exhibit No. 3 was marked for
21            identification.)
22   BY MR. LEGER:
23       Q.   Mr. Bloom, you are aware, because you received
24   this subpoena last week, that we requested that you bring 21
25   documents to your deposition today; Are you aware of that?

Page 56

1        A.   I'm aware that there were a list of documents
2   that were requested, sir.
3        Q.   Look at Exhibit A and tell the jury and judge
4   how many documents were requested.
5        A.   Now that I've reviewed it, 21 documents.
6        Q.   All right.  And you brought with you, today,
7   an e-mail; right?
8        A.   That's correct.
9        Q.   Okay.  Some printouts for flights from May 11;
10   correct?
11       A.   Correct.
12       Q.   A notice letter from Tom Bailey dated March 8,
13   2010?
14       A.   Correct.
15       Q.   And apparently you brought a copy of Tom
16   Bailey's report.
17       A.   Correct.
18       Q.   So in response to the subpoena duces tecum
19   that was sent to you over a week ago requesting 21
20   documents, you actually provided us one e-mail and a flight
21   printout; is that correct?
22       A.   That is correct, four documents were brought
23   today -- well, five if you include --
24       Q.   Okay, I'm sorry, I forgot the summary, that's
25   another one.  The -- two of the documents, you would agree,

Page 57

1   that we hadn't even asked for.
2        A.   Correct.
3        Q.   So three documents you brought with you today
4   in response to plaintiff's subpoena that you received last
5   week are in my hand; correct?
6        A.   I have three documents that I brought with me
7   today besides those two.
8        Q.   Identify those three documents to the judge
9   and jury.
10       A.   Sure.  The first one is a highlight of the
11   case.  It basically talks about the factual merits of the
12   case, the loss date, the assignment date, the date that I
13   first contacted Tom Bailey, the date of this first exam, the
14   date that the file was closed per Tom Bailey, that he wasn't
15   pursuing Norcold.  Then it was reopened by prior counsel.
16       Q.   Are those your notes?
17       A.   These are notes from the case file, and then
18   we also talked about the multi-party inspection --
19       Q.   We'll go over them, sir.
20       A.   -- documentation.
21   You asked me to identify them, sir.
22       Q.   Yeah.
23       A.   The second --
24       Q.   -- e-mail --
25       A.   -- is a e-mail correspondence between me and

15 (Pages 54 to 57)

Page 58

1  Tom Bailey and prior counsel, Patrick King.
2      Q.   Who does Patrick King represent?
3      A.   Patrick King represented your -- Mr. and Mrs.
4  Smith, and also, I'm not sure if he also represented
5  Mr. Bailey, and also with prior counsel for Alcoa, which was
6  Tom Wassman (phonetic).
7      And I talked about the weather delay that the
8  mid-west was hitting and forced the cancellation of all
9  flights so I could not attend the secondary inspection.
10     Q.   Okay.  So is it your testimony here today,
11 under oath, that a cancellation of a flight on May 11th
12 prevented you from attending an inspection on March 25th?
13     A.   The March 25th -- no, the answer to that is
14 no.
15     Q.   Okay.
16     A.   The March 25th inspection was done without my
17 input and with -- and against my objections.
18     The May issue was also for later, and that goes to
19 the secondary inspection we had set up at the scene with Tom
20 Bailey for pressure testing the cooling unit.
21     MR. LEGER:  Objection to the nonresponsive, long
22 portion of that answer.
23     Q.   So you, for the judge and the jury, you
24 brought three documents with you today that we do not
25 already have in our possession in response to a subpoena

Page 59

1  requesting you to bring 21 documents; is that correct?
2      A.   I received a copy of the subpoena, and I was
3  told I was a fact witness, and the attorneys told me it was
4  not properly served and I did not have to comply with it.
5      Q.   Did that attorney tell you it was not properly
6  served?
7      A.   No.
8      Q.   So you have some attorneys advising you that a
9  deposition notice that was served upon you in compliance
10 with the judge's order and the federal rules of civil
11 procedure was invalid; is that what you are telling me?
12     MR. SCHALK:  Objection, misstates facts.
13     THE WITNESS:  The answer, as you just said, is I was
14 never served with a subpoena in this case.
15     MR. LEGER:  Objection, nonresponsive.
16     Q.   But for the ladies and gentlemen of the jury,
17 you received this subpoena last week and you had it in your
18 hands and you read it last week; did you not?
19     A.   I received a copy of it and I did read that
20 there was a subpoena in place, at which point I did not open
21 up the attachments, I contacted counsel and counsel
22 instructed me that it was not a valid subpoena in this
23 state, it has to be hand-process served.
24     Q.   You understand that this case is filed in
25 Michigan, not in Oregon; you understand that?

Page 60

1      MR. SCHALK:  Objection, asked and answered.
2      THE WITNESS:  I understand that it's in Michigan and
3  I also understand that under Oregon law, that any service in
4  this state has to be hand-process served.
5  BY MR. LEGER:
6      Q.   Okay.
7      A.   Regardless if it's federal court or state
8  court.
9      Q.   Your lawyer sitting across this table gave you
10 a copy of plaintiff's notice of oral deposition of Chris
11 Bloom and the attached subpoena duces tecum list a week
12 before this deposition; correct?
13     A.   About a week before, yes.
14     Q.   Okay.  That will work for me.
15     Mr. Bloom, where did you get your engineering
16 degree?
17     A.   I do not have an engineering degree.
18     Q.   Oh, I'm sorry, you are not an engineer?
19     A.   I am not an engineer.
20     Q.   Were you ever a -- excuse me, scratch that.
21     Have you ever attended any school regarding fire
22 cause and origin?
23     A.   That is a vague question, sir, please be more
24 specific.
25     Q.   Do you have any degrees from any colleges with

Page 61

1  respect to fire cause and origin investigation?
2      MR. SCHALK:  Objection, assumes facts.
3      THE WITNESS:  No.
4  BY MR. LEGER:
5      Q.   Okay.
6      MR. SCHALK:  Brad, we have almost been going an
7  hour, can we take just a two-minute break?
8      MR. LEGER:  Yes, sure, sure, yeah, anytime, let's go
9  off.
10     THE VIDEOGRAPHER:  We are going off the record, the
11 time now the 10:57.
12     (Recess in proceedings.)
13                ---o0o---
14     THE VIDEOGRAPHER:  We are back on the record, the
15 time now is 11:03.
16     MR. LEGER:  Can we go back off the record real
17 quick?
18     THE VIDEOGRAPHER:  Sure.  We are going back off the
19 record, the time now is 11:04.
20     (Conversation held off the record.)
21     MR. LEGER:  Back on.
22     THE VIDEOGRAPHER:  We are back on the record, the
23 time now is 11:06.
24  BY MR. LEGER:
25     Q.   Mr. Bloom, what type of gas does the Norcold

16 (Pages 58 to 61)

Page 62

462 refrigerator use?
1  462 refrigerator use?
2      A.   Which gas, sir?
3      Q.   I'm asking you what type of --
4      A.   There's two different systems, so which system
5  are you talking about, sir?
6      Q.   Both.
7      A.   The refrigeration system uses propane gas as a
8  heating material medium to heat up the boiling material.
9      The boiling material is an absorption anhydrous
10  ammonia coolant.
11     Q.   Okay.  What's the other gas that's used in
12  that system?
13     A.   That's what I was mentioning to you.  There's
14  hydrogen gas, part of the ammonia system, but the gas or the
15  refrigerant is an ammonia-based system.
16     Q.   So hydrogen and propane; right?
17     A.   Hydrogen in the coolant with the ammonia, and
18  propane, as the heating mechanism, similar to your AC
19  heaters.
20     That's why I asked which gas you were referring to.
21     Q.   Okay.  What is the percentage of gas at
22  maximum burning velocity for hydrogen?
23     A.   Can you please repeat the question?
24     Q.   Yes.  What is the percentage gas at maximum
25  burning fuel velocity for hydrogen?

Page 63

1      A.   Four to seventy-five percent.
2      Q.   I'm sorry, what was that?
3      A.   Four to seventy-five percent; four, low side;
4  seventy-five, high side.
5      Q.   Are you aware that, according to NFPA, that's
6  54?
7      A.   Let me see the documents, sir.
8      Q.   My question to you is:  Are you aware that
9  according to NFPA 921, it's not 75 percent, it's 54 percent?
10     A.   Let me see the document, sir.
11     This is a new version of the document.  I have not
12  seen that yet, sir --
13     Q.   Okay.
14     A.   -- and this is also the maximum --
15     Q.   Thank you.
16     A.   -- burning velocity of the document.  It is
17  not talk about the burning upper and lower flammable limits,
18  which is four to seventy-five percent, sir.
19     MR. LEGER:  Objection, nonresponsive.
20     Q.   What is the maximum --
21     Are you familiar with NFPA 921?
22     A.   I helped write a portion of it, sir.
23     MR. LEGER:  Objection, nonresponsive.
24     Q.   Are you familiar with it?
25     A.   I know it, I helped write a portion of it,

Page 64

1  sir.
2      Q.   What portion did you write?
3      A.   The RV section, sir.
4      Q.   Okay.  Do you have a copy of the section that
5  you wrote with you?
6      A.   No.
7      Q.   Does it have your name --
8      I'm sorry, what was your excuse for not knowing the
9  percentage of gas at maximum burning velocity for hydrogen?
10     MR. SCHALK:  Objection.
11  BY MR. LEGER:
12     Q.   And this is a newer version of NFPA 921?
13     A.   I wanted to see what you were doing before you
14  ripped it out of my hand, so I can't give you the exact
15  reason --
16     Q.   Well, my notes are on here.
17     A.   You asked a question.  You asked about the
18  upper and lower flammable limits, is what I thought you were
19  asking for, and I told you that it was between four and
20  seventy-five percent, sir.
21     Q.   All right.  So you misunderstand my question?
22     A.   I was not able --
23     THE REPORTER:  Wait, wait, wait.  Please repeat your
24  answer.
25     THE WITNESS:  I was not able to answer his question

Page 65

1  because he took the document out of my hand before I had a
2  chance to review it.
3  BY MR. LEGER:
4      Q.   Well, the document is a page out of NFPA 921
5  which, according to you, you helped write.
6      A.   The current 2014 edition, I did not see that
7  portion of it and I was not involved in that portion,
8  either.
9      Q.   So you are not familiar with the percentage
10  gas and maximum burning velocity for hydrogen, which is one
11  of the gases in the refrigerator at issue in this case.
12     MR. SCHALK:  Asked and answered, misstates
13  testimony.
14  BY MR. LEGER:
15     Q.   Is that correct, sir?
16     A.   Again, sir, let me see the document so I can
17  review it; otherwise, I cannot answer your question.
18     Q.   It's NFPA 921 --
19     A.   Let me see the document, sir -- don't rip it
20  out of my hand -- so that I can review it and decide whether
21  or not it's --
22     Q.   I'm not going to show you the document because
23  it has my notes on it; okay?
24     A.   Then we are at an impasse because I'm not
25  going to answer it.

17 (Pages 62 to 65)

Page 66

1    Q.   Well, let me ask you this:  When I ask you
2  questions about NFPA 921, do you have to refer to the actual
3  document to answer my questions?
4    A.   Yes.
5    Q.   Okay.
6    A.   Especially because the new 2014 edition just
7  came out about two weeks ago.
8    Q.   And you are not familiar with the new 2014
9  edition of NFPA 921; are you?
10   A.   That is correct, because there are numerous
11  changes based upon numerous proposals by numerous
12  individuals, and I am not familiar with those changes yet.
13   Q.   Okay, thank you.  Well, let me ask you this --
14  it involves propane, you should get this one.  According to
15  NFPA 921, what is it maximum laminar burning velocity of
16  propane?
17   A.   Without you providing me with the document,
18  sir, I'm not going to answer your question.
19   Q.   Okay.  And propone is one of the gases in the
20  Model 462 refrigerator at issue in this case; right?
21   A.   Propane is the supplying medium that provided
22  the heat to the burners and to the boiler of the
23  refrigerator.
24   Q.   Okay.  And you are not aware of the maximum
25  laminar burning velocity of that gas; are you?

Page 67

1    A.   If you provide me with a copy of the document,
2  I'll be happy to review it.
3    MR. LEGER:  Objection, nonresponsive.
4    Q.   You are not aware of the maximum laminar
5  burning velocity of that gas; are you?
6    A.   I can't tell what I'm aware of until you
7  provide me a copy of the document so I can review it, sir.
8    Q.   Well, do I have to give you a document with
9  your name on it for you to be familiar with your name?
10   A.   I need to be able to see what is on --
11   Q.   If I ask you your name, sir, do you have to
12  look at a document to tell me what your name is?
13   MR. SCHALK:  Objection.
14   THE WITNESS:  No.
15  BY MR. LEGER:
16   Q.   Okay.
17   A.   But my name is ten letters and the document is
18  375 pages or 370 pages long.
19   Q.   Well, I just thought you were familiar with
20  NFPA 921.
21   Sir, are you licensed in Michigan by any fire
22  investigation organizations?
23   A.   Nope.
24   Q.   Okay.  Do you have a -- well, scratch that.
25   Have you met any of the requirements under Michigan

Page 68

1  law to testify in this case as an expert?
2    MR. SCHALK:  Objection, beyond the scope.
3    THE WITNESS:  I have no idea what the Michigan law
4  requirements are, sir.
5  BY MR. LEGER:
6    Q.   Okay, that's what I thought.
7    Did you not testify in one of these depositions --
8  Reis -- why don't we do this --
9    Have you ever testified that it was illegal to
10  testify in Michigan without a fire investigative license?
11   A.   That's not what I said, sir.
12   Q.   All right.
13   A.   What I said is you are not allowed to practice
14  investigations in that state without a P.I. license, and
15  that was due to a change in the P.I. law in 2011, I want to
16  say, or 2010.
17   Q.   Didn't you, in fact, drive out to Michigan or
18  fly out to Michigan to look at some evidence as an expert
19  witness in this case?
20   A.   Yes.
21   Q.   And you did that knowing that that was a
22  violation of Michigan law?
23   A.   Prior counsel, Patrick Kennedy, said it was
24  not.
25   Q.   I'm not asking you what prior counsel told

Page 69

1  you.  You did that knowing, from what you just stated
2  earlier, that that was a violation of Michigan law.
3    MR. SCHALK:  Objection.
4    THE WITNESS:  No.  Prior counsel for your client
5  said it was not, to go out and meet his expert who also was
6  not licensed to go out and look at the evidence.
7    MR. LEGER:  Objection, nonresponsive.
8    Q.   You took legal advice from the attorney for
9  the plaintiffs in this case?
10   MR. SCHALK:  Objection.
11   THE WITNESS:  When it came down to licensing issues,
12  yes, I did.
13  BY MR. LEGER:
14   Q.   All right.  Did you take time to consult, get
15  a second opinion and review the statute to determine whether
16  or not you were following the law?
17   A.   No, I did not, and the reason why was because
18  the prior law was determined by the attorney general that it
19  did not apply to fire investigators, but the P.I. law
20  changed in 2010 to 2011, and there's a question whether it
21  did.
22   Q.   Okay.  So regardless --
23   A.   So as a result, Patrick Kennedy -- I'm sorry,
24  Patrick King, um -- I raised this issue with him, trying to
25  get the evidence shipped down to Mr. Bailey's office or

18 (Pages 66 to 69)

Page 70

1  whatever, and he said to go ahead and go ahead, it's not an
2  issue.
3      Q.   But you understand that it really isn't up to
4  him, it's up to the attorney general?
5      A.   It's up to the attorney general who said the
6  prior law did not apply to us, but the new law changed, and
7  I had received advice from counsel licensed in that state
8  who said I could go in there and probably --
9      Q.   Didn't you just say you are not familiar with
10  the law?
11      MR. SCHALK:  Objection.
12      THE WITNESS:  I'm not familiar with law, I'm
13  familiar with the action and the decision made by counsel
14  who reviewed the law.
15  BY MR. LEGER:
16      Q.   Okay.  And you understand that it's not up to
17  him whether or not you are convicted of a crime for
18  violating the statute?
19      A.   Sir, I received legal advice from counsel
20  licensed in the state who reviewed the law and said it was
21  not an issue for me or for Mr. Bailey, who is also not
22  licensed.
23      Q.   Was that your attorney that advised you?
24      A.   Patrick King, plaintiff counsel for your
25  clients prior to you, gave that advice and that decision.

Page 71

1      MR. LEGER:  Okay.  Objection, nonresponsive.
2      Q.   You understand that it's not up to Patrick
3  King whether you are convicted for violating the statute
4  regarding professional investigations in Michigan; are you
5  aware of that?
6      MR. SCHALK:  Objection, beyond the scope of this
7  deposition.
8      THE WITNESS:  Again, I received legal advice from
9  counsel licensed in the state, I took that legal advice, he
10  reviewed the law and said go.
11  BY MR. LEGER:
12      Q.   Why do you keep repeating the same thing, sir?
13      A.   Because you keep asking the same thing over
14  again.
15      Q.   Yeah, but you are not answering my question.
16      MR. LEGER:  Objection, nonresponsive.
17      Q.   Are you aware that if you are convicted for a
18  crime for violating this statute, that the attorney
19  general's office will conduct the investigation, not Patrick
20  King?
21      A.   Yes.
22      MR. SCHALK:  Objection.
23      THE WITNESS:  My response is that I received legal
24  advice from an attorney licensed in the state who reviewed
25  the law and said that it did not apply.

Page 72

1  BY MR. LEGER:
2      Q.   That's not answering my question.
3      A.   That is answering your question.
4      Q.   It is not.
5      A.   Well, I'm sorry you don't think that way but
6  it is answering your question.
7      MR. LEGER:  Can we go off the record?
8      THE VIDEOGRAPHER:  We are going off the record, the
9  time now is 11:17.
10      MR. LEGER:  Look --
11      (Inaudible overlapping talk.)
12      MR. SCHALK:  Conversations like this are on the
13  record.
14      THE REPORTER:  Let's slow down here --
15      (Inaudible overlapping talk.)
16      MR. LEGER:  You are not going to tell me what to do.
17  Off the record right now.
18      MR. SCHALK:  No.
19      MR. LEGER:  If you don't answer my question, I'm
20  going to call the judge, we are going to get you held in
21  contempt of court, and we are going to get you thrown in
22  jail, Buddy.
23      I'm going to give you one more chance to answer my
24  question.  If you don't, we're calling the judge.
25      (Inaudible overlapping talk.)

Page 73

1      THE REPORTER:  Wait -- what was your --
2      MR. SCHALK:  I said, we can call the judge right now
3  if that's how we are going to go down this road.
4      MR. LEGER:  He's not answering my question.  It's a
5  simple question, Mike, it's a simple question.
6      MR. SCHALK:  This Michigan P.I. stuff is so beyond
7  what we are here for today, and if you're going to get this
8  abusive and finger pointing and threatening to throw
9  somebody in jail, that's totally unreasonable.
10      So if we need to get the judge on, that's fine, we
11  can go over the questions back and forth, we'll read it to
12  the judge and see where he rules on this.
13      MR. LEGER:  Let's go back on the record.
14      THE VIDEOGRAPHER:  We are back on the record, the
15  time now is 11:18.
16  BY MR. LEGER:
17      Q.   Mr. Bloom, you investigated a fire on behalf
18  of Norcold and Alcoa in the state of Michigan; true or
19  false?
20      A.   False.
21      Q.   False.  Did you -- true or false:  Did you
22  inspect evidence in this case --
23      A.   I documented --
24      Q.   I'm not done with my question.
25      Did you not inspect evidence in this case located in

19 (Pages 70 to 73)

Page 74

1    the state of Michigan?
2        MR. SCHALK: Objection.
3        THE WITNESS: Yes. I documented evidence that was
4    retained and handled by plaintiffs' experts. I did not
5    touch any of the evidence.
6        MR. LEGER: Objection, nonresponsive.
7        Q.   How did you go about documenting that
8    evidence?
9        A.   We had made arrangements for the inspection to
10   be done at a storage facility for Mr. Bailey and with
11   Mr. Waite, W-a-i-t-e.
12       I traveled out there, I asked them for a -- we had
13   questions about what evidence had been retained in the case.
14       They provided two pieces of evidence which were the
15   cooling unit and the burner assembly, and that was all that
16   they had.
17       MR. LEGER: Objection, non- ---
18       THE WITNESS: So I took photographs of the evidence
19   that they had, without touching it, without manipulating it
20   in any way, shape, or form, and then we left.
21       MR. LEGER: Objection, nonresponsive.
22       Q.   So you did in fact go out to Michigan to
23   inspect evidence in this case.
24       MR. SCHALK: Asked and answered.
25       THE WITNESS: As I mentioned, I went out to Michigan

Page 75

1    to document the evidence that plaintiffs had in their
2    possession.
3    BY MR. LEGER:
4        Q.   You took photographs of that evidence?
5        A.   Only photographs.
6        Q.   Where are those photographs?
7        A.   They are in my file.
8        Q.   You didn't bring those with you today?
9        A.   No.
10       Q.   And are you basing your allegations of
11   spoliation on some of the photographs that you took in this
12   case?
13       MR. SCHALK: Objection, vague and ambiguous.
14       THE WITNESS: Yes.
15   BY MR. LEGER:
16       Q.   And you didn't bring those photographs with
17   you today?
18       MR. SCHALK: We have them.
19       Go ahead.
20   BY MR. LEGER:
21       Q.   Did you bring those photographs with you
22   today?
23       A.   No.
24       Q.   So I can't ask you questions on those
25   photographs, obviously; correct?

Page 76

1        A.   Correct.
2        Q.   Will you agree to let me take your deposition
3    again and bring those photographs so in all fairness I can
4    ask you questions with those photographs present at the
5    deposition?
6        A.   When I'm supplied with a proper subpoena
7    issued through a proper court and hand served in the state
8    of Oregon, as required, I'll be happy to comply with
9    whatever is issued there in that subpoena.
10       MR. LEGER: Do you have a copy of those photographs?
11       MR. SCHALK: He's going to be deposed as an expert
12   witness.
13       MR. LEGER: He's basing his statements to you that
14   evidence was spoiled in this case on that inspection and
15   those photographs, and he didn't bring them today?
16       MR. SCHALK: He's basing part of his opinion, as far
17   as there not being the evidence there, because in his
18   photographs, there is no -- there is no evidence of anything
19   other than the cooling unit and the burner systems.
20       MR. LEGER: Where are those photographs? Where are
21   those photographs?
22       I'm entitled to see those photographs and ask him
23   questions about those photographs and he didn't bring them
24   today.
25       Q.   You didn't bring those with you today; right?

Page 77

1        A.   No.
2        Q.   Okay. We'll have to do this all over again.
3        And not only did you go to Michigan to take
4    photographs and look at evidence in this case, but you are
5    making serious, serious, serious allegations in a federal
6    court, based upon that inspection that you did in Michigan
7    and those photographs that you took; correct?
8        A.   The statements that I am making are based upon
9    my examination and investigation into the fire in the state
10   of Oregon, reviewing the documents and reviewing the
11   photographs that were provided by both Farm Bureau Insurance
12   and also by Tom Bailey, which show that most of the
13   refrigerator was still remaining after the fire and is not
14   there, was not secured as evidence in this case.
15       MR. LEGER: Objection, nonresponsive.
16       Q.   Are you not basing your, I guess I would call
17   it opinions in this case, that evidence was, through
18   spoliation of evidence in this case, on your inspection in
19   Michigan and photographs that you took during that
20   inspection?
21       A.   I am basing my opinion that there's spoliation
22   in this case based upon the information that was provided by
23   Tom Bailey and Mike Waite and the photographs that they
24   provided which was cross-referenced with the evidence list
25   that they retained in this case and my examination of that.

20 (Pages 74 to 77)

Page 78

1      Q.   And your examination of the evidence?
2      A.   The documentation of the evidence, correct.
3      Q.   And your examination of the evidence in
4   Michigan; correct?
5      A.   The evidence was in Michigan when I documented
6   it.
7      Q.   Okay.  And that's part of your analysis;
8   correct?
9      A.   That's part of my analysis.
10      Q.   And the photographs that you took at that
11   inspection; correct?
12      A.   Correct.
13      Q.   And you don't have a Michigan license to
14   investigate fires in Michigan; did you?
15      A.   No, I don't.
16      And again, if you want to go according to prior
17   counsel of Patrick King of Fabian, Sklar --
18      Q.   Well --
19      A.   -- who was counsel for your client --
20      MR. LEGER:  Objection, nonresponsive.
21      Q.   Mr. Bloom, when you are hired and paid by
22   Alcoa and Norcold to go and investigate a claim of fire,
23   what exactly do you do to determine whether or not there was
24   a defect in that product -- what caused the fire?
25      MR. SCHALK:  Objection, overbroad.

Page 79

1      THE WITNESS:  Well, depends on the actual model of
2   the refrigerator involved.
3      Some models, you are looking at electrical failures,
4   some models you are looking for propane gas failures, some
5   models you are looking for cooling failures.
6      Q.   Let's --
7      A.   So without having more information --
8      Q.   Let's focus on the model at issue in this
9   case, the 462.
10      A.   May I please finish my question (sic) before
11   you start asking --
12      Q.   You cannot finish it.
13      So let's focus on 462 --
14      MR. SCHALK:  Hold on, hold on, wait, wait, wait,
15   there was a question pending.  He's responding to it.
16      MR. LEGER:  He's asking me a question.  He's not
17   allowed to ask me a question.
18      MR. SCHALK:  No, no, that's not a question he asked
19   you.
20      MR. LEGER:  He said can he finish asking his
21   question, and I said no, you cannot ask questions.
22      MR. SCHALK:  No, no, I mean, I think he meant, can
23   he finish his answer.
24      (Inaudible overlapping talk.)
25      THE WITNESS:  I thought I said "answering the

Page 80

1   question," but my apologies.
2      MR. SCHALK:  Did you have something to finish?
3      THE WITNESS:  Well, it just depends on the model
4   number, it depends on what the problem is, it depends on
5   what we take out to go look at, and also, depending on the
6   circumstances, Sometimes there's the refrigerator, sometimes
7   there's the whole scene.  So it all depends on the
8   circumstances of each individual case, it depends on what
9   actions I perform.
10      MR. SCHALK:  Thank you, Counsel.
11   BY MR. LEGER:
12      Q.   Okay.  If there is a scene involving a coach
13   and a Model 462 refrigerator, what would you do during that
14   inspection to try to determine the cause and origin of the
15   fire?
16      A.   In an ideal world, it would be nice to see it
17   before it was moved from the scene.
18      MR. LEGER:  Objection, nonresponsive.
19      Q.   What would you do if you were out at the scene
20   to determine the cause and origin of the fire?
21      A.   Sir, I was answering your question and you
22   interrupted.  I would like to finish my question -- my
23   answer.
24      (Inaudible overlapping talking.)
25      Q.   No, what you said was it would be ideal to

Page 81

1   have the scene available.
2      We are talking about you going out to a scene and
3   investigating a scene, and with a Model 462 refrigerator,
4   what would you do to determine the cause and origin of the
5   fire?
6      That was my question.  You were not answering my
7   question.
8      A.   Actually, I am, sir.
9      You need to be very specific on what you are talking
10   about because the scene can be the refrigerator, the scene
11   can be the coach, the scene can be the whole fire scene.
12      In an ideal world, I would like to go out to the
13   whole fire scene to put the fire in context with other
14   potential ignition sources relating to the coach.
15      If that's not possible or if I cannot attend a scene
16   examination, then I request that the whole coach be secured
17   and put into secured storage at some location and we can
18   look at it at a future date with a multi-party.
19      And if that's not available, or in some cases when
20   the fire damage is very small, then sometimes you can just
21   remove the refrigerator.
22      It all depends on the circumstances of which scene
23   you are talking about and what context you are putting the
24   question in.
25      Q.   Do you know how to read burn patterns?

Page 82

1      A.   Yes.
2      Q.   Explain to the ladies and gentlemen of the
3   jury how you read burn patterns?
4      A.   Burn patterns are the patterns to the physical
5   components that are remaining after a fire.  For example,
6   you can have a burn pattern to a wall, you can have a burn
7   pattern to a structural support, you can have directional
8   patterns, you can have intense heating patterns; all of
9   these patterns indicate something occurred at that location,
10  and you need to identify what happened, if possible.
11     Q.   You would agree with me, sir, that a fire
12  investigator can determine the cause and origin of a fire by
13  reading burn patterns?
14     A.   In many case, yes, and in some cases, no,
15  depending on the context of the fire.
16     Q.   So you would agree with me, then, sir, it's
17  possible to determine the cause and origin of the fire
18  without the actual defective component that's alleged to
19  have caused the fire?
20     A.   In some cases, yes.
21     Q.   Sir, what is your understanding of the failure
22  mechanism in the 462 refrigerator at issue in this case?
23     A.   The 462 refrigerator in this case involves a
24  Sourdillion valve, what is also known as a combination
25  control valve.  And a failure of the gas leak -- of a gas

Page 83

1   seal on the combination control valve can allow propane to
2   escape and, under certain conditions, it can ignite and
3   catch fire.
4      Q.   So you do agree that the refrigerator at issue
5   in this case could have caused this fire?
6      A.   It was represented --
7           The answer to that is no.  The reason is because, in
8   this case, it was represented that this was a 462 model
9   refrigerator by plaintiff's counsel.  I have not seen any
10  documentation verifying that.  All I can tell you is that
11  this is a cooling unit likely from a 462 refrigerator.
12     Q.   Have you contacted the manufacturer of the
13  coach at issue in this case?
14     A.   I do believe I contacted Gulf Stream in this
15  case and requested information, but the age of the unit
16  prevented them from getting me documentation.
17          I don't know how plaintiffs' counsel came up with
18  the model number and serial number in this case.
19     Q.   Well, let's assume -- let's assume that it's
20  a 462.
21     A.   Okay.
22     Q.   If it's a 462, do you believe that that 462
23  could have caused the fire at issue in this case?
24     A.   It is a potential that needs to be looked at
25  but there are many other potentials as well.

Page 84

1      Q.   What other potentials have you identified?
2   What other potential sources of fire in this case have you
3   identified?
4      A.   Well, as identified in Mr. Bailey's and
5   Mr. Waite's photographs, there are numerous other vehicles
6   with batteries involved, there are other components in
7   there, there's a Hyster -- H-y-s-t-e-r -- forklift, there
8   are tractors, all of that in the general area.
9           You also have items pertaining to the coach, such
10  as, did the coach have a microwave, a problematic one that
11  does catch fire and cause problems, which is adjacent to the
12  refrigerator; do we have any rodent issues; do we have any
13  service and maintenance issues; things like that.
14     Q.   Do you have any evidence whatsoever, as you
15  sit here today, that any of those items you listed had
16  anything to do with this fire?
17     A.   They are items that have to be investigated
18  and determined, yes or no, were they factually involved.  I
19  have not been able to do that at this time.
20     Q.   So the answer to my question is no?
21     A.   I have not been able to do that at this time.
22     Q.   So then, as a result, you have absolutely no
23  evidence that any of those items you mentioned had anything
24  to do with this fire; correct?
25     A.   They have --

Page 85

1           MR. SCHALK:  Objection -- sorry -- objection.
2           THE WITNESS:  They have to be examined, per 921, and
3   eliminated independently from anybody else in order for me
4   to render an opinion.
5           I have not been able to do that yet; therefore, I
6   can't render an opinion whether they are or are not
7   involved.
8   BY MR. LEGER:
9      Q.   Okay.  You understand that NFPA 921 is not
10  law.
11     A.   It's a recognized standard of care in the
12  industry and the basis of both mine and Tom Bailey's
13  certifications.
14          MR. LEGER:  Objection, nonresponsive.
15     Q.   You understand that NFPA 921 is not the law?
16     A.   It is not the law, no.  It is recognized as
17  the standard of care in the industry and basis of all
18  certifications for all fire investigations.
19     Q.   Are you aware that, in fact, appellate courts
20  throughout the country have specifically rejected NFPA 921
21  as the only way to investigate a fire?
22     A.   No.  In fact, I have heard just the opposite.
23     Q.   Okay.
24     A.   There is case law that says that 921 is the
25  standard of care that must be followed, according to the

22 (Pages 82 to 85)

Page 86

1  website.
2      Q.   What's the cases, sir?
3      A.   You'll have to go to the fire investigation
4  website, they are posted on there, and you'll have to go
5  back and search several years.
6      Q.   All right.  I can represent to you, sir, that
7  there have been multiple court opinions that have
8  specifically rejected NFPA 921 as the only standard as how
9  to investigate fires.
10     In fact, the courts have said there are multiple
11 other ways to investigate fires.
12     A.   Is there a question in there?
13     Q.   Yeah.  Do you agree with that?
14     A.   If you can provide me with the citations, I
15 can tell you whether I agree with that.
16     Q.   Are you aware of those court opinions?
17     A.   No.
18     Q.   I'm sorry, I may have asked this, but did you
19 explain the -- the failure mechanism in the 462, in the
20 valve?
21     A.   Yes.
22     Q.   Let me ask you this:  Would you agree with
23 NHTSA, that the 462 refrigerator experiences a breakdown in
24 a rubber seal within the gas valve?
25     A.   That's what I said, sir.

Page 87

1      Q.   Okay.  And as the rubber seal ages, a leak may
2  occur, allowing propane gas to accumulate in the burner
3  area --
4      A.   That's what I said, sir.
5      Q.   -- which can ignite, resulting in fire, and
6  possibly causing serious injury and death.
7      Do you agree with that statement by NHTSA?
8      A.   I agree that there are circumstances that do
9  occur that that will be the case, yes.
10     Q.   Do you agree with that statement?
11     A.   Not all of them leak, sir, no.
12     Q.   I didn't --
13     A.   Under certain circumstances, yes, I agree.
14     Q.   I didn't ask you if all of them leaked.
15     I asked if you agreed with that statement regarding
16 the failure mechanism.
17     A.   If it failed, I agree with that.
18     Q.   And you agree --
19     A.   Many times, they don't fail.
20     Q.   Okay.  But many times, they do.  In fact --
21     A.   Yes.
22     Q.   -- in fact, one out of six?
23     A.   Yes, they do.
24     Q.   And those fires can possibly cause serious
25 injury and death; correct?

Page 88

1      A.   They could, depending on the circumstances of
2  the case, yes.
3      Q.   And in fact, there's an Arkansas
4  seven-million-dollar settlement by Norcold where somebody
5  died; right?
6      MR. SCHALK:  Objection.
7      THE WITNESS:  Again, I don't know if that was a 400
8  series unit so I can't say yes or no.
9  BY MR. LEGER:
10     Q.   NHTSA goes on to say that the rubber seal and
11 the defective valve was made from nitron rubber.
12     A.   Nitrile.
13     Q.   It's nitrile?  Yeah.
14     A.   If that's what it says, sir.
15     Q.   N-i-t-r-i-l-e.
16     Do you agree with that?
17     A.   Well, that's their report, sir.
18     Q.   Do you agree with this?
19     Do you agree with NHTSA -- is it nitrile?
20     A.   Nitrile.
21     Q.   -- nitrile rubber is very susceptible to
22 ozone?
23     A.   All I can tell you is that there's a leak that
24 occurs in the 462 Sourdillion valve, which is a breakdown of
25 the gas seal, which allows propane to leak and go back to

Page 89

1  the burner and flash fire back, and then you have potential
2  fire.
3      Q.   Thank you for that, I appreciate that.  But do
4  you also agree that the nitrile rubber is very susceptible
5  to ozone?
6      MR. SCHALK:  Objection.
7      THE WITNESS:  I'm taking your representation that
8  that is what it's saying.  I'm not seeing a copy of the
9  document, sir.
10 BY MR. LEGER:
11     Q.   Well, actually, I'm reading from my outline.
12     But are you aware that NHTSA has stated nitrile
13 rubber is very susceptible to ozone?
14     A.   I'm not aware of that.  I may have reviewed
15 it, but again, without seeing a copy of it in front of me, I
16 don't know what you are talking about, sir.
17     Q.   Well, I'm talking about the seal in the
18 Sourdillion valve, and I'm asking you if you are aware that
19 that was susceptible to ozone.
20     A.   Sir, you are making representations that I
21 cannot rely upon.  I would like to see the document that --
22     Q.   I am not making representations.  I don't even
23 have a document.  I'm asking you questions.
24     A.   And you are making a statement that NHTSA is
25 saying that.

Page 90

1   I would like to see the document where NHTSA says
2   that, and if that's the case, I'll be happy to render
3   opinions on it.
4       Q.   I'm asking you what your knowledge is
5   regarding this defect.
6       And contained in your knowledge, are you aware --
7   under your knowledge, scratch that.
8       Do you have knowledge that the rubber seal is
9   susceptible to ozone exposure?
10      A.   I am aware that there's some allegations to
11  that effect.  I have not seen it.
12      Q.   Are you aware that the nitrile rubber seal
13  could fail due to ozone exposure, causing cracks in the
14  nitrile rubber?
15      A.   Again, sir, without having the documents in
16  front of me to verify that you are talking about actual
17  nitrile rubber in this case, I cannot render any opinions
18  as to whether or not it's accurate until you produce the
19  document for me to review.
20      MR. LEGER:  Objection, nonresponsive.
21      Q.   What document are you referring to?
22      A.   You are citing NHTSA, and NHTSA has
23  documentation on their website, including research that they
24  will provide, which says --
25      THE REPORTER:  Can you start over again, please?

Page 91

1       THE WITNESS:  You are citing information from NHTSA
2   which, from their website, they have documentation which
3   says, on a piece of paper, that under this model, this
4   serial number, and these units, this is what happens, this
5   is the consequence, and this is the nature of the problem.
6   And until you can produce a copy of that, I'm not going to
7   testify as to what that document says or does not say upon
8   your interpretation in your notes.
9       MR. LEGER:  Objection nonresponsive.
10      Q.   I'm not asking you about a document anymore;
11  okay?
12      A.   You are asking me about the content.
13      Q.   I'm not asking you about the content of a
14  document from NHTSA.  I'm asking you a question about the
15  failure mechanism of this valve in this 462 refrigerator; do
16  you understand that?
17      A.   Yes, and you are asking specific
18  information --
19      MR. LEGER:  Objection, nonresponsive.
20      THE WITNESS:  That is information that I need to
21  review the document to find out if this even has nitrile.
22      BY MR. LEGER:
23      Q.   Are you telling me you can't answer questions
24  regarding the failure mechanism in the Sourdillion valve
25  without looking at documents?  I thought you were an expert.

Page 92

1       MR. SCHALK:  Objection.
2       THE WITNESS:  As I mentioned to you before, sir, you
3   get a lot of information incorrect.  You need to have the
4   documentation in front of you about what NHTSA is saying or
5   not saying.  I do not take your word when you mention --
6       BY MR. LEGER.
7       Q.   You do not have to take my word.
8       A.   I am not.
9       Q.   I'm asking you about the failure mechanism of
10  the valve.
11      A.   I described that to you.
12      Q.   Okay.  And here's another question that I want
13  to know if you're aware of.
14      Nitrile rubber is typically produced with anti-ozone
15  -- anti-ozonant and other ozone-resistant additives, some in
16  wax forms, to protect the material from ozone.
17      A.   Depends where you get that information from.
18  I am not familiar with that document from NHTSA.
19      Q.   What document from NHTSA are you referring to?
20      A.   As I just told you, you are citing information
21  from NHTSA about the content and construction of the
22  materials that are inside this gas valve.
23      I've already explained the failure of the value to
24  you, about what happens.
25      When you are talking about specifics of whether this

Page 93

1   is nitrile or whether it's something else, I don't know and,
2   therefore, I need to see the document in front of me to
3   verify the accuracy of your statements that you are
4   presenting.
5       Q.   Fair enough.  If you don't know, then you just
6   don't know.  That's fine.
7       Sir, would Jeff Negley be a better person to ask
8   about the internal failure mechanisms of the Sourdillion
9   valve?
10      MR. SCHALK:  Objection.
11      THE WITNESS:  I know Mr. Negley worked for Norcold
12  but I don't know what capacity.
13      BY MR. LEGER:
14      Q.   Do you think he would have more information
15  about the internal failure mechanism of the valve than you?
16      MR. SCHALK:  Objection.
17      THE WITNESS:  I know Mr. Negley, he worked for
18  Norcold, that's all I know.
19      BY MR. LEGER:
20      Q.   Okay.
21      Is this 4?
22          (Whereupon Exhibit Number 4 was marked for
23          identification.)
24      MR. SCHALK:  Counsel, I'm going to object to lines
25  of questions in this document, this is well beyond what we

24 (Pages 90 to 93)

Page 94

1  are here for today.  If you --
2       MR. LEGER:  Oh, no, it's not, I promise.
3       MR. SCHALK:  This has nothing to do with the
4  spoliation issue.
5       MR. LEGER:  Yes, it does.
6       MR. SCHALK:  Can you represent how?
7       MR. LEGER:  I'm not going to disclose my strategy to
8  you right now but it will get -- Michael, it will get there,
9  it will get there; okay?
10      MR. SCHALK:  Okay.
11      MR. LEGER:  Give me some latitude.  Apparently this
12 is the only person that describes spoliation so I would
13 appreciate some latitude in questioning him.
14      Q.  Sir, could you take a look at what we have
15 marked as Deposition Exhibit Number 4.
16      A.  Okay.
17      Q.  Have you ever seen that document before today,
18 sir?
19      A.  I'm not at liberty to discuss anything
20 relating to that.  In litigation, there's court protection
21 on the document so I don't know what is protected and what
22 is not.
23      Q.  Sir, I'm going to ask you some questions about
24 this document and you have to answer my questions.
25      A.  Sir, there's a protective order before a court

Page 95

1  in the case, I do not know what is covered and what is not.
2  I am not going to answer any questions, sir.
3       Q.  What case are you referring to?
4       A.  This is the Sourdillion valve litigation.
5  LeBoef, Lamb and Greene were the original attorneys in the
6  matter and then you also had, um, Putnam and Williams and
7  the secondary attorneys before K&L Gates were involved.
8       I have been advised that there are protective orders
9  in the record on this, I do not know what are protected and
10 what are not, and I am not going to testify to anything
11 related to that unless I have a court order --
12      Q.  You will testify about this, this is a public
13 record.  This is pulled off the Internet, this is not a
14 protective order, sir.  It's on the Internet.
15      A.  That is your representation.
16      Q.  It is not my representation.  We got this off
17 the Internet.
18      A.  I have no knowledge of that, sir.
19      There is a protective order in place, that's all I
20 know.  I'm not testifying to anything regarding the
21 litigation until I have a court order to that effect.
22      MR. LEGER:  Let's call the judge.
23      THE VIDEOGRAPHER:  Going off the record, the time
24 now is 11:44.
25      (Recess in proceedings.)

Page 96

1       ---o0o---
2       THE VIDEOGRAPHER:  We are going back on the record,
3  the time now is 11:54.
4  BY MR. LEGER:
5       Q.  Sir, prior to the break, I handed you what's
6  been marked Deposition Exhibit Number 4.  Do you see that
7  document?
8       A.  Yes.
9       Q.  Have you ever seen this document before today,
10 sir?
11      A.  I don't know.
12      Q.  Does it look familiar?
13      A.  I recognize the letterhead but I don't
14 recognize the letter.
15      Q.  Do you know who Richard Lewis is?
16      A.  No.
17      Q.  Before I move on to that, look down, there's a
18 footnote on page one of this letter -- scratch that.
19      These -- this law firm that you recognize, that's
20 the law firm that represents Alcoa and Norcold?
21      A.  They are the original law firm that I worked
22 with on the Alcoa Norcold cases back in the early, late
23 '90s, early 2000s.
24      Q.  And this is a letter drafted by an attorney
25 from that law firm; correct?

Page 97

1       MR. SCHALK:  Objection.
2       THE WITNESS:  There is -- it's on their letterhead
3  and there's a signature so --
4  BY MR. LEGER:
5       Q.  In the regarding column, it says Norcold
6  recall.
7       A.  That's correct.
8       Q.  Have you seen the footnote on the first page?
9  Do you see the footnote?
10      A.  Yes.
11      Q.  It says:  "The entity currently known
12 as Norcold, Inc. is the administrator of a
13 recall campaign discussed herein, as the
14 current manufacturer of Norcold
15 refrigerators."
16      Do you see that?
17      A.  That's correct.
18      Q.  Do you have any reason or knowledge to
19 disagree with that statement?
20      MR. SCHALK:  Objection.
21      THE WITNESS:  I have no knowledge either way.
22 BY MR. LEGER:
23      Q.  Okay.  Moving along in this letter, do you
24 see, on the first full paragraph of page two where it says:
25 "A recall campaign currently underway to

Page 98

1      replace defective Sourdillion gas -- " if I
2  mispronounce that, I apologize -- "gas valves that
3      were incorporated into various Norcold
4      refrigerator models manufactured between
5      January, 1987, and May, 1995."
6      Do you see that?
7      A.   Yes.
8      Q.   Okay.  Do you see that footnote number two?
9      A.   Yes.
10     Q.   And if you look down at footnote number two,
11  it says, "Model numbers," and it has 462 listed.
12     A.   Correct.
13     Q.   Okay.  Also, it goes on to say: "The
14     costs incurred by Alcoa in connection with
15     the recall have been in excess of 4.6
16     million through March of 2006."
17     Do you see that?
18     MR. SCHALK:  Objection.
19     THE WITNESS:  Yes.
20  BY MR. LEGER:
21     Q.   All right.  Moving down, it says, fourth full
22  paragraph on page two:  "Mr. Lewis performed testing
23     of 100 randomly selected valves returned
24     through the recall program to Norcold, Inc.
25     at its plant in Sidney, Ohio."

Page 99

1      Do you see that?
2      A.   Yes.
3      Q.   "Mr. Lewis's report shows 21 of the
4      100 tested valves had gas leaks, and that
5      15 of those leaks were characterized as
6      severe."
7      Do you see that?
8      A.   Yes.
9      MR. SCHALK:  Objection.
10  BY MR. LEGER:
11     Q.   Okay.  And earlier, I asked you if you knew
12  who Mr. Richard Lewis is.  You don't know who he is?
13     A.   I have no knowledge of Mr. Lewis.  There are
14  thousands of different engineers and fire investigators in
15  this field, so I have no idea who he is.
16     Q.   According to this letter, it says:
17     "Our client retained a consultant, Richard
18     O. Lewis, of Lewis Engineering and
19     Consulting, Inc., to perform additional
20     testing of the suspect valves in order to
21     determine whether the recalled valves
22     actually leak and thus whether a recall
23     was appropriate."
24     Do you see that?
25     MR. SCHALK:  Objection.

Page 100

1      THE WITNESS:  Yes.
2  BY MR. LEGER:
3      Q.   Okay.  Do you agree with me that back in at
4  least as far as 2006, that Norcold retained a Mr. Lewis of
5  Lewis Engineering to test Sourdillion valves to determine
6  whether they leak?
7      MR. SCHALK:  Objection, asked and answered.
8      THE WITNESS:  The letter is dated August, 2006, and
9  it says that he was retained.  It doesn't say when he was
10  retained so I have no knowledge of dates.
11  BY MR. LEGER:
12     Q.   But, obviously, he would have been retained
13  prior to 2006; right?
14     MR. SCHALK:  Objection, the witness says he doesn't
15  recognize this document.
16     THE WITNESS:  I don't recognize that document and,
17  again, this was August, 2006, and it says he was retained.
18  I don't know when he was retained.
19  BY MR. LEGER:
20     Q.   Okay.  It says he was retained, in a 2006
21  letter, which implies that he was retained either in 2006 or
22  prior to 2006; correct?
23     MR. SCHALK:  Same objection.
24     THE WITNESS:  That would be logical.
25  BY MR. LEGER:

Page 101

1      A.   Okay, thank you.  And then going back down to
2  this next paragraph, Mr. Lewis performed a hundred tests on
3  randomly selected valves; do you see that?
4      A.   Yes, we already went --
5      Q.   Okay.  And out of those hundred, he
6  characterized 21 as having gas leaks; do you see that?
7      MR. SCHALK:  Objection.
8      THE WITNESS:  Yes.
9  BY MR. LEGER:
10     Q.   And 15 were characterized as severe; correct?
11     MR. SCHALK:  Objection.
12     THE WITNESS:  Yes.
13  BY MR. LEGER:
14     Q.   An then he states:  "Even a slight
15     leak could allow the valve to continue
16     to supply gas to the refrigerator while
17     leaking gas into the rear of the
18     refrigerator compartment if used in a
19     recreational vehicle."
20     Do you see that?
21     MR. SCHALK:  Same objection.
22     THE WITNESS:  Yes.
23  BY MR. LEGER:
24     Q.   Do you agree with that statement?
25     A.   Yes.

26 (Pages 98 to 101)

Page 102

1    Q.   Moving down, it says: "Moreover,
2    when the results of Mr. Lewis's testing are
3    combined with the materials previously
4    supplied by Norcold, Inc., related to the
5    inadequate levels of anti-ozonant in the
6    rubber gasket in the valve -- " I was asking you
7    those questions earlier -- "it is clear that the
8    recall of these valves was and is
9    justified."
10   Do you see that?
11   MR. SCHALK:  Objection.
12   THE WITNESS:  Yes.
13   BY MR. LEGER:
14   Q.   Do you agree with that?
15   MR. SCHALK:  Objection.
16   THE WITNESS:  Again, from the nitrile aspect, no,
17   but if you are talking about the general plastic -- or I'm
18   sorry -- rubber, then yes.
19   BY MR. LEGER:
20   Q.   Okay.  Take a look at the report attached to
21   the correspondence from LeBoeuf, Lamb, Greene & MacRae.
22   Do you see that report, the report findings, page four on
23   Exhibit 4?
24   A.   I see a four-page report with appendixes.
25   Q.   Okay.  Look on page two of the attached

Page 103

1    report.
2    Do you see valve test protocol?
3    A.   Yes.
4    Q.   "Lewis Engineering proposed to
5    conduct a visual examination and leak
6    pressure test on an initial series of
7    recall valves."
8    Then he goes on to say:  "The leak
9    pressure test would be performed by
10   installing a valve in a relatively simple
11   test rig whereby a standard regulated
12   propane gas pressure of nominally eleven
13   inches of water pressure could be applied
14   at the inlet end.  A direct current
15   voltage would be applied to the
16   thermocouple input to effect a means of
17   simulating a heated thermocouple input to
18   maintain the primary control valve open.
19   The outlet fitting from the valve would
20   then be connected to a gas manometer to
21   measure exit pressure and allow monitoring
22   for leaks."
23   Do you see that?
24   A.   Yes.
25   Q.   Is that consistent with how you test

Page 104

1    Sourdillion valves?
2    MR. SCHALK:  Objection.
3    A.   I do not test Sourdillion valves.
4    BY MR. LEGER:
5    Q.   You have never tested a Sourdillion valve to
6    determine whether it was leaking?
7    A.   No.  My job is to determine the origin and
8    cause of the fire, and if testing is necessary, then we
9    request an engineer to get involved; it is beyond my scope.
10   Q.   Okay.  So you -- you only determine -- you are
11   an OC guy, you just determine the origin?
12   A.   I'm a fire cause and origin expert as it
13   pertains to RV's, RV systems, and origin on RV's.
14   MR. SCHALK:  Slow down.
15   BY MR. LEGER:
16   Q.   So if a valve, a Sourdillion valve, is located
17   and collected from a scene, you wouldn't be the person at
18   Norcold to do the testing on that valve; Norcold would hire
19   someone else to do that; correct?
20   A.   Correct.
21   Q.   So in this case -- and I don't want to ask you
22   your opinions -- in this case, your job was, or would have
23   been to just determine the area of origin and the potential
24   cause of fire?
25   A.   And all potential cases of the fire and which

Page 105

1    one rises to the role of more probably than another.
2    Q.   We are going to go back to that in a minute.
3    Mr. Bloom, I believe you testified earlier that you
4    first became aware of this fire on March 9th, or was it
5    March 10th?  Scratch that.
6    Did you receive an e-mail on March 9th and then you
7    just did not read it until March 10?
8    A.   I received an e-mail on March 10th and I
9    didn't read it until March 11th --
10   Q.   March 11.
11   A.   -- to my understanding of the situation.
12   These dates were pulled off of my report to counsel -- or
13   excuse me, these were off to my report in the case.
14   Q.   Did you bring the actual e-mails that were
15   sent back and forth prior to the inspection in this case
16   between you, Tom Bailey, John Schlesman, Alan Foyt --
17   A.   Fogt.
18   Q.   Fogt, sorry -- Jackie Bligh, Farm Bureau
19   representatives, Michael Waite, Kerby, Bailey and Associates
20   representatives; did you bring any of those to your
21   deposition today?
22   A.   Nope.
23   Q.   And you would agree with me that these e-mails
24   are highly relevant in determining when and what type of
25   notice you received of this fire; correct?

27 (Pages 102 to 105)

Page 106

1        A.   I would have to review the file to find out
2   when I received the documentation.  The documentation that I
3   currently pulled off of my reports is listed with those
4   dates as accurate.
5        MR. LEGER:  Objection, nonresponsive.
6        Q.   You didn't review your file to look for these
7   e-mails before the deposition today?
8        A.   I did not review my file other than the
9   report, just to grab the highlights of the case, for dates,
10  times, and what happened in between.
11       Q.   Okay.  Are you aware that in the subpoena that
12  your lawyer sent us, we asked for all correspondence,
13  communications, documents, reflecting communications of any
14  kind between the deponent, which is you, John Schlesman, Tom
15  Bailey, Jackie Bligh, Michael Waite?
16       A.   You asked for it, sir.
17       Again, I was advised that I was a fact witness in
18  this case.  That was part of my expert file.
19       Q.   So you do have these e-mails in your file?
20       A.   I should have most of those e-mails in my
21  file, sir.
22       There were problems, as mentioned in the Reis case
23  and in the Dubose matter, that I had a computer problem
24  where we actually lost information on the hard drive, but
25  the majority of them would have been printed up and kept in

Page 107

1   the file.
2        Q.   And you didn't bring these e-mails with you to
3   your deposition today?
4        A.   No.
5        Q.   And you agree with me that these e-mails show
6   when you actually received notice of this incident; correct?
7        A.   The e-mails would have dates and times as far
8   as when I received notices, sir.
9        Q.   Who you received the notice from; correct?
10       A.   It would have been from John Schlesman, yes.
11       Q.   Okay.  And communications between you and Tom
12  Bailey; correct?
13       A.   Yes.
14       Q.   Communications between you and Farm Bureau
15  Insurance and Jackie Bligh; correct?
16       A.   Those would have the e-mail correspondence
17  that would not include the telephone conferences.
18       Q.   Of course, but e-mail correspondence; right?
19       A.   E-mail correspondence, yes.
20       Q.   E-mails would contain information about your
21  retention to investigate this claim, when you were retained,
22  and what information was provided to you weeks prior to the
23  actual inspection; correct?
24       A.   It would have been two weeks prior to,
25  correct.

Page 108

1        Q.   Okay.  And you didn't bring these with you
2   today so I can ask you questions about it?
3        A.   Correct.  Again, I was a fact witness
4   (inaudible) --
5        THE REPORTER:  Again, I was a fact witness --
6        THE WITNESS:  A fact witness designation.  I am --
7        Those are part of my expert witness file.
8   BY MR. LEGER:
9        Q.   Okay.  Do you have a fact witness file?
10       A.   You are looking at it.
11       Q.   All right.  Well, we are going to have to get
12  you to --
13       Will you at least agree to give those e-mails to
14  your lawyer so we can take a look at them and take your
15  deposition again and ask questions about them?
16       A.   Whatever I am subpoenaed properly in this
17  state to provide, and as long as it doesn't violate state
18  law, I will be happy to provide to counsel.
19       Q.   Is it your testimony today that our subpoena
20  duces tecum to you that was filed in federal court in
21  Michigan that was given to you by your lawyer sitting across
22  the table violates Oregon state law?
23       A.   Yes it does.  Oregon 703- -- Oregon 703416, I
24  believe it is, or 541, subsection 16, requires me to protect
25  the confidentiality of each client.

Page 109

1        Some of your requests were overly vague.
2        I do work for and against Norcold, and some of the
3   files I work opposite Norcold on.
4        Q.   You said overly vague; are you making a legal
5   objection in your deposition?
6        MR. SCHALK:  Objection.
7        THE WITNESS:  No, you just asked for too much
8   information, and by state law, I cannot legally provide it
9   to you without a judge's order to violate my state law.
10       MR. LEGER:  All right.  We'll just take that up with
11  Judge Berg.
12       THE WITNESS:  I'll be happy to comply with whatever
13  written judge's order there is, but until then --
14  BY MR. LEGER:
15       Q.   There was already a court order, Buddy.
16       A.   That's your interpretation of it.
17       Q.   Yeah, it absolutely is my interpretation.
18       So in any instance, since you failed to bring these
19  extremely relevant e-mails to your deposition today so I can
20  question you about when you actually received notice of this
21  fire, let me ask you this:  You do agree that you did in
22  fact receive notice within days after the fire and weeks
23  before the inspection by Farm Bureau representatives and Tom
24  Bailey?
25       A.   Correct.  I received notice on March 2nd,

28 (Pages 106 to 109)

1 that's when the -- the loss date was March 2nd. I received
2 the notice on March 10th. I opened it back up on March
3 11th.
4     The issue with e-mails, once you open it, it changes
5 the date on the opening of the document.
6     I opened up on March 10, I printed out a copy, and
7 then I contacted, March --
8     March 11th, I contacted Tom Bailey directly via
9 telephone immediately to discuss with him that I was
10 unavailable on March 25th for the inspection -- I was going
11 to be on another one at that time -- and I requested a delay
12 in the inspection.
13     Q.   Okay.
14     MR. LEGER:  Can we go off the record for a second?
15     THE VIDEOGRAPHER:  We are going off the record, the
16 time now is 12:12:
17     (Conversation held off the record.)
18         (Whereupon Exhibit Number 5 was marked for
19         identification.)
20     THE VIDEOGRAPHER:  We are back on the record, the
21 time now is 12:15.
22 BY MR. LEGER:
23     Q.   Mr. Bloom, I'm handing you what's been marked
24 Exhibit Number 5, and can you explain to the ladies and
25 gentlemen of the jury what you are looking at?

1     A.   It's an e-mail apparently between Mr. Fogt to
2 John Schlesman, copied to George Strasburg and Dave Roberts
3 about the Lonnie Smith matter.
4     Q.   What does the e-mail say?
5     A.   "The complete file has been scanned and
6 attached to this e-mail."
7     Q.   So you agree with me, sir, that Norcold was
8 put on notice and, in fact, given a complete copy of the
9 file on March 9th, 2010?
10     A.   The e-mail does say March 9th, 2010, so that's
11 what I would interpret that document to mean.
12     Q.   Okay.  Here's another e-mail, I believe this
13 one is from John Schlesman.  And just for the record, John
14 Schlesman works for Norcold?
15     A.   (Inaudible.)
16     THE REPORTER:  I'm sorry?
17     THE WITNESS:  I was asking if that was his question
18 because he stopped --
19 BY MR. LEGER:
20     Q.   Yes.
21     A.   John Schlesman is a third-party administrator,
22 a separate firm.  He worked, at the time, for Specialty Risk
23 Services, which has now changed their name to Sedgewick
24 Claims Management.  He is not an employee of Norcold.
25     Q.   Okay.  But he investigates claims on behalf of

1 Norcold?
2     A.   As I understand it, he adjusts claims.
3     Q.   He's like an insurance adjuster for Norcold?
4     A.   That would be a logical deduction, yes.
5     Q.   And then he hires fire investigators to go out
6 to determine if the defect caused the fire?
7     A.   Correct.
8     Q.   For instance, sometimes he hires you?
9     A.   Correct, to determine the cause and origin of
10 the fire if a defect was involved.
11     Q.   Okay.  Here is an e-mail from Tom Bailey to
12 you, I believe, on March 10th.
13     Would you describe to the ladies and gentlemen of
14 the jury and the judge, what that e-mail is all about?
15     A.   Yes.  This is e-mail from Tom Bailey to
16 myself, containing a file called Lonnie Smith Fire.  It was
17 sent on March 10th, at 8:12 p.m.
18     Q.   What does the e-mail say?
19     A.   "I have attached the notice for your
20     file. I know by the time you read this,
21     you'll still be tired from the trip so I'll
22     keep it short. Thanks for the way you're
23     handling this. You'll have everything I
24     have. Kindest regards, Tom."
25     Q.   Okay.  Do you agree that Tom Bailey put you on

1 notice of this fire on, via e-mail, on March 10, 2010;
2 correct?
3     A.   At the 8:00 time frame.
4     Q.   Right, 8 p.m., right.
5     A.   We are dealing with two areas.  Tom is in
6 Florida, I'm in Oregon, so we have time differences.
7     Q.   That's a big time.  But in any instance, it
8 was on Wednesday, March 10, 2010, where Tom Bailey advised
9 you that there had been a fire and attached a notice.
10     A.   That is correct.  I receive a lot of such
11 notices but I have no involvement until I get notified by
12 Norcold.
13     Q.   Okay.
14     A.   Tom and I have a very good working
15 relationship together.
16     Q.   That's what he said as well.
17     Here is an e-mail from John Schlesman to Tom Bailey,
18 copying Jackie Bligh from Farm Bureau Insurance.
19     Could you explain to the judge and the jury what
20 that e-mail is all about?
21     A.   It says, um, "Tom, I'm in receipt of
22     your below e-mail and voice mail. Thank
23     you for the same. I have hired a cause and
24     origin expert, Chris Bloom, to contact you
25     and coordinate the scene inspection. I'll

Page 114

1    report back to you after my receipt of his
2    report."
3       And that was dated March 10th at 1:36 p.m.
4    **Q.   So do you agree with me, sir, that Norcold**
5  **received notice of this fire on as early as -- as early as**
6  **March 10th and, likewise, you received notice of this fire**
7  **as early as March 10th?**
8    A.   That is incorrect.  Norcold was noticed on
9  March 9th.  I received the e-mail on March 10th but I didn't
10  open it until March 11.
11    **Q.   Okay.  So an e-mail was sent to Norcold,**
12  **putting them on notice of this fire on March 9th; correct?**
13    A.   Correct.
14    **Q.   And an e-mail was sent to you, putting you on**
15  **notice of this fire, on March 10th; however, you didn't read**
16  **that e-mail until March 11th; correct?**
17    A.   Correct.
18    **Q.   And in fact, on Exhibit Number 5, the third**
19  **e-mail that we have been talking about, Norcold's claims**
20  **adjuster or representative, John Schlesman, hired you as the**
21  **cause and origin expert; correct?**
22    A.   Correct.
23    **Q.   And that was on March 10th; correct?**
24    A.   That's when he told them he had hired me.
25    I received the notification, again, on March 10th,

Page 115

1  opened it up on March 11.
2    **Q.   Did he send you a separate e-mail saying, hey,**
3  **Chris, we want to retain you as a fire cause and origin**
4  **expert in this case?**
5    A.   Yes.
6    **Q.   John did?**
7    A.   Yes.
8    **Q.   Do you have a copy of that e-mail with you?**
9    A.   Not with me; it's part of my expert file.
10    **Q.   Okay.  But in any instance, you were put on**
11  **notice of this fire and retained as a cause and origin**
12  **expert for Norcold on March 10th, 2010?**
13    A.   March 11.
14    **Q.   You read the e-mail March 11th.**
15    A.   That's when the retention begins, when I read
16  the e-mail.
17    **Q.   Okay.  So March 11th, you had notice and you**
18  **were acting as a fire cause and origin expert on behalf of**
19  **Norcold; correct?**
20    A.   Correct.
21    **Q.   And this fire happened March 2nd, 2010;**
22  **correct?**
23    A.   Correct.
24    **Q.   So within a matter of a week -- within a**
25  **matter of a week, you were put on notice and hired to**

Page 116

1  **represent Norcold as a fire cause and origin expert in this**
2  **case; correct?**
3    A.   Correct.
4    **Q.   Did you, after March 11th -- or are you aware**
5  **of Norcold, after March 9th, contacting Jackie Bligh, or**
6  **Farm Bureau, to arrange an inspection of the evidence?**
7    A.   I did.
8    **Q.   You did?**
9    A.   I don't know if John did.
10    **Q.   When did you -- why did you contact Jackie**
11  **Bligh at Farm Bureau?**
12    A.   The insurance -- at this point, I understood
13  that the owners, Mr. and Mrs. Smith, hired Tom Bailey
14  directly, but there was an insurance company issue involved.
15    I needed to find out the insurance company, who
16  their investigator was, what relevance they had in the case,
17  if they insured the structure.
18    Before I step foot on scene, I need permission to
19  step foot on the scene and to find out who the players are.
20    **Q.   You need permission from Farm Bureau?**
21    A.   From Farm Bureau as well as from the owners.
22    **Q.   And you are aware that the owners of the RV**
23  **were a third party, not the plaintiffs in this case?**
24    A.   I am aware of that.
25    **Q.   So you needed permission from the owners or**

Page 117

1  **their insurance company or their representative before you**
2  **could go out and inspect their evidence.**
3    A.   That's correct.
4    **Q.   Okay.  And that's why you contacted Jackie**
5  **Bligh?**
6    A.   That's correct.
7    **Q.   Okay.  And what did Jackie Bligh say to you**
8  **when you contacted her, if you could go out to inspect Farm**
9  **Bureau's, or this third party's evidence?**
10    A.   I was told that Farm Bureau had a $5,000
11  coverage and they didn't want to be involved in it.
12    **Q.   Okay.**
13    A.   Now, at some point in time on the 11th, also
14  given the size of the loss as represented by Tom Bailey, I
15  did call counsel and recommended that the John Schlesman
16  counsel get involved in this.
17    I do not have the specific date; that is in my file,
18  though.
19    **Q.   Okay.  Did Jackie Bligh deny you access to the**
20  **evidence?**
21    A.   No.  Jackie Bligh instructed me to contact her
22  investigator, Fred Waite.
23    **Q.   Did you contact Fred Waite to ask him to**
24  **examine the evidence?**
25    A.   I asked Mr. Waite what his involvement was so

Maxene Weinberg Agency
(800) 640-1949

Page 118

1  far, to make sure that the evidence was still at the scene,
2  if the scene had been cleared, what happened.
3      And at that point in time, he indicated that there
4  was a multi-party inspection that was going to be conducted
5  in the future but he didn't know if he was going to be
6  involved, given the exposure of the loss.
7      MR. SCHALK:  Just so I'm clear -- I'm sorry -- you
8  both referenced Mr. Waite as Fred Waite.  Is that --
9      THE WITNESS:  Michael Waite.
10     MR. LEGER:  Michael Waite.
11     MR. SCHALK:  Just for the record.
12     MR. LEGER:  Good catch.
13     THE WITNESS:  Sorry.
14  BY MR. LEGER:
15     Q.   And Michael Waite was or is an expert that was
16  hired by the third-party owners of the evidence and/or their
17  insurance company to participate in the investigation;
18  correct?
19     A.   I'm not sure exactly who was who.  All I can
20  say is that Mike Waite was representing Farm Bureau
21  Insurance, and Farm Bureau Insurance insured the structure
22  itself.
23     Q.   Okay.  And also the RV and the refrigerator
24  inside that RV was owned by some third parties; correct?
25     A.   Correct.

Page 119

1      Q.   So you would agree with me that the scene and
2  the RV and the refrigerator was in the control of either the
3  third parties, Farm Bureau, or their expert; correct?
4      A.   The information that I had was that the scene
5  was controlled for access by Farm Bureau or their expert.
6  The actual evidence was under the control of Tom Bailey.
7      Q.   The evidence was owned by --
8      Are you aware that Tom Bailey actually was
9  requesting from Farm Bureau Insurance that he be allowed to
10  have access to the evidence, and he was denied?
11     A.   I have no knowledge of that.
12     Q.   Do you have any evidence or knowledge to
13  dispute that fact?
14     A.   I have no knowledge of that.
15     Q.   Okay.
16     MR. LEGER:  Why don't we add this to the e-mail
17  exhibits.
18     Q.   Can you explain to the ladies and gentlemen of
19  the jury, what the -- I'm sorry.
20     While he's reviewing that, you would agree with me,
21  sir, that the coach and the refrigerator inside that coach
22  belonged to a third party and not the plaintiffs -- I
23  believe their names were the Vorheese?
24     A.   We were told -- yes, I was told that the
25  answer was Vore, V-o-r-e.

Page 120

1      Q.   Yes, that's what I have right here, Vore.
2      MR. SCHALK:  Belated objection.
3  BY MR. LEGER:
4      Q.   So the RV and anything inside the RV was
5  controlled by the Vores and/or their representatives;
6  correct?
7      A.   That would have been how I would have handled
8  it, yes.
9      Q.   And then the Farm Bureau -- it's your
10  testimony that Farm Bureau and Jackie Bligh was the
11  representative that you would have to go through to access
12  the scene and inspect the evidence; correct?
13     A.   The structure, correct.
14     Q.   Okay.  And, in fact, even Tom Bailey would
15  have to get permission from Jackie Bligh, Farm Bureau?
16     MR. SCHALK:  Objection.
17     THE WITNESS:  If Tom Bailey was acting in the
18  capacity of an investigator, that would be my recommendation
19  to him, was to get permission.
20  BY MR. LEGER:
21     Q.   And, in fact, if you read this e-mail here
22  that was sent by Jackie Bligh to Tom -- I'm sorry, from Tom
23  -- no, I'm sorry, excuse me.
24     It's actually from Jackie Bligh to Tom; correct?
25     A.   Correct.

Page 121

1      Q.   And Jackie Bligh tells Tom:  "We will
2  not allow you to take possession of any part
3  of the trailer that cannot be tested on site.
4  They would have to be put in the custody of
5  Kerby, Bailey and Associates."
6  Do you see that?
7      A.   Yes.
8      MR. SCHALK:  Objection, foundation.
9  BY MR. LEGER:
10     Q.   And Kerby, Bailey and Associates, who is that?
11     A.   Michael Waite.
12     Q.   Okay.  And that's the fire investigation
13  company that the third party, Farm Bureau, hired to conduct
14  an investigation; right?
15     A.   Right.
16     Q.   Okay.  And the inspector working for Kerby,
17  Bailey and Associates is Michael Waite?
18     A.   Correct.
19     Q.   And then the letter -- the e-mail goes on to
20  say -- Jackie Bligh says:  "They can make
21  arrangements for storage of the goods if
22  necessary," referring to Kerby, Bailey and
23  Associates; correct?
24     A.   That would be my understanding, sir.
25     Q.   Okay.  According to this e-mail, Farm Bureau

31 (Pages 118 to 121)

Maxene Weinberg Agency
(800) 640-1949

Page 122

1  and Jackie Bligh would not allow Tom Bailey to collect any
2  evidence; any evidence would have to be collected by Farm
3  Bureau and their representatives; correct?
4      MR. SCHALK: Objection, foundation.
5      THE WITNESS: I -- I am reading something here that
6  is contradictory to what I was told so I don't know how to
7  answer your question.
8  BY MR. LEGER:
9      Q.   But according to that e-mail, that's, that's
10 what that would imply to you; correct?
11     MR. SCHALK: Objection.
12     THE WITNESS: It doesn't say about collecting, it
13 just says the custody of it if they are going to store it.
14 BY MR. LEGER:
15     Q.   Okay. So according to this e-mail, any
16 custody of the evidence for storage purposes would have to
17 go through Kerby, Bailey and Associates; correct?
18     A.   Storage of it, correct.
19     Q.   Okay. And -- okay. And -- but it also says
20 we will not allow you to take possession of any part of the
21 trailer; right?
22     A.   Correct.
23     Q.   So according to this e-mail, Tom could not
24 take any part -- could not take possession of any part of
25 the trailer; correct?

Page 123

1      MR. SCHALK: Objection.
2      THE WITNESS: That cannot be tested on site,
3  correct.
4  BY MR. LEGER:
5      Q.   Okay. And then the e-mail goes on. According
6  to this e-mail, Tom -- scratch that.
7          According to this e-mail, any evidence would have to
8  be put in the custody of Kerby, Bailey and Associates;
9  correct?
10     MR. SCHALK: Same objections.
11     THE WITNESS: That's what it says.
12 BY MR. LEGER:
13     Q.   Okay. And then Kerby, Bailey and Associates
14 could make arrangements for storage of the evidence if
15 necessary; correct?
16     A.   Correct. The evidence in this case was stored
17 at his facility.
18     Q.   At Kerby, Bailey Associates?
19     A.   Well, it's a storage locker, yes, under their
20 care, custody, and control.
21     Q.   Okay.
22         (Whereupon Exhibit Number 6 was marked for
23          identification.)
24 BY MR. LEGER:
25     Q.   Along the lines of the e-mails we have been

Page 124

1  talking about, Mr. Bloom, I hand you some photographs of the
2  evidence that I believe was collected by Farm Bureau,
3  Exhibit Number 6. Can you take a look at that?
4      A.   Yes.
5      Q.   Can you hold those photographs up so the
6  videographer can get a close-up on those?
7      A.   Please forgive the Kilroy look.
8      THE VIDEOGRAPHER: Okay, okay.
9  BY MR. LEGER:
10     Q.   And those photographs are photographs of
11 evidence collected from the scene that was shrink-wrapped;
12 correct?
13     A.   That is correct. Those are photographs of the
14 cooling unit of the refrigerator.
15     MR. LEGER: Object to the nonresponsive portion.
16     Q.   And there's also a tag on that evidence;
17 correct?
18     A.   That is correct.
19     Q.   Okay. And that tag is -- was made by who?
20     A.   The tag is listed by Kerby, Bailey and
21 Associates from Michael Waite.
22     Q.   And an item description, what does it say?
23     A.   Item description is one Norcold refrigerator,
24 fire damaged.
25     Q.   And it says insurance company, what?

Page 125

1      A.   Insurance company is Farm Bureau Insurance.
2      Q.   Insured?
3      A.   The insured is Jeff Vore, V-o-r-e.
4      Q.   And the investigator?
5      A.   Michael Waite.
6      Q.   So these photographs, you would agree with me,
7  sir, are in line with the e-mails between Tom and Jackie
8  Bligh about who actually collected and preserved and now
9  controls the evidence in this case, that being Kerby, Bailey
10 and Associates; correct?
11     A.   That would be what the e-mail says, which is
12 contradictory to what I was told physically at the scene.
13     MR. LEGER: Objection, nonresponsive.
14     Q.   But these photographs are consistent with the
15 e-mail which is Exhibit Number 5, which indicates that Tom
16 Bailey was not allowed to collect any evidence from the
17 scene; correct?
18     MR. SCHALK: Objection.
19     THE WITNESS: Again, this is -- the photographs are
20 consistent with the e-mails but is contradictory to what I
21 was told when I went out to Michigan.
22 BY MR. LEGER:
23     Q.   Okay. You agree with me that the evidence is
24 in the custody, control, and possession of Farm Bureau's
25 investigators, Kerby, Bailey and Associates; correct?

Maxene Weinberg Agency
(800) 640-1949

Page 126

1   A.   When I saw it, it was, and to my knowledge, it
2   still is.
3   Q.   Okay.  So in other words, even if we wanted to
4   go look at the evidence, we would have to contact either
5   Kerby, Bailey and Associates or their -- the people who
6   hired them, Farm Bureau; correct?
7   A.   That's correct.  That's the problem that both
8   you and I have had in the past in trying to examine this.
9   Q.   Exactly, I'll give you that, we have had
10  problems with that.
11      Okay.  Would you agree with me, sir, that Norcold,
12  or the defendants in this case, had an equal -- that the
13  evidence was equally available to them as of March 9th,
14  2010?
15      MR. SCHALK:  Objection.
16      THE WITNESS:  I can't agree with that because I was
17  not advised of this until March 11th when I opened the
18  e-mail, and I made the immediate phone call to Tom Bailey,
19  saying I was not available, we needed to reschedule this
20  inspection.
21  BY MR. LEGER:
22  Q.   Okay.  Did you, at any time after March 11th
23  -- and I may have asked you this -- contact Jackie Bligh to
24  say, hey, I'm available on this date, I want to come look at
25  the evidence?

Page 127

1   A.   No, because, again, Tom Bailey is the one who
2   originally put Norcold on notice, not Jackie Bligh.
3   Q.   Okay.  But as we established earlier, a third
4   party, Farm Bureau and the Vores and Kerby, Bailey and
5   Associates controlled the scene; one would have to obtain
6   permission from them in order to investigate the scene;
7   correct?
8   A.   Incorrect.  What I said was that is who I --
9   how I would handle it.  I don't know how Michael handled it.
10      So as a result, when I was told of the inspection
11  date and time, I told Tom Bailey, who was running the show,
12  who put Norcold on notice, that I was unavailable at this
13  time, we needed to reschedule.
14      Tom said he couldn't because there were other
15  parties showing up.  And I don't remember the whole gist of
16  the conversation but, generally, it was, he'd give me a call
17  with the outcome of the inspection at that time, and we'd
18  figure out if I needed to do a follow-up.
19  Q.   And it's your understanding that Tom Bailey
20  had to be around and speak to Farm Bureau's people about
21  getting this all together; correct?
22  A.   I don't know what Tom Bailey did.
23  Q.   Okay.  But you could have picked up the phone
24  and called Michael Waite, Jackie Bligh, or any of those
25  folks and asked to go out and take a look at the evidence;

Page 128

1   correct?
2   A.   I did.
3   Q.   And they told you no?
4   A.   They didn't tell me no, they said, this is set
5   up for a multi-party on March 25th.  I said I'm unavailable,
6   I'm on another inspection, we need to reschedule this.
7   Q.   But you could have gone out before that time
8   to take some photographs of the scene; correct?
9   A.   No.
10  Q.   Was -- were you not allowed to?
11  A.   No.
12  Q.   Did anyone refuse you access to the scene from
13  March 11, 2010, up until March 25th?
14  A.   No.  I was unavailable, I had other
15  inspections to do.
16  Q.   You agree with me that Norcold has other
17  investigators; correct?
18  A.   They -- Alcoa and Norcold, I don't know.
19  Thedford Norcold has three other investigators, possibly
20  four.
21  Q.   What about Jeff Negley?  Jeff Negley was
22  actually copied on some of this e-mail correspondence
23  between you, Kerby, Bailey and Associates, Jackie Bligh, so
24  he was aware of this incident and he's actually only three
25  hours away.  Norcold could have sent him out to inspect this

Page 129

1   scene; correct?
2       MR. SCHALK:  Objection.
3       THE WITNESS:  Again, I don't know the relationship.
4       What typically happens in cases like this, when we
5   have issues of conflict such as scheduling conflicts, I
6   would write back to them saying I'm unavailable, how about
7   someone else present?
8       Maybe Jeff was not available so they originally kept
9   the assignment back to me.  I don't know, without pulling my
10  file, but changes of investigators are not uncommon.
11  BY MR. LEGER:
12  Q.   Okay.  One of the documents that you brought
13  with you today was -- well, let me ask you this question.
14      Do you think Tom Bailey was prudent in putting --
15  attempting to do his part in putting, at least what he
16  thought the appropriate parties were, on notice?
17  A.   If he put those parties on notice, then he did
18  what he would think probably -- I can't speak as to what he
19  would think, actually.
20  Q.   Would you have done the same thing?
21  A.   No.
22  Q.   You would not have tried to determine who --
23  tried to determine who the interested parties were and
24  attempt to put them on notice?
25  A.   There are more parties that should have been

33 (Pages 126 to 129)

Page 130

1 invited, in my opinion.
2    **Q.  And who is that?**
3    A.  Well, the propane tank was modified, it was
4 not the original propane tank, per the witnesses' statements
5 in Tom Bailey's report. There was a hundred-pound propane
6 tank that was installed recently.
7    You also need to check on the regulator when you are
8 dealing with anything relating to propane, to verify the
9 integrity of that system.
10    Those people were not put on notice.
11    **Q.  And did you put those people on notice?**
12    A.  It was not my job to put those people on
13 notice.
14    **Q.  I did not ask you if it was your job. You**
15 **didn't put them on notice; did you?**
16    A.  No, it's not my job.
17    MR. LEGER: Objection to the nonresponsive portion.
18    **Q.  Do you think Farm Bureau and Michael Waite**
19 **should have put those people on notice?**
20    MR. SCHALK: Objection.
21    THE WITNESS: The standard in the industry says that
22 investigators are to advise their clients to put all known
23 parties on notice.
24    I was unaware of this until after I received Tom
25 Bailey's report of the hundred-pound propane tank and the

Page 131

1 regulator and such.
2    Until you can identify who they are, it may be
3 appropriate and it may not be, depending on the
4 circumstances.
5    **Q.  And if you were unable to do so, how in the**
6 **world would Tom Bailey be able to do so prior to going out**
7 **to the scene?**
8    A.  Tom Bailey identifies himself as a certified
9 fire and explosion investigator, And with the years and
10 decades of experience in RV's, He should also know.
11    **Q.  But you said you didn't know.**
12    A.  Because I don't have access and did not
13 interview your insureds or the Vores.
14    **Q.  Okay. But the Vores -- I don't represent the**
15 **Vores.**
16    A.  Exactly. I did not interview your clients or
17 the Vores in this case because they were represented by
18 counsel.
19    **Q.  What did you do in this case to set up -- to**
20 **-- scratch that.**
21    **What did you do to interview the Vores, the owners**
22 **of the RV?**
23    A.  I did not contact the owners of the RV because
24 of potential litigation in this case.
25    **Q.  Okay. And so you don't -- you have no**

Page 132

1 **complaints about any other experts not doing that; correct?**
2    A.  My complaint is not about them interviewing
3 what happened, no.
4    **Q.  Okay.**
5    A.  To -- let me back up. To the extent that
6 additional information that should have been asked was not.
7    MR. LEGER: Objection, nonresponsive.
8    **Q.  In any instance, you didn't contact the owners**
9 **of this RV to talk to them; did you?**
10    A.  No.
11    **Q.  At any time?**
12    A.  Part of the problem that we had from the
13 outset of this was understanding who the players were, and
14 that was that the Vores were related to the Smiths, and
15 trying to find out who was actually involved with what.
16    **Q.  Okay, and --**
17    MR. LEGER: So objection, nonresponsive.
18    **Q.  You did not, at any time, contact the Vores to**
19 **discuss their coach and refrigerator with them; did you?**
20    A.  No.
21    **Q.  Okay. Sir, isn't it true that Norcold was put**
22 **on notice of an expedited inspection to avoid the potential**
23 **for disturbance at the scene by the elements?**
24    A.  Who made that -- the notice that I brought
25 does not mention that. It says expedited investigation

Page 133

1 requested but it doesn't say anything else to that effect.
2 That's the headline, is Expedited Investigation Request.
3    **Q.  It says due -- bold, underlined, on the second**
4 **page; "Due to the location of the fire and the**
5 **potential for disturbance at the scene, an**
6 **early inspection date is requested."**
7 **Did you see that on March 8, 2010?**
8    A.  Yes, I did, but that's not what you asked.
9    **Q.  Okay. Do you agree that Norcold was put on**
10 **notice of an expedited inspection on March 8th, 2010, due to**
11 **the location of the fire and the potential for disturbance**
12 **of the scene, an early inspection date is requested?**
13    A.  Norcold was put on notice on March 8,
14 according to this document, for a request for an expedited
15 investigation.
16    **Q.  All right. Read that bold paragraph right**
17 **there to the jury and the judge, please.**
18    A.  I'll be happy to.
19    Due to the location of the fire and the potential
20 for the disturbance of the scene, an early inspection date
21 is requested.
22    **Q.  And you agree with me that according to the**
23 **principles outlined in NFPA 921, it's important to get out**
24 **to a fire scene as early as possible so that the scene is**
25 **not disturbed by outside factors, vandals, or the weather;**

34 (Pages 130 to 133)

Page 134

1  correct?
2      A.  I would agree with that.
3      Q.  Okay.
4      A.  If it's possible.
5      Q.  Sure.  Was it possible for you to book another
6  flight after May 11 to attend the inspection?
7      A.  I tried but it was not available because when
8  I had to cancel the flight that evening, they also canceled
9  the last flight out that morning, the two morning flights
10 were overbooked, and the return flight -- the last available
11 flight that would have had seats on it was after Tom had
12 informed me that he was already on his return flight home
13 back to Florida.
14     MR. LEGER:  Mark that as Exhibit Number 7, it's the
15 Tom Bailey notice.
16         (Whereupon Exhibit Number 7 was marked for
17          identification.)
18 BY MR. LEGER:
19     Q.  I'm sorry, going back to your failure to
20 attend the inspection, I have an e-mail here that you
21 provided us with today as part of your three documents that
22 you brought --
23     A.  Five.
24     Q.  Well, two of them we already had.  Five
25 documents, three new ones -- it's dated May 11th, 2011;

Page 135

1  correct?
2      A.  Correct.
3      Q.  And this scene inspection was May 25th;
4  correct?
5      A.  The first scene inspection was dated March
6  25th.
7      Q.  Okay.
8      A.  The second one was from May 12th.
9      Q.  I'm sorry, say that again?
10     A.  The first scene inspection, the notice of this
11 request, was for a date -- originally, the first notice that
12 Tom gave us was March 24.  He then sent an e-mail back
13 saying he was incorrect, it should have been March 25.
14     Q.  Okay.
15     A.  Then there was a second set-up for an
16 inspection after Mr. King got involved for the plaintiffs,
17 and he asked that this inspection be performed on May 12th
18 when we coordinated our schedules.
19     And I flew out on May 11th, and that's when the
20 weather hit the Chicago area and canceled hundreds of
21 flights, including the one that I was on.
22     Q.  Okay.  And from May 11 to May 25th, did you
23 attempt to book another flight out to go out to inspect the
24 evidence on May 25th?
25     A.  We are trying -- at that point, once I

Page 136

1  canceled it and went back to the office, I contacted Tom
2  Bailey via e-mail; I contacted prior counsel, Tom Wascum
3  (phonetic), for us; I also contacted Patrick King,
4  plaintiff's counsel, and we tried to reschedule an
5  inspection for a different date.
6      MR. LEGER:  Objection, nonresponsive.
7      THE WITNESS:  And that date was scheduled for August
8  16, 2011, at that time.
9      MR. LEGER:  Objection, nonresponsive.
10     Q.  At any time after May 11, did you attempt to
11 book another flight to participate in the May 25th
12 inspection?
13     A.  There was no May 25th inspection.  To my
14 knowledge, the March 25th inspection notice, a May 12th
15 inspection, which I was unable to attend, and then the
16 August 16th inspection are the only three inspections that
17 I'm aware of.
18     Q.  But you agree there was a March 25th
19 inspection?
20     A.  Yes.
21     Q.  And you agree you were put on notice on March
22 11; correct?
23     A.  Correct.  And I requested a delay due to
24 another inspection.
25     Q.  Did you contact Norcold and say, hey, I'm

Page 137

1  unavailable to attend, maybe you should send Jeff Negley
2  out?
3      A.  I had contacted John Schlesman and told him
4  there was an issue with the scheduling.  He said to work it
5  out with Tom Bailey.
6      Again, the content of the rest of the conversation I
7  know would be in my expert file but it's not here today.
8      Q.  Okay.  And the access to the evidence was
9  coordinated through Farm Bureau and Jackie Bligh; correct?
10     A.  For the fire scene, correct.
11     Q.  Yes.  And then the evidence, the RV and the
12 refrigerator, through the Vores?
13     A.  The Vores.
14     Q.  Did you contact either of those parties at any
15 time to inform them that you were unable to attend an
16 inspection and ask to go out to inspect on a different day?
17     A.  I contacted Mike Waits directly.  I also
18 contacted Tom Bailey from the plane when we were landing in
19 Chicago, advising him of the cancellation of the flights,
20 finding out if they wanted to stay until later or should we
21 do this on another day.
22     And Tom Bailey informed me that he was not available
23 that day due to his flight back to Florida; we'd have to
24 schedule for a different time.
25     Q.  You understand that it was not up to Tom

Page 138

1  Bailey, it was up to the people who controlled the scene and
2  the evidence as to when an inspection was going to occur?
3        A.   I understand that that's your interpretation.
4        My interpretation, from what I understood from Fred
5  and Mike Waite was that Tom Bailey was running the show.
6        Q.   Okay, all right.  Tom Bailey was running the
7  show but he wasn't allowed to collect the evidence; correct?
8        A.   Again, sir, that's the first time I've seen
9  that e-mail, but that's what I was told:  Tom Bailey was
10 running the show.
11       Q.   But according to the actual documents we have,
12 he was not allowed to collect any evidence; correct?
13       MR. SCHALK:  Objection.
14       THE WITNESS:  That's what that e-mail says.  And
15 again, he's not allowed to maintain the custody.  He can
16 collect, he cannot maintain the custody.
17 BY MR. LEGER:
18       Q.   Actually, the e-mail says:  We will not allow
19 you to take possession of any part of the scene.
20       A.   Take possession of it, but he can collect it.
21 He can tell Mike -- that's the discussion we are having
22 here.  Mike Waite told me that Tom Bailey told him what
23 items to remove.  And that's why I asked:  What evidence do
24 you have in this case?
25       MR. LEGER:  Objection, nonresponsive.

Page 139

1        Q.   According to the documents that we have in
2  front of you, Tom Bailey was not allowed to take possession
3  of any evidence.
4        MR. SCHALK:  Objection.
5        THE WITNESS:  Not allowed to take possession of it,
6  but it doesn't mean he couldn't identify it or collect it.
7  BY MR. LEGER:
8        Q.   What's the difference between taking and
9  collecting?
10       A.   Well, when you identify a piece of evidence at
11 the scene, you say, this one here, we're tagging it, we're
12 going to remove it, you take it there, you put it on the
13 back of a truck bed --
14       THE REPORTER:  I'm sorry, go ahead, can you start
15 your answer over again?
16       THE WITNESS:  You identify the evidence, you pick it
17 up, you tag it, you remove it to the back of the truck bed,
18 as identified in Exhibit 6.  You then tag it appropriately
19 as it was in the rest of Exhibit 6, about what the evidence
20 is, and then Mike Waite takes custody and possession of it
21 and puts it in his storage unit.
22       That is what was represented to me as the facts of
23 the case.
24 BY MR. LEGER:
25       Q.   And who actually tagged the evidence?

Page 140

1        A.   In this case, Mike Waite tagged the evidence.
2        Q.   Okay.  Were you at the inspection?
3        A.   No.  And which -- I was not at --
4        Q.   At the inspection where the evidence was
5  apparently collected and tagged by Kerby, Bailey and
6  Associates?
7        A.   At the March --
8        MR. SCHALK:  Objection.  Go ahead.
9        THE WITNESS:  At the March 25th inspection, when
10 this was tagged and secured with shrink wrap, I was not
11 present.
12 BY MR. LEGER:
13       Q.   Okay.  Mr. Bloom, you agree you failed to
14 participate in the inspection despite being put on notice;
15 correct?
16       MR. SCHALK:  Objection, asked and answered.
17       THE WITNESS:  I admit that I was not at the March
18 25th inspection because it proceeded forward despite me
19 advising people two weeks earlier I was not available, we
20 needed to reschedule the date.
21 BY MR. LEGER:
22       Q.   And you agree, according to the NFPA 921
23 principles, it's important to get out to investigate scenes
24 as quickly as possible?  People can't just wait forever for
25 someone to become available; correct?

Page 141

1        A.   Your interpretation of what's appropriate and
2  mine are completely different, so --
3        Q.   I'm asking you a question --
4        A.   And my interpretation is the scene was kept
5  long enough, it should have been delayed another week.  I've
6  seen fire scenes up to six months to a year later.
7        Q.   Where is the correspondence between you and
8  Jackie Bligh, Mike Waite, or anyone, for that matter, saying
9  you are available next week to inspect?
10       A.   That will be in my expert files, not in my
11 fact file.
12       Q.   And you didn't bring that with you today?
13       A.   As I said, it's not -- that's not in my fact
14 file I brought today.
15       Q.   And you don't feel like that's relevant to the
16 spoliation issue in this case?
17       MR. SCHALK:  Objection.
18       THE WITNESS:  Not as a fact witness.
19 BY MR. LEGER:
20       Q.   What do you mean, as a fact witness?
21       A.   Well, it's not relevant because this has
22 nothing to do with what we are talking about, Exhibit 6.
23       Q.   I'm not talking about Exhibit 6.  Why did you
24 pick up Exhibit 6?
25       A.   Because that's the only part of the

36 (Pages 138 to 141)

Page 142

1  refrigerator.  The entire refrigerator was not collected.
2      Q.  What are you talking about?
3      I'm talking about:  Did you ever, at any time, send
4  correspondence to any of the players, saying, hey, guys, I'm
5  not available here, I'm available next week?
6      A.  As I said, that would be in my expert file,
7  not in my fact file.
8      Q.  And you didn't bring those documents with you
9  today?
10     A.  No, I was a fact witness today.
11     Q.  Okay.  Who told you you were a fact witness?
12  I'm concerned --
13     A.  Plaintiffs' counsel, sir.
14     Q.  What plaintiffs' counsel told you that?
15     A.  Excuse me, let me finish.
16     Brian Rohn, right after receiving a copy of the
17  subpoena, informed me that I was a fact witness in this
18  case, I was being presented as a fact witness in this case.
19     Q.  Who in the hell is Brian Rohn?
20     MR. SCHALK:  Objection.  He's my co-counsel.
21  BY MR. LEGER:
22     Q.  And he told you you were only allowed to answer
23  questions today as a fact witness?
24     A.  Yup.
25     Q.  Okay.  He didn't tell you that this deposition

Page 143

1  was regarding your allegation that evidence was spoiled in
2  this case?
3      MR. SCHALK:  Objection.
4      THE WITNESS:  The issues were fact witness as to
5  whether the refrigerator was collected in its entirety or
6  not, and it was not.
7      MR. LEGER:  Objection, nonresponsive.
8      Q.  He didn't tell you that you were supposed to
9  -- the court ordered you to come here today to testify
10  regarding the spoliation issue?
11     A.  I was told that I received a subpoena and what
12  the subpoena is, and I'm designated as a fact witness in
13  this case.
14     They would be filing objections before the court.
15     As a fact witness, I'm here to talk about why the
16  refrigerator in Exhibit 6 is not the entire refrigerator as
17  documented in Mike Waite's and also in Tom Bailey's
18  photographs at the scene.
19     MR. LEGER:  Objection, nonresponsive.
20     Q.  Who designated you as a fact witness?
21     A.  Brian Rohn instructed me that I was a fact
22  witness in this case at this time.
23     Q.  Do you know Brian Rohn was a participant in
24  the hearing we had when the court ordered the defendants to
25  produce you for a deposition?

Page 144

1      A.  Sir, all I can tell you is counsel instructed
2  me I'm a fact witness in this case as it pertains to
3  spoliation of this issue, and that was it.  I saw what I
4  saw, it's not what was in the other photographs.
5      Q.  All right, I'm sorry, so you have
6  correspondence in your file at home where you advised the
7  players that you had availability the next week after the
8  inspection took place?
9      A.  There will be correspondence most likely of
10  that, it may have been a simple telephone call.
11     Q.  A telephone call --
12     A.  I have known Tom Bailey for 20 years or close
13  to it, and a lot of phone calls are just cordial phone calls
14  between investigators working cooperatively together.
15     Q.  I asked you for correspondence, documentation.
16  You said you had documentation in your expert file.  That's
17  what you said.  I could have the court reporter read it back
18  if you like.
19     A.  Please.
20     MR. LEGER:  Let's have the court reporter read it
21  back.
22     THE REPORTER:  "Answer:  There will be
23  correspondence most likely of that, it may have been a
24  simple telephone call."
25     Is there more to it?

Page 145

1      MR. LEGER:  We don't need to waste time.
2      THE REPORTER:  Okay, thank you.
3  BY MR. LEGER:
4      Q.  Mr. Bloom, do you have correspondence or any
5  documentation in your file you could show us, the judge
6  and the jury, where you informed the parties in this case
7  that you could inspect the evidence a week after the
8  inspection took place?
9      A.  Again, without reviewing my entire file, I
10  don't know.  There may be correspondence in there and it may
11  have been a simple telephone call between investigators who
12  work well together.
13     Q.  Okay.  I know I asked this question but I
14  forgot.  Is it your testimony here today, under oath, that
15  there was not a single flight available from the time that
16  -- well, scratch that, scratch that.
17     When you went out to Michigan as a fire cause and
18  origin expert for Norcold, is Exhibit 6 what you saw?
19     A.  Exhibit 6 is one of two pieces that I saw.
20     Q.  Did you take the shrink wrap off the evidence?
21     A.  No.
22     Q.  Do you have any firsthand knowledge of what is
23  contained in that shrink wrapping?
24     A.  Yes.
25     Q.  Have you actually seen what's in that shrink

37 (Pages 142 to 145)

Page 146

1  wrapping?
2      A.  Yes.
3      Q.  How could you see what's in it if you didn't
4  take the shrink wrapping off?
5      A.  You asked if I took it off, I didn't touch the
6  evidence.
7      Q.  Who took it off?
8      A.  Mike Waite and Tom Bailey took it off.
9      Q.  And you took the photographs?
10     A.  That's correct.
11     Q.  And you didn't bring those photographs today?
12     A.  Nope.
13     Q.  Sir, would you agree with me that if this
14  evidence was to be produced to anyone in this case, whether
15  it be you or the plaintiffs, that it would have to be
16  produced by Farm Bureau and their representatives?
17     MR. SCHALK:  Objection.
18     THE WITNESS:  It's my understanding this is still
19  under their care, custody, and control.
20  BY MR. LEGER:
21     Q.  And by "their," who do you mean?
22     A.  Michael Waite at Kerby, Bailey and Associates.
23     Q.  Who represents?
24     A.  Farm Bureau.
25     Q.  I was watching the deposition earlier, of you,

Page 147

1  and I think -- I believe you were naming some experts that
2  work in this area, and you named David Bristol.  Does he
3  work for Norcold?
4      A.  David Bristol, at the time, was a private fire
5  investigator, like myself, who also was one of the Norcold
6  investigators.
7      Q.  Norcold could have called David Bristol to go
8  out to attend the investigation when you told Norcold you
9  were not available; correct?
10     MR. SCHALK:  Objection.
11     THE WITNESS:  David Bristol works the Thedford
12  cases, he works opposite Alcoa a lot, so I don't know if
13  they could or could not.
14     Q.  But you also were opposite Norcold?
15     A.  Correct.
16     Q.  I believe another one that was mentioned --
17  who else was mentioned -- there's Jeff Negley; right?
18     A.  Yep.
19     Q.  They could have called Jeff Negley, too;
20  right?
21     MR. SCHALK:  Objection.
22     THE WITNESS:  Jeff Negley was in the correspondence.
23  I don't know what they talked to him about.
24  BY MR. LEGER:
25     Q.  Okay.  They could have asked him to go out

Page 148

1  whenever you said you weren't available to make it; right?
2      A.  If there's a conflict between me and any
3  inspections, I advise the client there's a conflict, and
4  then if they want to send someone else out, they are more
5  than welcome to.
6      Q.  Okay.  Who are the other guys out there that
7  -- Kim May, he doesn't work for Norcold; does he?
8      A.  Kim May, I don't know.  He may have worked for
9  Norcold.  I recommended him to.
10     Q.  Kim May is a guy; isn't he?
11     A.  Yes, he is.
12     Q.  Norcold could have called up Kim May and said,
13  hey, we need you to go out to this inspection; Chris Bloom
14  is unavailable.
15     A.  Sir, again, Norcold, what they could or could
16  not have done, I don't have any knowledge of.
17     All I can say is that I told them I have a conflict.
18  Negley's name is on some correspondence; they may have
19  talked to him, they may not have, I don't know, but I was
20  retained in this case.
21     Q.  Okay.  On the e-mail correspondence that you
22  have, did you receive any e-mails from Jeff Negley?
23     A.  To my knowledge, I did not receive any e-mails
24  from Jeff Negley.
25     Q.  But you did see his name on the

Page 149

1  correspondence?
2      A.  That you just provided.
3      Q.  You didn't see him on any correspondence that
4  you have in your file?
5      A.  I did not review my file before coming here
6  today, I don't know.
7      Q.  Do you think Tom Bailey is a competent fire
8  cause and origin investigator?
9      MR. SCHALK:  Objection.
10     THE WITNESS:  Mr. Bailey is a personal friend; I'm
11  just going to leave it at that.
12     Let me back up.  Mr. Bailey is also certified, as I
13  am certified, so we are both certified to work fire
14  investigations.
15  BY MR. LEGER:
16     Q.  And he was certified by the same people that
17  certified you?
18     A.  That's correct, to my knowledge.
19     Q.  And can you get certified without knowing how
20  to read burn patterns?
21     MR. SCHALK:  Objection.
22     THE WITNESS:  Depends which organization.
23  BY MR. LEGER:
24     Q.  Well, what are the common organizations that
25  have certified you and Tom Bailey?

38 (Pages 146 to 149)

Page 150

1    A.   Tom Bailey and I are certified by the NAFI, to
2 my knowledge, and that is the National Association of Fire
3 Investigators, and the answer to that would be no.
4    Q.   You cannot get certified by that organization
5 without knowing how to read burn patterns?
6    A.   Correct.
7    Q.   Tom Bailey knows how to read burn patterns?
8    A.   Tom Bailey can read burn patterns just like I
9 can read burn patterns.
10   Q.   And he can determine the cause and origin of a
11 fire when he investigates scenes?
12   A.   He has determined the cause and origin of
13 fires. Many times we agree, many times we disagree.
14   Q.   Okay.  Mr. Bloom, did you ever, at any time,
15 go out to the scene of this fire?
16   A.   No.
17   Q.   Okay.  Did you ever, at any time, talk to the
18 eyewitnesses in this case?
19   A.   No.
20   Q.   Are you aware that there's an eyewitness that
21 saw the fire start at the rear of the refrigerator?
22   A.   That's not what was said.
23        Yes, I am aware of an eyewitness in this case that
24 places the fire, after it was already going, in that area.
25   Q.   Have you talked to that person?

Page 151

1    A.   No.
2    Q.   So you don't really know exactly what she was
3 saying, then?
4        MR. SCHALK:  Objection.
5        THE WITNESS:  I can only report what Mr. Bailey put
6 in his report.
7 BY MR. LEGER:
8    Q.   Let's take a look at that report.
9    A.   If you will pardon me for one moment?  Can we
10 go off the record, please?
11       THE VIDEOGRAPHER:  Going off the record, the time
12 now is 1:07.
13       (Recess in proceedings.)
14            ---o0o---
15 BY MR. LEGER:
16   Q.   Before the break, Mr. Bloom, I was asking you
17 if you've ever been to the scene --
18       THE VIDEOGRAPHER:  Sorry, just one second.
19       We are back on the record, the time now is 1:20.
20 BY MR. LEGER:
21   Q.   Before the break, Mr. Bloom, I was asking you
22 if you'd ever been out to the scene at issue in this case,
23 and your answer was no; correct?
24   A.   Correct.
25   Q.   I asked if you talked to any of the

Page 152

1 eyewitnesses in this case, and your answer was no; correct?
2    A.   No.
3    Q.   What eyewitnesses did you talk to?
4    A.   No, I agree, I did not talk to any
5 eyewitnesses.
6    Q.   Okay.  Would you agree with me that the
7 eyewitnesses in this case state that, "Upon entering
8       the barn, I saw smoke and flames coming from
9       the driver's side, midway back roof of the
10      travel trailer.  I opened the entrance door
11      to the camper, where I saw black smoke, and
12      then proceeded to the back of the travel
13      trailer, around the rear corner to the
14      driver's side area, where I observed fire
15      coming from the louvered refrigerator
16      inspection cover and a burn hole located
17      six to eight inches above the inspection
18      cover and approximately one to one and a
19      half inches in diameter."
20      Do you agree with me that that's what one of the
21 witnesses to this fire has stated?
22   A.   Yes.
23   Q.   And did you -- you never spoke to that
24 witness; did you?
25   A.   No.

Page 153

1    Q.   Okay.  Another witness stated that he observed
2 the fire and smoke coming from the driver's side center roof
3 area of the travel trailer.
4       Do you agree that another witness has stated that?
5    A.   I'm trying to find the statement.
6    Q.   It's --
7    A.   Yes, that's what it says.
8    Q.   Did you ever speak to that eyewitness?
9    A.   No.
10   Q.   All right.  Did you ever talk to the first
11 responders?
12   A.   I have made several attempts to contact the
13 fire department.  To my knowledge, at this date, I still
14 have not received a copy of the fire report or witness
15 statements.
16       MR. LEGER:  Okay.  Objection, nonresponsive.
17   Q.   Have you ever, at any time, ever spoken to any
18 of the first responders in this matter?
19   A.   Again, I have contacted the fire department
20 several times, I have made several requests for reports and
21 statements, and I have not received anything.
22   Q.   So the answer is no, you haven't spoken to any
23 of the first responders?
24   A.   That's what I said.
25   Q.   Is that true?

39 (Pages 150 to 153)

Page 154

1    A.   That's what I said, yes.
2    Q.   You said you didn't speak to any of them?
3    A.   I spoke to the fire department.  I have
4  requested copies of the fire report and the statements from
5  the first responders, and I have not received any documents,
6  to my knowledge, yet.
7    Q.   Maybe it's a bad question.
8        Have you spoken to any of the first responders that
9  actually had gone out to the scene to respond to this fire
10  to put it out?
11    A.   No.
12    Q.   Okay.  Do you have any knowledge of what the
13  first responders did to the scene as they were attempting to
14  put out this fire?
15    A.   Yeah; put the fire out.
16    Q.   Other than that, do you have any knowledge of
17  what the first responders did to the scene as they were
18  attempting to put the fire out?
19    A.   Well, they would have walked through the
20  entire scene to suppress the fire, and there would have been
21  a subsequent investigation performed by either the
22  lieutenant, the chief, or a captain at that time.
23    Q.   And I'm not asking you about your assumptions.
24        Do you have any direct knowledge of what the first
25  responders did at the scene while they were attempting to

Page 155

1  put the fire out?
2    A.   That's -- I've already answered your question.
3        Mr. Waite informed me that there was an
4  investigation performed, so therefore, they, logically, they
5  had to put the fire out.
6        To put the fire out, they logically had to walk
7  through the fire scene, and someone investigated the fire
8  after it was out.
9    Q.   Do you have any direct knowledge of the other
10  acts that were committed by the first responders while they
11  were attempting to put this fire out?
12    A.   No.
13    Q.   Okay.  Did you ever test any evidence at any
14  time in this case?
15    A.   No.  Tom Bailey did and reported the results
16  back to me.
17    Q.   Is interviewing eyewitnesses and talking to
18  first responders normally part of your fire investigation
19  techniques?
20    A.   Yes, normally.  But in this case, with the
21  statements that were already given, I went with the
22  information contained in Mr. Bailey's interview.
23    Q.   So you went with the statements that the first
24  -- the statements that we just went over previously?
25    A.   I went with the statements -- yes, the

Page 156

1  statements we went over with Mr. Smith, Mrs. Smith, Mr.
2  Harvey and Mr. Smith.
3    Q.   Did you ever see a witness statement or talk
4  to anyone that said the fire started outside of the RV?
5    A.   No.
6    Q.   Have you seen any evidence that would indicate
7  that the fire started outside of the RV?
8    A.   At this point, I have a lot of questions about
9  a lot of -- where the fire started, so that's why I have not
10  been to the scene and not seen it.
11    Q.   In fact, you don't know why the fire started;
12  do you?
13    A.   At this point in time, there are assumptions
14  being made, which a dangerous in this case.  The fire is
15  reported to be at the subject RV, but that's a witness, only
16  one.
17        MR. LEGER:  Objection, nonresponsive.
18    Q.   At this time, you don't have any idea where
19  the fire started; do you?
20    A.   No, that's not correct.
21        Okay, in the report is the allegation that the fire
22  started at the RV, but I have not independently confirmed
23  that.
24    Q.   You don't have any evidence that would
25  contradict that finding; do you?

Page 157

1    A.   That it started at the RV?
2    Q.   Yes.
3    A.   Not at this point, but there are other nearby
4  potential ignition sources that need to be examined.  I have
5  not done that yet, I have not rendered any opinions to that.
6    Q.   All right.  And you didn't ask the Farm Bureau
7  or Jackie Bligh to go out and take a look at those other
8  items at any time; did you?
9    A.   That's incorrect.  I have made numerous
10  requests from Ms. Bligh for many things, and I'm getting
11  nowhere fast.  The evidence, as you and I both know, is one
12  of them.
13    Q.   And again, I don't want to beat a dead horse
14  here, but that evidence is in the care, custody, control of
15  Farm Bureau, where Jackie Bligh works.
16    A.   Correct.
17    Q.   And it's always been, since day one; correct?
18    A.   To my knowledge, yes.
19    Q.   Okay.  You agree that the Sourdillion valve is
20  the defective component in the Model 462 that could
21  potentially cause a fire; correct?
22        MR. SCHALK:  Objection.
23        THE WITNESS:  Is a potentially defective product
24  that could cause a fire, correct.
25  BY MR. LEGER:

40 (Pages 154 to 157)

Page 158

1    Q.   Well, it was recalled because a defective
2 condition could occur in that component; correct?
3    A.   Correct, it could occur, but it doesn't always
4 occur.
5    Q.   Okay.  You recall a telephone conversation
6 that we had last week wherein you stated that that valve
7 should have been recovered because it was made out of steel?
8    A.   I recall the conversation.
9    I also recall you threatening me during that phone
10 call.
11    MR. LEGER:  Objection, nonresponsive.
12    Q.   Do you recall a telephone conversation last
13 week wherein you stated that the valve should have been
14 recovered from the scene because it was made of steel?
15    MR. SCHALK:  Objection --
16    THE WITNESS:  I recall conversation that --
17    THE REPORTER:  Wait a minute, wait a minute.
18    MR. SCHALK:  Objection, to the extent it misstates
19 facts.
20    THE WITNESS:  I recall the conversation was supposed
21 to be off the record.  Do you want to go on the record with
22 the whole conversation?  Because I took notes.
23 BY MR. LEGER:
24    Q.   Sir, do you recall a phone conversation last
25 week wherein you stated that the valve, the Sourdillion

Page 159

1 valve, should have been recovered because it was steel?
2    A.   I remember that I said that portions of it
3 were steel.  I also remember you threatening me right after
4 that and telling me to get off the phone.
5    MR. LEGER:  Objection, nonresponsive.
6    Q.   Is it your testimony here today, under oath,
7 that you did not say that the valve is made out of steel?
8    A.   I said that portions of the value are
9 contained with steel and yet, the whole valve, no.
10    Q.   What is the valve made out of?
11    A.   It's made of a pot metal and then portions
12 of it have brass fittings, portions of it have copper
13 connectors, portions of it are steel, such as the screws, so
14 there are many different components that are made up of the
15 valve.
16    Q.   Sir, would you take a look at Deposition
17 Exhibit Number 4, I believe.
18    And this is, again, this is the report of Richard
19 Lewis, who was hired by Norcold to conduct testing on the
20 Sourdillion valve; correct?
21    A.   Exhibit 4 is the cover letter with the report
22 attachment, yes.
23    Q.   Take a look at page -- the first page of the
24 report.
25    Do you see where in the third paragraph, Mr. Lewis

Page 160

1 states:  "One of the two valves received by LEC had
2    been removed from a Model 462 refrigerator."
3    That's the refrigerator in this case; correct?
4    A.   Correct.
5    Q.   "On the outer surface, the valve
6    appeared to be in good condition and was
7    stamped 94 20 in the aluminum alloy body
8    of the valve."
9    Do you agree with me, sir, that the body of the
10 valve was made of aluminum alloy?
11    A.   Yes.
12    Q.   Okay.  And --
13    A.   Which is what I call pot metal.
14    Q.   And further on down, last paragraph:
15 "Exposing of the lower portion of the
16    regulating stem fitted with the subject
17    Polymer seals required drilling of the
18    aluminum alloy rivets."
19 Do you see that?
20    A.   Yup.
21    Q.   Do you agree with that?
22    A.   And it also says, "of the stamped steel
23 bracket to which is fitted."
24    Q.   I'm sorry?
25    A.   Continue the rest of the sentence, it goes on

Page 161

1 to say --
2    Q.   Okay.
3    A.   " -- of the stamped steel bracket to
4    which is fitted a microswitch for electric
5    operation control, and the metal diaphragm
6    for temperature regulation via the bulb
7    capillary tube," which means you have more than
8 aluminum sitting there.
9    MR. LEGER:  Objection, nonresponsive.
10    Q.   Do you see the part where he's talking about
11 polymer seals and the drilling of the aluminum alloy rivets?
12    A.   That is correct, but you are stopping in
13 mid-sentence; the rest of the sentence is also very
14 important.
15    Q.   Sir, it's not your deposition.  I'm asking the
16 questions here; okay?  And --
17    A.   I answered your question.
18    Q.   It's important to what?  Do you even know what
19 I'm about to ask you?
20    A.   Go ahead.
21    Q.   It's important to what?
22    A.   Go ahead.
23    Q.   What is it important to?  I'm asking you a
24 question.
25    MR. SCHALK:  Objection.

Page 162

1    THE WITNESS:  It's important to put statements in
2  proper context.  So if you are going to read a sentence,
3  read the entire sentence to put it into context.
4  BY MR. LEGER:
5    Q.  All right, whatever.
6    So do you agree that the body of the valve is made
7  out of aluminum?
8    A.  The body of the housing is made out of
9  aluminum, correct, what I would consider pot metal.
10   Q.  Okay.  And do you agree that the fire in this
11 case was hot enough to melt some brass flare nuts?
12   A.  Yes.
13   Q.  Okay.
14   A.  But portions of the brass flare nuts still
15 exist.
16   MR. LEGER:  Objection to the nonresponsive portion.
17   Q.  But in any instance, you agree that the fire
18 was hot enough to melt brass.
19   A.  In some areas, yes.
20   Q.  Okay.  And what is the melting temperature of
21 brass?
22   A.  I don't have the documentation right in front
23 of me but it's anywhere between 1200 and 1700 degrees, would
24 be my guess, copper being 1981.  I don't have the specifics
25 of what's in front of me.

Page 163

1    Q.  Well, would you disagree that the melting
2  temperature of brass is 1700 degrees?
3    A.  Again, I don't have the specific number in
4  front of me but it's in that general range.
5    Q.  1700 degrees.
6    A.  1200 to 1700 degrees.
7    Q.  I've done tons of research and I've never seen
8  brass at 1200 degrees.
9    Where have you -- where have you seen brass -- well,
10 let me just --
11   (Inaudible overlapping talk.)
12 BY MR. LEGER:
13   Q.  Let me get you on record, under oath:  Is it
14 your testimony here, today, under oath, that brass melts at
15 1200 degrees Fahrenheit?
16   MR. SCHALK:  Objection, asked and answered.
17   THE WITNESS:  That's not what I said.
18   I said I can tell you that it wasn't this, and here
19 is the other end, and it's somewhere in between, because I
20 don't have the documentation with the exact number right in
21 front of me.
22 BY MR. LEGER:
23   Q.  What document are you referring to?
24   A.  Well, the NFPA 921, for example, in your notes
25 there.

Page 164

1    Q.  Okay.  Why don't you take a look at it and
2  read to the ladies and gentlemen of the jury what the
3  melting temperature of brass is.
4    A.  This is not from 921.
5    Q.  Well, you just said it was from NFPA 921.
6    A.  That's where I need to get my source, sir.
7    Q.  Okay.  Well, let's take a look at -- you don't
8  have a copy of NFA -- NFPA 921 with you?
9    A.  Not with me.
10   Q.  Okay.
11   A.  I'm a fact witness for the specific issue of
12 the spoliation in this case.
13   Q.  I'm going to object to you saying "fact
14 witness," like I said before.
15   According to NFPA 921 --
16   A.  Figure?
17   Q.  What figure --
18   A.  The figure that you are quoting, sir.
19   Q.  Figure -- table 6.2.8.2 --
20   A.  And which version of 921 --
21   Q.  -- is the most recent, the most recent one,
22 2014.
23   MR. SCHALK:  Do you mind if the witness looks at
24 that while you are going through it?
25   MR. LEGER:  Sure.

Page 165

1    MR. SCHALK:  It would be easier.
2  BY MR. LEGER:
3    Q.  You agree that we are looking at NFPA 921;
4  right?
5    A.  This appears to be NFPA 921, correct, 2014
6  edition.
7    Q.  Okay.  And if you look at brass red, you have
8  a melting temperature of 1,825 degrees Fahrenheit; brass
9  yellow, 1710; correct?
10   A.  Right.
11   Q.  Okay.  So you would agree with me that brass,
12 the melting temperature of brass is in between 1700 and 1800
13 degrees Fahrenheit.
14   A.  As a ballpark.
15   Q.  Okay.  Not 1200, like you said earlier.
16   A.  I didn't say 1200.  I said it was in that
17 range because I didn't have the document in front of me.
18   Q.  But it's -- that was incorrect, it's not in
19 the range of 1200 to 1700.
20   A.  That is correct, in the sense that if you are
21 dealing with the yellow brass or red brass, it may have
22 fallen in that range, sir.
23   Q.  Okay.  And according to NFPA 921, the melting
24 temperature of brass is anywhere from 1710 degrees
25 Fahrenheit to 1825 degrees Fahrenheit; correct?

42 (Pages 162 to 165)

Page 166

1    A.    Pure brass, correct.
2    Q.    Okay.  Earlier, you said pot metal.  What do
3  you mean by pot metal?
4    A.    Pot metal, to me, even though you can be
5  dealing with aluminum, you can be dealing with magnesium,
6  you can be dealing with zinc, they are lower-end, lighter
7  metals that melt very easily.
8    Q.    And that is what you believe that this value
9  was made out of?
10   MR. SCHALK:  Objection.
11   THE WITNESS:  The Lewis report says that the valve
12 body is made -- the housing itself is made of aluminum.
13 BY MR. LEGER:
14   Q.    Okay.  And so it's either an aluminum alloy --
15 you think it's made out of pot metal?
16   A.    I said pot metal includes aluminum alloy.
17   Q.    What is the --
18   THE REPORTER:  I'm sorry --
19 BY MR. LEGER:
20   Q.    According to the NFPA 921, what is the melting
21 temperature of pot metal?
22   A.    Again, for me, pot metal is a conglomerate of
23 many different types of light-end melting metals.
24   Aluminum melts at 1200 degrees Fahrenheit.
25   Q.    Okay, I would agree with you on that.

Page 167

1    But it says pot metal here melts at about 560
2  degrees Fahrenheit to 752 Fahrenheit.
3    A.    It depends on the interpretation of pot metal.
4    Q.    What's your interpretation of pot metal?
5    A.    I've already answered you three times.
6    It can be a magnesium housing, it can be an aluminum
7  housing, it can be a tin bismuth housing -- it just depends.
8  I call it a light-end metal, it's a pot metal housing.
9    Q.    In any instance, you agree with me that this
10 fire was at least 1710 degrees Fahrenheit to 1825 degrees
11 Fahrenheit; correct?
12   MR. SCHALK:  Objection, overbroad.
13   THE WITNESS:  The fire scene shows that it could
14 have been a lot lower than that and also it could have been
15 a lot higher than that, depending on where you are at the
16 fire scene.
17   Q.    Okay.  And if you are at the location where
18 brass was melted, would the temperature be at least 1710
19 degrees Fahrenheit to 1825 degrees Fahrenheit?
20   A.    At that location, it could also be eutectic
21 alloy, which is a combination of two different types of
22 metals which actually have a lower melting point than the
23 temperature of either metal to begin with, per 921.
24   MR. LEGER:  Objection, nonresponsive.
25   Q.    If we are looking at the location of the fire

Page 168

1  where brass was melted, the temperature of the fire would
2  have had to have been at least 1710 degrees Fahrenheit to
3  1825 degrees Fahrenheit, according to NFPA 921; correct?
4    MR. SCHALK:  Objection, asked and answered,
5  overbroad.
6    THE WITNESS:  That is not correct because, again, if
7  you have eutectic alloy that is occurring, such as aluminum
8  dropping onto the brass, you'll end up with an alloy that
9  has a lower melting temperature than brass or aluminum, and
10 it will cause damage consistent with melt.
11   It's also straight out of 921.
12 BY MR. LEGER:
13   Q.    What is the melting temperature of brass,
14 according to NFPA 921?
15   A.    According to that document that you showed me,
16 it's between 1700 and 1825.
17   Q.    And that document I showed you was the most
18 recent version of NFPA 921; correct?
19   A.    Correct.
20   Q.    Okay.  And the melting temperature of aluminum
21 alloy is what?
22   A.    The melting temperature of pure aluminum is
23 1200, and then if you have alloys, depending on what the
24 concentration of that alloy is, will either lower or
25 increase the melting temperature.

Page 169

1    Q.    Okay.
2    A.    Straight out of NFPA 921.
3    Q.    You keep saying straight out of NFPA -- where,
4  what section?
5    A.    Keep going through to rest of your documents.
6    Q.    What section?  You keep saying, "straight out
7  of NFPA."
8    (Inaudible overlapping talking.)
9    Q.    Tell me the section.
10   MR. SCHALK:  Objection, relevancy.
11 BY MR. LEGER:
12   Q.    What section are you referring to?
13   A.    Straight out of NFPA 921, sir.
14   Q.    Straight out of NFPA 921, what is straight out
15 of NFPA 921, what section?
16   A.    Please go to your --
17   Q.    Don't tell me what to do.  What section?
18   MR. SCHALK:  Objection.
19   THE WITNESS:  We are done.
20 BY MR. LEGER:
21   Q.    What section are you talking about?
22   MR. SCHALK:  This is completely irrelevant.
23   MR. LEGER:  He's saying straight out of NFPA 921.
24 What section is he talking about so I can look at it?
25   THE WITNESS:  Move on.

43 (Pages 166 to 169)

Page 170

1    MR. LEGER: Don't tell me to move on.
2    **Q.   What section are you looking at?
3    A.   Move on.
4    MR. SCHALK: Yes.
5    MR. LEGER: Are you refusing to answer my question?
6    THE WITNESS: Yes. Move on.
7    MR. LEGER: Certify that question.
8    Q.   Next time you want to say "straight out of
9    NFPA 921," provide me with a section or page number.
10   Mr. Bloom, you would agree with me that if the
11   Sourdillion valve was in an area where the temperature of
12   the fire was hot enough to melt brass, then the casing, body
13   of the valve, would have been consumed in the fire because
14   it is made of an aluminum alloy and melts at a much lower
15   temperature than brass; correct?
16   A.   There's a possibility of it, yes.
17   Q.   Okay. In this case, there's a possibility
18   that the Sourdillion valve housing was consumed in the fire;
19   correct?
20   A.   There's that possibility, that's correct.
21   Q.   Okay.
22   A.   But that would only be the aluminum housing
23   portion and the lower melting temperature would be below
24   brass.
25   MR. LEGER: Objection to the nonresponsive portion.

Page 171

1    Q.   During that phone conversation where you --
2    you actually threatened me, as well --
3    MR. SCHALK: Objection.
4    BY MR. LEGER:
5    Q.   -- that you stated that you have never seen a
6    photograph of the Sourdillion valve at the scene of the
7    fire. Do you stand behind that representation, sir?
8    A.   Yes, I do.
9    Q.   All right. And if the Sourdillion valve was
10   not at the scene of the fire, then the individuals
11   responsible for collecting and controlling the evidence
12   could not have retained that evidence; correct?
13   A.   Incorrect. The Sourdillion valve, going back
14   to the Richard Lewis report, which is Exhibit Number 4, page
15   number -- on the back of the, the first page of this, it
16   talks about the aluminum alloy for the body and then the
17   removal of the stamped steel brackets to which the
18   microswitch and the electric operation control the metal
19   diaphragm for the temperature regulation via the bulb
20   capillary tube.
21   The bulb capillary tube being made of copper, which
22   is 1900 degrees, the steel being much higher, above 2,000
23   degrees, there would be remnants of the combination control
24   valve, the Sourdillion valve, in the area, even if the
25   aluminum housing melted.

Page 172

1    MR. LEGER: Objection, nonresponsive.
2    Q.   Sir, how many times have you testified in
3    front of a jury?
4    A.   Um, I believe it's three times, and all three
5    jury verdicts.
6    Q.   Three times you've testified in front of
7    juries?
8    A.   Yes.
9    Q.   Going back to my question earlier, you said
10   that if the Sourdillion valve was --
11   A.   Excuse me, I'm sorry, it was four times in
12   front of a jury.
13   Q.   Okay, good for you.
14   If the -- my question to you earlier was this: If
15   the Sourdillion valve was consumed in the fire, then
16   wouldn't it be impossible for anyone, for that matter, to
17   have collected the Sourdillion valve from the scene?
18   A.   No. Again, because there are components other
19   than the aluminum housing --
20   Q.   Can you look into that camera and answer?
21   A.   Yeah. There are -- can you please hand me
22   that?
23   Q.   What was the first thing you said --
24   A.   The answer is no, because inside the
25   Sourdillion valve, there are steel screws. Those will

Page 173

1    survive post-fire, even if it melts.
2    There are copper wires, there are copper
3    attachments, all of those will survive a fire. They will be
4    in the very base of the unit, and they were not collected.
5    MR. LEGER: Objection, nonresponsive.
6    Q.   How big are those screws and steel components
7    that you are talking about? How big are those?
8    A.   The two mounting screws for the front mount
9    bracket, which is steel, are 3/16ths.
10   Q.   Show the ladies and gentlemen of the jury.
11   A.   About that big.
12   There is going to be a steel recoil spring from the
13   igniter that should survive and at least be in the bottom of
14   the housing itself --
15   Q.   How big is that?
16   A.   Um, probably about that big.
17   Q.   Okay.
18   A.   There's going to be copper wiring,
19   approximately four to six feet of copper wiring in there,
20   there's going to be copper bolts for the temperature
21   control.
22   Q.   And how big -- show the ladies and gentlemen
23   of the jury how big that is.
24   A.   Which one?
25   Q.   The copper -- the last thing you were talking

44 (Pages 170 to 173)

Page 174

1 about.
2 A. The capillary tube is approximately
3 one-sixteenth of an inch, and that actually is part of the
4 evidence that Mr. Bailey secured, part of it.
5 Um, there is going to be --
6 Q. So that was --
7 A. -- electrical wiring in there, number 12 and
8 number 14 -- sorry, number 14 and number 16 size copper
9 stranded wire that should survive in the bottom of the
10 compartment.
11 Q. And for the ladies and the --
12 MR. SCHALK: Hold on, just let him finish.
13 THE WITNESS: There is going to be the remains of
14 the steel for the fuse tube holders, there is going to be
15 remains of the mounting brackets and the mounting screws
16 themselves, so there's quite a bit of evidence that survived
17 this fire in the bottom of this container.
18 MR. LEGER: Objection, nonresponsive.
19 Q. How big are the parts that you just mentioned?
20 A. Everything is going to probably -- the screws
21 on the mounting brackets -- the screws are probably
22 three-sixteenths, and the mounting brackets are probably
23 going to be approximately -- I'm going to guesstimate here,
24 it's probably about 16 inches long, about three to four
25 inches high, and approximately two to three inches in depth.

Page 175

1 MR. LEGER: Objection, nonresponsive.
2 Q. The components that we are talking about in
3 this Sourdillion valve, that you say would have survived
4 this fire, how big are they?
5 A. I said the Sourdillion valve and the
6 components there, they are three-sixteenths, they are about
7 this big, for the screws that secure the front plate to the
8 metal plate.
9 Q. Okay.
10 A. Then you have four screws that secure the
11 mounting bracket to the refrigerator.
12 Then you have a capillary tube which is going to run
13 approximately two feet --
14 Q. Hold on, hold on, hold on.
15 A. -- part of the component --
16 Q. Time out, time out.
17 A. -- you have the rest of the Sourdillion --
18 Q. Are you saying there's a two-foot steel rod
19 inside the Sourdillion valve?
20 A. I didn't say that, sir.
21 Q. Well, my question to you is: What components
22 inside the Sourdillion valve, according to you, would
23 survive a fire in excess of 1800 degrees Fahrenheit?
24 A. As I mentioned to you before, you have the
25 brass -- you have the copper tubing for the capillary tube

Page 176

1 which allows the ignition of the temperature sensor module
2 for the ignition of the propane, and that's copper, and
3 that's going to be approximately, melting temperature, 1981
4 degrees, well above your melting temperature of your
5 housing; you are going to have the brass fittings to the
6 connectors; you are going to have the steel spring inside
7 the unit when you are pushing the button in to get the thing
8 to ignite; there's a steel spring for recoil, those would
9 survive and they are about this big --
10 Q. I'm sorry, about --
11 A. About this big.
12 Q. That big?
13 A. And then you have the other electrical wiring
14 connectors and brass fittings and such as that.
15 Q. Can you grab that photograph right there and
16 then hold that up for the ladies and gentlemen of the jury?
17 What is that a photograph of?
18 A. Looks like the fire scene to me.
19 Q. Can you hold it up, please?
20 And is it your testimony here today that you are 100
21 percent sure that an item no bigger than the tip of my
22 pinkie should have been found in that scene?
23 A. I was hoping that you were going to ask that
24 question.
25 MR. SCHALK: Objection, assumes facts.

Page 177

1 THE REPORTER: I'm sorry, just hang on -- can we
2 stop for one minute?
3 MR. LEGER: Sure.
4 THE VIDEOGRAPHER: We are going off the record, the
5 time now the 1:49.
6 (Pause in proceedings.)
7 THE VIDEOGRAPHER: We are back on the record, the
8 time now is 1:53.
9 THE WITNESS: The continuation of my answer, the
10 bottom --
11 MR. LEGER: Whoa, whoa, whoa --
12 (Inaudible overlapping talking.)
13 MR. LEGER: Hold on, hold on, hold on, time out.
14 MR. SCHALK: He had not --
15 MR. LEGER: He had to finish your answer before we
16 go off the record.
17 THE WITNESS: No.
18 MR. SCHALK: Absolutely, absolutely.
19 (Inaudible overlapping talking.)
20 MR. LEGER: No, he knows that's the rules of the
21 deposition. Stop right here.
22 (Inaudible overlapping talking.)
23 MR. SCHALK: We stopped because she -- her machine
24 was running out of paper, but that's fine, we'll get to it.
25 THE WITNESS: Okay.

45 (Pages 174 to 177)

Page 178

1    MR. LEGER:  You cannot take a break and consult with
2  your lawyer and then come back and answer the question.
3    THE WITNESS:  I didn't consult with a lawyer, sir.
4    MR. SCHALK:  Let's just go.
5  BY MR. LEGER:
6    Q.   Sir, can you show the ladies and gentlemen of
7  the jury how large the Sourdillion valve is?
8    A.   It's approximately that big.
9    Q.   Okay.  And the majority of that component is
10  made out of aluminum alloy; correct?
11    MR. SCHALK:  Objection.
12    THE WITNESS:  According to the Lewis report, yes.
13  BY MR. LEGER:
14    Q.   Do you disagree with the Lewis report?
15    A.   No.  Again, I call it a pot metal housing;
16  aluminum housing falls within that category, it's fine with
17  me.
18    Q.   And from what I can understand, you have a
19  complaint with some screws that were in the Sourdillion
20  valve that you allege could have survived the fire; is that
21  correct?
22    A.   What I allege -- that is not correct.
23    Q.   Okay.  You don't allege that some screws
24  inside the Sourdillion valve could have survived the fire?
25    A.   What I said is that there are multiple things

Page 179

1  that could have and should have survived that fire and, in
2  fact, are documented on the photographs taken by Bailey and
3  Waite at the fire scene, which were not collected.
4    MR. LEGER:  Objection, nonresponsive.
5    Q.   Is it your testimony here today that there are
6  some screws inside that Sourdillion valve that would have
7  survived the fire?
8    MR. SCHALK:  Objection, asked and answered.
9    THE WITNESS:  As I said, the Sourdillion valve, the
10  screws for the mounts, all of that would have survived the
11  fire, they would have fallen in the pan.
12    That is clearly documented in all of Michael Waits'
13  and Tom Bailey's photographs at the base of the
14  refrigerator.
15  BY MR. LEGER:
16    Q.   Okay.
17    A.   The bottom of that component has 27 different
18  parts.  Some of them would have survived, some of them would
19  not have.
20    Q.   And you had never been to the scene?
21    A.   No.
22    Q.   Okay.
23    A.   But I have photographic documentation of the
24  scene.
25    MR. LEGER:  Objection, nonresponsive.

Page 180

1    Q.   Okay.  How many times in your professional
2  career have you determined the origin and cause of a fire by
3  examining screws no bigger than the tip of my pinkie?
4    MR. SCHALK:  Objection.
5    THE WITNESS:  As a fact witness today, sir, I cannot
6  give you that number because I have not reviewed my file.
7  BY MR. LEGER:
8    **Q.   Sir, I'll ask you again:  How many times in
9  your professional career have you ever determined the cause
10  and origin of a fire by reviewing screws no bigger than the
11  tip of my pinkie?
12    MR. SCHALK:  Objection, assumes facts.
13    THE WITNESS:  I'm here as a fact witness in this
14  case, sir.  My origin and cause fire -- my expert file,
15  which I do not have with me, I cannot give you an answer to
16  that.
17  BY MR. LEGER:
18    Q.   Well, sir, you --
19    MR. LEGER:  You know what, we'll certify that
20  question and take it up with the judge.
21    Why don't we go off the record for a second.
22    THE VIDEOGRAPHER:  We are going off the record, the
23  time now is 1:56.
24    (Pause in proceedings.)
25    THE VIDEOGRAPHER:  Back on the record, the time now

Page 181

1  is 1:58.
2  BY MR. LEGER:
3    Q.   Mr. Bloom, in your professional career as a
4  fire cause and origin expert, how many times, in your
5  career, have you determined the cause and origin of a fire
6  by looking at and examining screws no bigger than the tip of
7  my pinkie?
8    A.   For the third --
9    MR. SCHALK:  Objection.
10    THE REPORTER:  I'm sorry -- what?
11    MR. SCHALK:  Objection, beyond the scope of the
12  deposition.
13    THE WITNESS:  Third time:  I'm a fact witness in
14  this case.  That was part of my expert file, if there is
15  such a number, and I don't have access to that so I cannot
16  answer your question.
17  BY MR. LEGER:
18    Q.   Have you ever determined the cause and origin
19  of a fire by examining screws no bigger than my pinkie?
20    MR. SCHALK:  Same objection.
21    THE WITNESS:  Yes.
22  BY MR. LEGER:
23    Q.   You have.  In what case?
24    A.   They were involved in a litigation case --
25  sorry, an insurance case involving screws going through

46 (Pages 178 to 181)

Page 182

1    sheet metal siding on trailers, going into electrical wires.
2        Q.   Have you ever determined the cause and origin of
3    a fire involving a Sourdillion valve by looking at nothing
4    other than the screws no larger than the tip of my pinkie?
5        MR. SCHALK:   Same objections.
6        THE WITNESS:   In that case, no.
7        MR. LEGER:   We may be done.  Let's go off the record
8    real quick.
9        THE VIDEOGRAPHER:   We are going off the record, the
10   time now is 1:59.
11       (Recess in proceedings.)
12       ---o0o---
13       THE VIDEOGRAPHER:   Back on the record, the time now
14   is 2:06.
15   BY MR. LEGER:
16       Q.   Mr. Bloom, take a look at Deposition Exhibit
17   Number 4.
18       A.   What page?
19       Q.   Let's go with the report of findings, the
20   first page of the report of Richard Lewis.
21       See that?
22       A.   Yes.
23       Q.   Remember how, earlier, you were talking about
24   reading complete sentences and not taking things out of
25   context?

Page 183

1        A.   I wish you would.
2        Q.   Do you remember that --
3        If you are going to be obstructive one more time,
4    I'm going to get the judge on the phone.  Do you understand
5    that?
6        A.   Please do.
7        Q.   Do you want me to get the judge on the phone?
8        A.   Yes.
9        MR. LEGER:   Let's call the judge.
10       THE WITNESS:   Threatening a witness is not exactly a
11   condoned act.
12       THE VIDEOGRAPHER:   Going off the record?
13       MR. LEGER:   Yes, off the record.
14       THE VIDEOGRAPHER:   We are going off the record, the
15   time now the 2:07.
16       (Recess in proceedings.)
17       ---o0o---
18       MR. LEGER:   Back on the record.
19       THE VIDEOGRAPHER:   Back on the record, the time now
20   is 2:09.
21   BY MR. LEGER:
22       Q.   Mr. Bloom, once again, do you remember early
23   in the deposition where you testified that we should read
24   sentences, complete sentences, and not take things out of
25   context?

Page 184

1        A.   Yes.
2        Q.   Do you remember testifying to that?
3        A.   (Witness nods head.)
4        Q.   Yes?
5        A.   I just said yes.
6        Q.   Okay.  Take a look at Exhibit Number 4,
7    Richard Lewis's report.  On the bottom there, where I was
8    asking you about aluminum alloy rivets, do you see that?
9        A.   Yes.
10       Q.   And then you continuously wanted to read the
11   rest of the sentence, "to allow removal of the
12           stamped steel bracket to which is fitted a
13           microswitch for electric operation control
14           and the metal diaphragm for temperature
15           regulation via the bulb capillary tube?"
16       A.   Correct.
17       Q.   Do you see the next sentence?
18       A.   Yup.
19       Q.   With those components removed, the
20           regulating stem and lower seal can be
21           visually inspected."
22       Do you see that?
23       A.   Yes.
24       Q.   Do you agree with me, sir, that those
25   components which you allege are steel were removed prior to

Page 185

1    the testing done by Richard Lewis to determine whether or
2    not the valves leaked?
3        A.   Again, the answer would be no because I never
4    said that.
5        Q.   According to Richard Lewis's test report,
6    would you agree with me that he removed those components
7    prior to the testing and visual inspection of the valves to
8    determine whether or not they leak?
9        MR. SCHALK:   Objection, foundation, relevance.
10       THE WITNESS:   Yes, that's what it says.
11   BY MR. LEGER:
12       Q.   Okay.
13       MR. LEGER:   That's all I have.
14       MR. SCHALK:   All right.  I just have a couple
15   questions to clean up.  Do you guys need a break or --
16       MR. LEGER:   That's good.
17       ---o0o---
18           EXAMINATION
19   BY MR. SCHALK:
20       Q.   All right, good afternoon, Mr. Bloom.
21       First of all, what I would like to do is hand you
22   what will be marked as --
23       Keep the same numbers or --
24       MR. LEGER:   Why don't we just --
25       MR. SCHALK:   Still 8?

47 (Pages 182 to 185)

Page 186

1      MR. LEGER: Yeah.
2      MR. SCHALK: This will be marked as Exhibit 8.
3         (Whereupon Exhibit Number 8 was marked for
4         identification.)
5      MR. SCHALK: I'll represent to you this is Alcoa,
6  Inc., Norcold's objections in response to plaintiffs' notice
7  of oral deposition. That's just for housekeeping.
8     **Q.  Mr. Bloom, we have talked before your**
9  **deposition came up today; correct?**
10     A.  Yes, on several occasions.
11     **Q.  And what is -- is it your understanding that**
12  **you have been retained by my client as an expert witness in**
13  **this case?**
14     A.  I don't have any retention agreement as an
15  expert witness in this case at this time.
16     **Q.  What is your understanding of why you have**
17  **been presented today in this case, at this time?**
18     A.  Was to identify the fact that not all the
19  components of the refrigeration unit, which will be the
20  control board, the Sourdillion valve, the mounting brackets,
21  the screws, the wiring -- only the cooling unit was secured,
22  and the burner box.
23     There were about 27 other parts that potentially
24  could have been secured in this case, which are documented
25  in the photographs.

Page 187

1     **Q.  We'll get into the photographs momentarily.**
2  **Let me just run through my time line, because I**
3  **think we have been jumping around a little bit and it's been**
4  **a long deposition.**
5  **If you could just confirm for me if you have**
6  **personal knowledge about these dates and what took place,**
7  **I'd appreciate it.**
8  **I have the loss date, meaning when the fire**
9  **occurred, as March 2nd, 2010.**
10     A.  Correct.
11     **Q.  I have that you were given notice by Tom**
12  **Bailey and/or received an assignment around the March 10th,**
13  **March 11th, 2010, time frame.**
14     A.  Correct.
15     **Q.  Okay. And then I have the first scene**
16  **inspection that was conducted by Mr. Bailey and Mr. Waite**
17  **took place on March 25th, 2010; right?**
18     A.  That's correct. There were other parties
19  there, too, but no -- there were the witnesses and the
20  owners of the coach.
21     **Q.  Okay. And you were invited to attend that**
22  **inspection?**
23     A.  I was invited to the March 25th inspection but
24  I could not make it due to another scheduled inspection.
25     **Q.  Okay. What I want you to do is -- do me a**

Page 188

1  **favor: Would you grab your, what's been marked as Exhibit**
2  **7, I believe.**
3     **And just remind the judge and jury, if you don't**
4  **mind, Mr. Bloom, what is Exhibit 7?**
5     A.  Exhibit 7 is the letter from Mr. Bailey to Mr.
6  Fogt at Norcold, to Jackie Bligh at Farm Bureau, dated March
7  8, 2010, and it talks about their trying to set up an
8  inspection of the fire scene.
9     **Q.  Okay. So this letter predates the March 25th**
10  **inspection that Mr. Bailey and Mr. Waite conducted that you**
11  **were unavailable?**
12     A.  That's correct.
13     **Q.  Can you go to the bottom paragraph of that**
14  **first page?**
15     A.  Okay.
16     **Q.  Can you read that paragraph, please, to the**
17  **camera?**
18     A.  Sure. And it continues on to page two.
19  This is a letter from Tom Bailey. It says:
20  "I am providing you the following
21  information relative to your attendance in
22  the investigation of the building and RV
23  fire. It will be your responsibility to
24  notify your designated representatives.
25  Any items removed will be tested on site

Page 189

1  if possible. If testing cannot be
2  performed" -- actually, it says preformed --
3  "RV and Marine Investigations of America,
4  LLC, will retain those items until such
5  time as testing is available, and notify
6  all parties of a future testing date."
7  It continues on if you would like me to read the
8  next few sentences.
9     **Q.  Yes, please.**
10     A.  In the event -- excuse me.
11  "In any event, all property that RV
12  and Marine Investigations of America, LLC,
13  has determined to be possible evidence will
14  be retained and stored. All requests to
15  inspect the retained evidence after the
16  intrusive investigation date must be made
17  with RV and Marine Investigations of
18  America, LLC."
19     **Q.  Can I take a look at that?**
20  **So this is a letter from Tom Bailey; correct?**
21     A.  To Norcold and the Farm Bureau.
22     **Q.  And when Mr. Bailey says that, "Any**
23  **items removed will be tested on site if**
24  **possible. If testing cannot be performed,**
25  **RV and Marine Investigations of America,**

Page 190

1    LLC, will retain those items," just so I'm clear,
2  who is RV and Marine Investigations of America, LLC?
3    A.   That's Tom Bailey.
4    Q.   That's Tom --
5    A.   That's his firm name.
6    Q.   And so later on, he says, um, "In
7  any event, all property that RV and Marine
8  Investigations of America has determined
9  to be possible evidence will be retained
10  and stored."
11  Is that your understanding?
12    A.   That's what it says, sir.
13    Q.   Okay.  And that letter went out to Norcold
14  prior to the March 25th first scene inspection by Mr. Bailey
15  and Mr. Waite; correct?
16    A.   The letter is dated March 8th.
17    Q.   2010; correct?
18    A.   2010.
19    Q.   Okay.  Mr. Leger referenced the phone call we
20  did with Mr. Bailey, and I know you've talked to Mr. Bailey
21  prior in some of these later inspections.
22  Has Mr. Bailey told you what all the evidence that
23  they -- they retained in this case from the refrigerator?
24    A.   Yes, he has.
25    Q.   Okay.  And what was that evidence that they

Page 191

1  retained from that refrigerator?
2    MR. LEGER:  Objection, form.
3    THE WITNESS:  I was informed that they secured the
4  two items of evidence that were at the storage unit, which
5  consisted of the burner box and components as well as the
6  cooling unit.
7  BY MR. SCHALK:
8    Q.   Okay.  There's no reference to retaining the
9  Sourdillion valve; correct?
10    A.   Correct.
11    Q.   Or anything else from that refrigerator?
12    A.   Or any of the other 27 parts to the bottom
13  part of that refrigerator.
14    Q.   Okay.  At some point, you were notified after
15  the March -- I'm sorry --
16  After the March 25th, 2010, first scene inspection
17  by Mr. Bailey and Mr. Waite, were you ever informed whether
18  Norcold was the target of the investigation?
19    A.   Yes.
20    Q.   And what -- do you recall what you were told?
21    A.   I don't remember if it was two days after the
22  fire -- sorry, two days after the inspection or when, but,
23  um, I received a phone call from Tom Bailey indicating that
24  he was not pursuing against Norcold at that time, and I
25  requested that in writing so that I didn't have to set up a

Page 192

1  secondary inspection of the scene.
2    Q.   Did you get that in writing?
3    A.   Yes, we did.  It was e-mailed directly to John
4  Schlesman as well as a cc to me on April 28, 2010.
5    Q.   Okay.  And at some point, the cooling unit
6  that was retained by Mr. Bailey and Mr. Waite, that was
7  tested; was it not?
8    A.   Correct.  It was a secondary test, and that's
9  the one we were discussing earlier about the May 11th
10  travel.
11  On May 12th, Mr. Bailey and Mr. Waite tested the
12  cooling unit with my permission, without me being present,
13  and the cooling unit passed, it did not leak.  I think they
14  tested it with a 70 p.s.i., is what this report says.
15    Q.   And again, the cooling unit and the burner
16  box, those were the only pieces of evidence retained by
17  Mr. Bailey and Mr. Waite?
18    A.   That's correct.
19    Q.   And that was tested.  How was that tested, the
20  cooling unit?
21    A.   The cooling unit is tested through a general
22  industry-recognized procedure, and that is that on a
23  Norcold, the safety fuse is located at the top absorber
24  coil.  In a fire, because the melting temperature of the tin
25  bismuth alloy fuse is 281 Fahrenheit, give or take two or

Page 193

1  three degrees, it generally opens up.  So you hook an air
2  compressor or compressed air source with an air hose to that
3  safety fuse, you secure it with some pipe clamps, you
4  pressure the system, and then you soak the boiler down with
5  a soap solution to see if you have a leak.
6    Q.   And that was performed over two months after
7  the -- the loss date of March 2nd; is that fair?
8    A.   That's fair.
9    Q.   I'm sorry, actually, that was performed on May
10  12th, 2011, so a full year post the fire?
11    A.   I'm sorry, yes, you're right, a full year
12  post-fire at the storage facility.
13    Q.   Mr. Bailey tested the cooling unit that they
14  retained from the fire scene in -- over a year prior.
15    MR. LEGER:  Objection, form.
16  BY MR. SCHALK:
17    Q.   And that test reveals that the cooling unit
18  was, in fact, not the cause of the fire?
19    MR. LEGER:  Objection, form.
20    THE WITNESS:  The cooling unit was not the cause of
21  the fire based upon the testing.
22  And I need to clarify that I was mistaken, they
23  actually tested it at the scene, on a table, during that May
24  12th inspection.
25  I was informed of the results at -- that was the

Maxene Weinberg Agency
(800) 640-1949

Page 194

1  March 25th Inspection, I was informed of the results.
2      Q.   Okay.
3      MR. LEGER:  Is he testifying as an expert now or a
4  fact witness?
5      MR. SCHALK:  Fact witness.
6      MR. LEGER:  Well, you are asking him expert
7  opinions.
8      MR. SCHALK:  On what?  I'm sorry.
9      MR. LEGER:  On whether or not -- what caused the
10  fire.
11      MR. LEGER:  No --
12      MR. LEGER:  You asked him --
13      MR. SCHALK:  I'm asking him a question about what
14  your expert did.
15      MR. LEGER:  No, no, no, no, no.
16      (Inaudible overlapping talking.)
17      MR. LEGER:  -- and that after he said that did not
18  cause the fire.
19      MR. SCHALK:  That's in the expert report.
20      THE WITNESS:  That's what Tom Bailey told me.
21      MR. LEGER:  I'm sorry --
22      THE WITNESS:  Tom Bailey told us.
23      MR. SCHALK:  I'm not asking --
24      (Inaudible, overlapping talking.)
25      MR. LEGER:  -- all day long --

Page 195

1      MR. SCHALK:  I'm not asking his opinion on cause.
2  I'm just asking him what's in Bailey's report and what
3  Bailey did.
4      MR. LEGER:  Okay, Mike, go ahead.
5  BY MR. SCHALK:
6      Q.   Again, this cooling unit was tested a year,
7  more than a year after the fire took place, is that -- and I
8  just want to make sure my dates are right.
9      A.   The cooling unit was tested on May 12th,
10  almost a year plus two months after the loss date, and there
11  were no leaks in the cooling unit, according to Tom Bailey.
12      Q.   Okay, thank you.  Just so I'm clear -- strike
13  that.
14      And in this first scene inspection when the evidence
15  was secured on March 25th, 2010, was Mr. Waite present for
16  that, to your knowledge?
17      A.   To my knowledge, he was present, only from the
18  information contained in Tom Bailey's report.
19      Q.   And did you subsequently have a chance to talk
20  to Mr. Waite during the investigation of this case?
21      A.   Multiple times.
22      Q.   What did Mr. Waite tell you about the process
23  for retaining and securing evidence in this case?
24      MR. LEGER:  Objection, form.
25      THE WITNESS:  What I was informed was that Tom

Page 196

1  Bailey instructed Mike what to take and what to secure.
2  Mike stored it as a courtesy given that Farm Bureau didn't
3  have a large financial involvement in the case.
4  BY MR. SCHALK:
5      Q.   Okay.  And would that -- would that
6  information be consistent with Mr. Bailey's letter and also,
7  um -- strike that, I'm sorry.
8      Would that information you received from Mr. Waite
9  be consistent with Mr. Bailey's letter, which is marked
10  Exhibit 7, as well as the previous exhibit that Mr. Leger
11  produced, talking about the custody and control of the
12  evidence?
13      A.   That would be consistent with Mr. Bailey
14  identifying and marking, removing the items, but the items
15  would be secured by Mr. Waite at Farm Bureau.
16      Q.   Were you ever involved in retaining any of the
17  evidence at the scene?
18      A.   No.
19      Q.   Were you ever asked what evidence you would
20  want to examine?
21      A.   No.
22      Q.   Now, at one point, Mr. Bloom, you were holding
23  up some kind of a parts list.  Do you have that?
24      A.   Yes.
25      Q.   Okay.  Well, what is that document or what is

Page 197

1  it from?
2      A.   This document --
3      MR. LEGER:  Why don't we mark it?
4      MR. SCHALK:  I will.  I want to figure out how we
5  will do this.  We can mark these, I'll give you a copy.
6      THE WITNESS:  That's a complete --
7      MR. SCHALK:  I don't know if we can -- do you mind
8  marking those?
9      THE WITNESS:  No, these are --
10      MR. SCHALK:  Okay, sorry.
11      THE WITNESS:  The document itself is a part list for
12  the Norcold refrigerator including the 462 model, and of
13  that, it identifies each of the individual components, it
14  also gives a component breakdown of what the components are,
15  where they are located, and such.
16      The most important part of this being that there are
17  two parts of this refrigerator, there's the cooling unit
18  part and then there's the bottom pan control assembly.
19      So basically, this is inside a metal pan, and that's
20  where these items are located.
21  BY MR. SCHALK:
22      Q.   Okay.
23      A.   Almost all of these items are located inside
24  of this pan.
25      Q.   Now, I'm sorry, can you hold that --

Maxene Weinberg Agency
(800) 640-1949

Page 198

1    A.   Sure.
2    Q.   -- the diagram of the pan up?
3    So that's actually a diagram of the pan?
4    A.   Correct.
5    Q.   Is that where the Sourdillion valve and the
6  associated componentry are housed on this 462?
7    A.   That is correct. The Sourdillion valve is
8  located here. It is actually inserted inside this slot, so
9  it actually sits inside the pan.
10   Q.   Okay, do me a favor, just for the jury. Can
11 you circle the Sourdillion valve and just mark it by the
12 initials SV?
13   A.   Okay.
14   Q.   All right, and I will mark this as well.
15   MR. LEGER:   Uh-huh.
16 BY MR. SCHALK:
17   Q.   Okay. And I'm sorry, I cut you off before you
18 said -- it's actually inserted there --
19   A.   This Sourdillion valve is mounted to this
20 frame, secured with metal screws, and it inserts inside the
21 pan, so it actually sits about here, inside the pan, flush
22 mounted to the frame.
23   Q.   Okay. You said the frame; what is that frame?
24   A.   It's a mounting bracket that is mentioned in
25 Mr. Lewis's report.

Page 199

1    Q.   What's it made out of?
2    A.   Steel.
3    Q.   Can you circle the frame?
4    A.   It's item number 21.
5    Q.   Okay, perfect. What about what's marked on
6  your diagram as 19? What is that piece?
7    A.   19 is the entire bottom metal piece of the
8  refrigerator. It's an actual tray that all of these
9  components sit inside, underneath the refrigerator itself.
10   Q.   Okay.
11   A.   So the refrigerator sits actually on top of
12 this. This is a separate cabinet, and then the cooling unit
13 sits on the backside of this.
14   Q.   And that -- okay, I'm sorry, what was that
15 made out of?
16   A.   Steel.
17   Q.   Steel. I know you went through some other
18 things, brass fittings, steel screws, um, four feet of
19 copper wiring, is that all contained within this bottom, you
20 call it the bottom pan of the control assembly?
21   A.   It's the bottom pan control assembly, yes.
22 And they are itemized on this list except for the electric
23 wires that go to this whole setup up here.
24   Q.   Okay, can you do me a favor? Can you put
25 those together and we'll mark that as Exhibit 9.

Page 200

1       (Whereupon Exhibit Number 9 was marked for
2  identification.)
3  BY MR. SCHALK:
4    Q.   Now, I guess I do have another question, here,
5  Mr. Bloom.
6    If that bottom pan or control assembly was inspected
7  and documented with photographs and retained for future
8  inspections, what could that potentially tell us about the
9  cause and origin of this fire?
10   A.   Well, as it was mentioned previously by prior
11 counsel, you'd be able to determine burn patterns, you could
12 tell if you have a directional pattern to the Sourdillion
13 valve, if the Sourdillion valve was even damaged; it may not
14 be, you don't know until you examine it. It could be
15 damaged on one side more than another, indicating you had a
16 gas leak; you could have a partially intact Sourdillion
17 valve and an intense amount of damage to the steel next to
18 it which indicates you have a gas leak coming out.
19   There's a lot of burn patterns that can be
20 interpreted from this area with these 28 to 27 components
21 that we can't do now because they were photographed as being
22 present, in a general sense, but they were never secured so
23 we can't look at them post-fire.
24   Q.   I know you have some photos here, and I'd like
25 to just run through these fairly quickly.

Page 201

1    You've identified a handful of photos before the
2  deposition for Mr. Leger. Do you have those photos?
3    A.   Yes, there's a stack right here.
4    Q.   Okay. And --
5    A.   I do not have the specific photo number, so I
6  can tell you that these are the ones of interest but they
7  may not be the exact ones cited in my --
8    Q.   And that's fine. And this stack of photos
9  looks to be roughly, maybe, I don't know, three and a half,
10 four inches tall?
11   A.   That would be fairly accurate.
12   Q.   Okay. Do you have an understanding of who
13 took these photographs?
14   A.   These photographs -- of who took them -- no.
15   Q.   Okay.
16   A.   Because it could be Mr. Waite, it could be Mr.
17 Bailey. I know some of them provided them. I believe these
18 are Mr. Bailey's photos but I am not absolutely positive.
19   Q.   But they are a collection of photographs from
20 the scene of the fire; correct?
21   A.   It looks like it's during the initial
22 processing of the scene.
23   Q.   Okay.
24   A.   They are dated March 25th on the time stamps.
25   Q.   Mr. Bloom, can you walk me through the first

51 (Pages 198 to 201)

Page 202

1　photograph that you tabbed?
2　　　A.　The first photograph --
3　　　Q.　Hold it up to the camera, too, please.
4　　Can you get a good shot at it?
5　　　A.　The first photograph is showing the frame of
6　the coach, the remains of the refrigerator, the remains of
7　the stove, and some other miscellaneous debris in the area
8　of the RV that's only partially unwrapped.
9　　　Q.　Okay.
10　　　MR. SCHALK:  I'm sorry, let's mark that as Exhibit
11　10.
12　　　　(Whereupon Exhibit Number 10 was marked for
13　　　　identification.)
14　BY MR. SCHALK:
15　　　Q.　Okay, go ahead, Mr. Bloom.
16　　　A.　The next one is a picture, a close-up picture
17　of some of the frame members; the electrical I was
18　mentioning for the refrigerator was running right here; this
19　is the base frame of that metal pan that we are talking
20　about, has those 27, 28 parts in there, they are sitting
21　right here.  Here is the remains of the cooling unit.  We
22　have some combustible debris that is still partially intact
23　here, and you have what appears to be another metal
24　component, I'm not sure what that is without doing more
25　research on it.

Page 203

1　　　Q.　I'm sorry -- can you --
2　　　MR. SCHALK:  Let's mark this as Exhibit 11.
3　　　　(Whereupon Exhibit Number 11 was marked for
4　　　　identification.)
5　BY MR. SCHALK:
6　　　Q.　Actually, I'm not done with Number 11, Mr.
7　Bloom.
8　　　A.　Okay.
9　　　Q.　Can you get that diagram of Exhibit 9 again
10　for me?  I just want to look at the actual diagram of the
11　control panel, or that was the bottom pan -- do you have
12　that?  There you go, the one you marked up.
13　　　Okay, that's the control pan that you told us
14　earlier houses the Sourdillion valve and all the
15　componentry.  Can you identify, or can you tell us whether
16　that control pan is actually visible in Mr. Bailey's
17　photograph here marked as Exhibit Number 11?
18　　　A.　Yes, it is.
19　　　Q.　Can you circle that and point it out for the
20　camera, please.
21　　　A.　This is the vertical frame support for the
22　refrigerator door.  This is the bottom of that pan, the
23　separate piece, separate from the cooling unit, separate
24　from the storage.  It's sitting right here at the very base.
25　You can see the electrical wiring running into that area,

Page 204

1　and that's the base pan itself.
2　　　Q.　Okay.  Could you just circle that and just --
3　if you can, you can draw a line to the margin and write, um,
4　bottom pan, parentheses, Sourdillion valve?
5　　　A.　That's not the Sourdillion valve, that's just
6　the bottom pan.
7　　　Q.　Correct.  You can just leave it as bottom pan.
8　　　A.　The pen is not really that good but it is
9　marked.
10　　　Q.　Okay.  And then you said you could see the
11　cooling unit on it?
12　　　A.　That's correct.
13　　　Q.　And that's the cooling unit that was secured
14　as evidence that was -- that had the test performed on it by
15　Mr. Bailey; correct?
16　　　A.　Correct.
17　　　Q.　Could you circle that and then, on the upper
18　margin, just draw an arrow to it and put, cooling unit?
19　　Thank you very much, Mr. Bloom.
20　　　A.　So it's this part right here.
21　　　Q.　Okay.  And Mr. Bloom, I know you've gone
22　through all the photographs.  Do you recall coming across a
23　photograph taken by either Mr. Bailey or Mr. Waite of this
24　bottom pan after they removed the cooling unit?
25　　　A.　After the cooling unit was removed, there were

Page 205

1　no pictures taken of the bottom pan.
2　　　Q.　Nothing in his report?
3　　　A.　Nothing in his report.
4　　　Q.　Nothing in this large stack of photographs --
5　　　A.　No.
6　　　Q.　-- of the scene?
7　　So we have no photographs of the burn pattern within
8　that pan, if there was a burn pattern?
9　　　A.　Correct.
10　　　Q.　Do we have any photographs that indicate
11　whether the Sourdillion valve was even damaged within that
12　pan?
13　　　A.　I think some logical deductions can be made
14　that it was at least slightly damaged.
15　　　Q.　Sure.
16　　　A.　But there's no documentation of whether it's
17　still partially in tact or completely destroyed.
18　　　Q.　The next photo that you identify, Mr. Bloom,
19　please --
20　　　MR. SCHALK:  We'll mark that as Exhibit 12, please.
21　　　　(Whereupon Exhibit Number 12 was marked for
22　　　　identification.)
23　BY MR. SCHALK:
24　　　Q.　When you have the opportunity, can you please
25　tell us what we are looking at in this photograph and share

52 (Pages 202 to 205)

Page 206

1  it with the jury and the judge?
2      A.   What you are looking at here is, this is the
3  side of the coach.  You can see the side of the frame rails.
4      There's our tire; it's partially burned -- actually,
5  it's significantly burned but there's still some combustible
6  still remaining.
7      Here is the LP tubing.  This is the tubing that
8  supplies the propane to the refrigerator, and it terminates
9  at this point.
10     Then you can also see that we have the remains of
11 the absorber coils and reservoir, which means that this is
12 the cooling unit, and you can also see in the background of
13 this, behind the cooling unit, this is the base plate right
14 here.  It's sitting underneath the remains of the cooling
15 unit, remains of the shelves inside the refrigerator.  It's
16 this bottom metal piece right here that contains all the
17 electrical, the Sourdillion valve and all of that.  So you
18 can see it's documented in this photograph from a distance,
19 underneath other evidence.
20     Q.   Okay.  So these photographs taken by Mr.
21 Bailey and Mr. Waite at the scene indicate that this bottom
22 control pan, bottom pan of control assembly did exist
23 post-fire?
24     A.   Yes.
25     Q.   And that's not one of the items that they

Page 207

1  retained following the fire as a possible evidence?
2      MR. LEGER:  Objection, form.
3      THE WITNESS:  That's correct.
4  BY MR. SCHALK:
5      Q.   Do you have anymore -- do you have another
6  photo that we can walk through?
7      And we'll mark this next one as Exhibits 13.  If
8  they are duplicative, we can keep going.
9          (Whereupon Exhibit Number 13 was marked for
10          identification.)
11     THE WITNESS:  Lucky Number 13.
12 BY MR. SCHALK:
13     Q.   Go ahead, Mr. Bloom, let us know what we are
14 looking at here.
15     A.   This is a photograph taken from outside the
16 coach.  This is the rear of the coach, you can see the frame
17 rail right here, the tire.  So you know you are standing
18 outside the coach, looking towards the back corner.  This
19 would be driver's side, passenger's side.
20     And what you are seeing here is that the cooling
21 unit, again, is in tact and so is the bottom base plate of
22 that refrigerator, it's still there.
23     And this is very important because, again, with
24 those 27 parts, we need to see what is remaining there.
25 It's documented but they didn't secure it.

Page 208

1      Q.   Thank you, Mr. Bloom.  And in these photos,
2  Mr. Bloom, it looks like, at some point just prior to the
3  inspection, the carriage or the RV, the remains of the RV,
4  including all of the contents therein, were covered with a
5  tarp?
6      A.   That's correct, a blue tarp.
7      Q.   In your discussions, Mr. Leger mentioned
8  concerns in some inspection sites about vandals.  Did Mr.
9  Bailey or Mr. Waite ever reference any kind of concern about
10 preserving evidence due to vandals taking this evidence?
11     A.   Not once.
12     Q.   Any concerns referenced in -- by Mr. Bailey or
13 Mr. Waite about weather destroying some evidence?
14     A.   No.
15     Q.   Okay.  If -- if the valve itself, the pot
16 metal section of the valve, the aluminum part of the valve,
17 was burned or melted or consumed by the fire, would that
18 possibly leave a puddle or, um, would we have some way of
19 being able to document that through photography, taking
20 pictures?
21     A.   Yes.  The aluminum would melt and it would
22 stay in the bottom of the pan.  That's what that pan is,
23 it's basically like a frying pan.  So if you melt metal,
24 regardless of what it is, it's going to stay in the bottom
25 of that pan.

Page 209

1      Q.   And I'm sorry, how many investigations of the
2  four -- approximately -- we had a lot of numbers today, but
3  approximately -- the series, the 400 series of the Norcold
4  refrigerators, on how many have you performed fire
5  investigations?
6      A.   All I can say is hundreds.
7      Q.   Okay.
8      A.   The reason why I have to clarify that is
9  because many times, on very small dollar losses, they send
10 me a desk review to do from my office on whether or not the
11 burn patterns and the circumstances would be consistent with
12 that situation.
13     Q.   Okay.
14     A.   So the physical scene examinations, nowhere
15 near that number for these types of units, but for the
16 purpose of discussion here, a couple hundred, easy.
17     Q.   Okay.  And just very quickly, Mr. Leger was
18 making reference to your set of photographs that we don't
19 have here today.  Were those photographs taken at the same
20 time these photographs were taken?
21     A.   No.
22     Q.   They were taken of the only evidence retained
23 by Mr. Waite and Mr. Bailey, that being the cooling unit and
24 the burner box; is that correct?
25     MR. LEGER:  Objection, form.

53 (Pages 206 to 209)

Page 210

1    THE WITNESS:  That is correct.  Those were taken on
2   August 16, 2011, almost 18 months after the fire.
3   BY MR. SCHALK:
4       Q.   Okay.  And those -- you didn't have the
5   opportunity to take any pictures of the control panel or
6   anything like that?
7       A.   The control panel was not available for my
8   inspection.
9       Q.   What do your pictures of the cooling unit and
10  burner box tell us about the cause of the fire?
11      A.   Nothing, other than that Mr. Bailey stated,
12  when he did his test, the unit didn't leak, which is -- I
13  can reasonably rule that the cooling unit leak out at that
14  point.  That's the only thing I can tell.
15      MR. SCHALK:  We can go off the record.
16      THE VIDEOGRAPHER:  We are going off the record, the
17  time now the 2:39.
18      (Pause in proceedings.)
19      THE VIDEOGRAPHER:  We are back on the record, the
20  time now is 2:42.
21  BY MR. SCHALK:
22      Q.   Mr. Bloom, did you tag any photos that would
23  give an idea about --
24      Earlier, Mr. Leger was talking about the melting
25  points for various metals.

Page 211

1       A.   Correct.
2       Q.   Do you have anything that would demonstrate
3   kind of what he's talking about?
4       A.   Yes.  I would have to find some pictures here.
5       (Whereupon Exhibit Number 14 was marked for
6           identification.)
7       THE WITNESS:  It's been marked Exhibit 14.
8   BY MR. SCHALK:
9       Q.   Can you hold that up and explain to us what we
10  are looking at here?
11      A.   This is a photograph of the fire scene, and
12  what you are looking at here is the remains of the cooling
13  unit, the remains of the burner assembly.
14      This is the burner assembly here, the burner box,
15  and this is copper wire with a brass fitting that has melted
16  aluminum on it, it's called eutectic alloy.  And what that
17  means is that the alloy created from the melting aluminum
18  dripping onto the copper or the brass creates an alloy with
19  a melting temperature lower or higher, depending on what
20  materials are involved, and it will create a melting damage
21  in that area less than the melting temperature of brass or
22  the melting temperature of aluminum.  It's a unique alloy
23  experience, not straight, documented in this photo.
24      Q.   And what does that -- how does that --
25      MR. LEGER:  I'm going to object to the extent that

Page 212

1   you are asking him questions that require expert opinions.
2       MR. SCHALK:  I'm just following up on your questions
3   about how high the heat --
4       MR. LEGER:  I mean, you know, you have the ability
5   to ask him questions all day long about this fact witness
6   deal; he didn't bring his expert file, and now, Mike, you
7   are asking him questions that require expert opinion.
8       MR. SCHALK:  Okay.
9       Q.   Last question, Mr. Bloom.  Regardless of your
10  testimony on this photograph, there is evidence in this case
11  that the bottom pan that housed the Sourdillion valve and
12  all of its componentry did -- was not completely consumed by
13  the fire; is that fair?
14      MR. LEGER:  Objection, form.
15      THE WITNESS:  That's correct.  There are probably
16  about 20 to 25 photographs showing the bottom pan of this
17  refrigerator which would have contained the Sourdillion
18  valve, and all the other electrical and gas fittings would
19  have been at the bottom of this refrigerator.  They did
20  survive, at least to some extent, after the fire; we don't
21  know because it wasn't documented properly.
22      MR. SCHALK:  Thank you, Mr. Bloom.
23      Your witness.
24                ---o0o---
25  - - - - -

Page 213

1            CONT'D EXAMINATION
2   BY MR. LEGER:
3       Q.   Did you say you don't know what was -- what
4   survived the fire?
5       A.   I said we don't know what survived the fire
6   because it was not documented properly.
7       We know that the bottom pan exists and that the
8   electrical is still there and that we have some gas fittings
9   that are still there.  Therefore, you have to assume that
10  there are other things that are still there.
11      Q.   Okay.  Other than your assumption, you haven't
12  been to the scene, you have no actual evidence of any of
13  those components surviving the fire; do you?
14      A.   I have your photographic evidence from your
15  expert showing that they did survive the fire.
16      Q.   They do exist.  Let me see the components
17  list.
18      Hold this up for the ladies and gentlemen of the
19  jury, and please point to the Sourdillion valve for the
20  judge and the jury, please.
21      A.   That's easy.  It's way over here.
22      Q.   Show it to me.
23      A.   It's located right here on --
24      Q.   Circle the Sourdillion valve on that
25  photograph, if you please.  Circle it.

Maxene Weinberg Agency
(800) 640-1949

Page 214

1    I don't want to know where you think it's located, I
2 want you to circle the actual Sourdillion valve in that
3 photograph.
4    A.   The Sourdillion valve is located at the very
5 front of the refrigerator at right about that location right
6 here, at the very front of this metal base plate that's
7 right here, that's documented in the photograph.
8    MR. LEGER:   Objection, nonresponsive.
9    Q.   Is it your testimony here today, under oath,
10 that these -- I'm assuming these are copper tubing?
11    A.   That's a bad assumption.
12    Q.   Okay, what are they, then?
13    A.   They are steel.
14    Q.   Steel.   These steel tubings are -- this
15 circle, is that the sourdillion valve?
16    MR. SCHALK:   Objection.
17    THE WITNESS:   I said that's the location where the
18 Sourdillion valve would be located on the metal base plate
19 as described in the photograph that still survived the --
20    MR. LEGER:   Objection, that's nonresponsive.
21    Q.   Please circle, in this photograph, the
22 Sourdillion valve that you identified in this Exhibit.
23    MR. SCHALK:   Objection.
24    THE WITNESS:   You want the actual Sourdillion valve
25 in this photograph?

Page 215

1 BY MR. LEGER:
2    Q.   Yes, I want you to circle it for me.
3    A.   That photograph cannot be -- the Sourdillion
4 valve cannot be documented in this photograph because they
5 did not secure the bottom plate which would have had it.   It
6 would have been located right here.
7    The plate that holds the Sourdillion valve made of
8 steel that did survive the fire is located right there.
9    MR. LEGER:   Objection, nonresponsive.
10    Q.   Can you identify, in any photograph, any
11 photograph out of the hundreds of photographs that you have
12 had over there, the Sourdillion valve at all?
13    A.   No, and thank you for bringing that up because
14 it should have been done.
15    MR. LEGER:   Okay, objection, nonresponsive.
16    Q.   So you have no actual evidence whatsoever that
17 the Sourdillion valve was actually present at the scene at
18 the time of the, um, March 25th inspection.
19    A.   The Sourdillion valve was on the vehicle at
20 the time of the fire or else your allegation of the
21 Sourdillion valve didn't -- or started the fire would be
22 totally bogus.
23    MR. SCHALK:   No, no, listen to the question.
24    MR. LEGER:   Objection, nonresponsive.
25    Q.   You understand that that's not responsive to

Page 216

1 my question --
2    MR. SCHALK:   Can you just repeat it?
3 BY MR. LEGER:
4    Q.   -- right?   Are you trying to obstruct my
5 ability to take your deposition?
6    A.   I'm answering the questions as truthfully as I
7 can.
8    MR. LEGER:   Even your lawyer over here thinks that
9 wasn't a responsive answer to my question.
10    THE WITNESS:   Actually, he asked you to repeat the
11 question.
12 BY MR. LEGER:
13    Q.   Okay.   Well, apparently I need to repeat it
14 because you are not understanding it.
15    Do you have any evidence at all other than your
16 opinion, whether it be by way of photographs or anything,
17 anything other than your opinion, any hard, actual evidence
18 that the valve, Sourdillion valve, existed at the scene at
19 the time of the March 25th, 2010, inspection?
20    A.   Again, sir, the only thing I can tell you is
21 that the Sourdillion valve is located at this location on
22 the refrigerator remains, the remains themselves are
23 documented for the rest of it.
24    If the unit did not have a Sourdillion valve on it
25 at the time of the fire, and the unit was under the care,

Page 217

1 custody, control of the Farm Bureau and Mr. Bailey, then
2 this did not have a Sourdillion valve at the time.
3    Q.   Wait, you said care, custody, control of the
4 Farm Bureau and Bailey?
5    A.   The Farm bureau has the care, custody, control
6 of the scene and Mr. Bailey has the unit itself; therefore,
7 there you go.
8    Q.   You just said, under oath, that Mr. Bailey has
9 the unit itself, but he doesn't, in fact, have the unit
10 itself; does he?
11    As the photographs indicate --
12    A.   Mr. Bailey --
13    Q.   -- Mr. Waite collected it on behalf of Farm
14 Bureau; correct?
15    A.   Mr. Bailey was running the operation by
16 putting the parties on notice.   Mr. Bailey is the one who
17 secured the scene.   Mr. Bailey did not secure the items.   He
18 identified the items to be secured.
19    Mr. Waite secured them at his facility.
20    But this is Mr. Bailey's, the building is Mr.
21 Waite's, and none of it is mine, because I would have done
22 it differently.
23    Q.   I know you would have, but you chose not to
24 participate in the inspection in spite -- despite having
25 notice; isn't that true?

55 (Pages 214 to 217)

Page 218

1     A.   That's not correct.
2     Q.   You didn't have notice of the inspection?
3     A.   I asked for them to reschedule based upon a
4  scheduling conflict, and Mr. Bailey and Mr. Waite decided to
5  proceed forward without a known party being present.
6     Q.   Okay.  Back to my original question:  Please
7  point out, in any of these photographs that you were going
8  over with your lawyer, the Sourdillion valve for the ladies
9  and gentlemen of the jury.
10     MR. SCHALK:  Objection, asked and answered.
11     THE WITNESS:  As I said, the Sourdillion valve
12  itself is inside this metal frame and that is all.
13     If they had done the investigative procedure right,
14  when they removed the cooling unit, it would have been
15  documented with a photograph.  It was not done.
16     There's no photographs of the cooling unit removed,
17  showing the bottom plate, the remains of the Sourdillion
18  valve, or anything else, and that's a basic investigative
19  step.
20     MR. LEGER:  Objection, nonresponsive.
21     Q.   Do you have or are you aware of any
22  photographs depicting the actual Sourdillion valve at the
23  scene?
24     A.   I've already answered your question.
25     Your guy did not take any pictures of the

Page 219

1  Sourdillion valve at the scene.
2     MR. LEGER:  Objection, nonresponsive.
3     Q.   Are you aware of any photographs at the scene
4  depicting the Sourdillion valve?
5     A.   Again, your guy did not take any pictures of
6  the scene --
7     MR. LEGER:  Okay, that's enough.  Let's go off the
8  record.  I'm calling the judge and -- this time, I'm calling
9  the judge.
10     THE VIDEOGRAPHER:  We are going off the record, the
11  time now is 2:50 p.m.
12     (Recess in proceedings.)
13     ---o0o---
14     MR. LEGER:  Back on the record.
15     THE VIDEOGRAPHER:  We are back on the record, the
16  time now is 2:52.
17     MR. LEGER:  The witness is continuously obstructing
18  my ability to take his deposition.
19     We attempted to call the judge.  It's 5:00 in
20  Michigan, the court is closed, and we were unable to get in
21  touch with the judge.
22     So I will take this up with the judge at a later
23  time and continue my line of questioning.
24     Q.   Mr. Bloom, once again, do you have any
25  photographs in your possession or that you are aware of that

Page 220

1  depict the actual Sourdillion valve?
2     A.   I do not have any photographs to that extent
3  because none were taken by Mr. Bailey or Mr. Waite.
4     MR. LEGER:  Object to the nonresponsive portion.
5     Q.   Do you have any photographs or are you aware
6  of any photographs depicting what you believe to be or
7  allege to be -- scratch that.
8     Do you have any photographs depicting -- are you
9  aware of any photographs depicting any of these components
10  in Exhibit 9?
11     A.   You asked me three different questions in the
12  same question, please ask it again.
13     MR. LEGER:  Actually, it's one question.
14     Q.   Do you have any photographs in your possession
15  or are you aware of any photographs in your possession that
16  depict any of the components that you identified in Exhibit
17  9, inside the bottom pan?
18     A.   Yes.  Including the bottom pan, which is part
19  of that.
20     Q.   Show me that.
21     A.   This is Exhibit 13.  You can see the bottom,
22  again, right here, the bottom pan.
23     Q.   Yeah.
24     A.   Exhibit 12, you can see the bottom of the
25  frame and the bottom pan.

Page 221

1     Exhibit Number 11, taken from a different angle, you
2  can see the frame and the bottom pan, and the -- including
3  electrical.
4     You can see another one from Exhibit Number 10, the
5  bottom frame, the bottom pan.
6     So we know it survived the fire, which is part of
7  that entire bottom --
8     MR. LEGER:  Objection, nonresponsive.
9     Q.   Okay.  Hold up those pictures again for the
10  judge and the jury.
11     Now, identify each of these 28 components in those
12  photographs.
13     A.   Okay.  First, start with this one.
14     Q.   Identify each of those 28 components in the
15  photographs you just referred to.
16     A.   This is the diagram taken from the parts list
17  of a 462 refrigerator.  Part number one is the burner
18  assembly --
19     Q.   Hold on --
20     A.   Part number two is the --
21     (Inaudible overlapping talking.)
22     Q.   Hold on --
23     A.   Part number three is the gasket orifice.
24     Q.   Hold on.  You're not answering my question.
25     (Inaudible overlapping talking.)

56 (Pages 218 to 221)

Page 222

1    Q.   Show us the --
2    A.   You asked me to identify the parts that are
3  listed in here, which I am doing.
4    Q.   In the photographs, show us where part number
5  one is in the photographs.
6    MR. SCHALK:  I don't think you understood his
7  question or it wasn't very clear.
8  BY MR. LEGER:
9    Q.   Okay, I'll repeat it.
10   Let's start with number one.  Do you see number one?
11  Let's hold that up to the jury and to the judge.  Number
12  one, do you see number one there?
13   A.   No, not yet.
14   Q.   Okay.  Take a look at it.
15   A.   One second.  Do you have it?
16   THE VIDEOGRAPHER:  Okay.
17  BY MR. LEGER:
18   Q.   Do you see number one?  What is number one?
19   A.   Part number one is the burner orifice assembly
20  and burner -- I'm sorry, it's the burner housing assembly.
21   Q.   And what is that component made out of?
22   A.   The burner housing assembly is made out of
23  steel.
24   Q.   And where is that component, where is that
25  component in each of the photographs that you -- which you

Page 223

1  are referring to?
2    A.   Right here, sitting right there.
3    Q.   Okay.  Where is it in the other photographs?
4    A.   It's sitting right there.
5    Q.   Let me see.  I'm sorry, where?
6    And what you just circled, was that collected by
7  Farm Bureau and preserved at their facility?
8    A.   That area -- not this part, not that circle --
9    Q.   No, no, no.
10   A.   -- the circle of the burner box, yes, that was
11  collected.
12   Q.   Okay.  So you have no complaints with part
13  number one being collected by Farm Bureau?
14   A.   No.
15   Q.   Okay.  Part number two, can you please
16  identify part number two for the ladies and gentlemen of the
17  jury, and then we will have you identify that, if you can,
18  in the photographs.
19   What is part number two?
20   A.   Part number two is the burner orifice which
21  sits right here.
22   Q.   And what is that made out of?
23   A.   It's also made of steel.
24   Q.   Okay.  Now, part number two -- was that part
25  of the assembly collected by Farm Bureau?

Page 224

1    A.   That is part of the evidence that Farm Bureau
2  collected, along with Mr. Bailey.
3    MR. LEGER:  Objection to the nonresponsive portion.
4    Q.   Tom Bailey doesn't have possession of any of
5  the evidence in this case; does he?
6    A.   He doesn't have possession of it now.  He was
7  the one that directed the removal of it at the scene --
8    Q.   Why do you keep saying that?
9    A.   -- according to Mr. Bailey and Mr. Waite.
10   Q.   Do you have anything in any documentation, any
11  e-mails, other than your testimony about what somebody else
12  said that would indicate Tom Bailey actually had control of
13  this scene?
14   A.   Mr. Bailey's letter says that he is going to
15  be securing --
16   It says, again, on Exhibit Number 7, bottom
17  sentence, "If testing cannot be performed -- " or
18  "preformed," excuse me " -- RV and Marine
19   Investigations of America, LLC will retain
20   those items until such time as testing is
21   available and notify all parties of a
22   future testing date."
23   Q.   What's the date --
24   A.   This is very similar to what I was told at the
25  scene when we did the examination of the --

Page 225

1    Q.   And we went over this letter earlier;
2  remember?
3    A.   Yeah.
4    Q.   And what's the date of that letter, March --
5    A.   March 8.
6    Q.   And you recall going over this e-mail, Exhibit
7  Number 5, which is dated when?
8    A.   March 10th.
9    Q.   Two days after Tom Bailey wrote this letter;
10  right?
11   A.   Right.
12   Q.   He became painfully aware that he would not be
13  allowed to take possession of any part of the trailer;
14  correct?
15   A.   Correct.
16   Q.   And in fact, that would have to be put in the
17  custody, control of Kerby, Bailey and Associates; correct?
18   A.   To retain the evidence, correct.
19   Q.   Okay.  And then they can make arrangements for
20  storage, talking about Kerby, Bailey and Associates;
21  correct?
22   A.   Correct.
23   Q.   This e-mail was sent to Tom Bailey two days
24  after he wrote to Norcold on March 8th; correct?
25   A.   Correct.

57 (Pages 222 to 225)

Page 226

1    Q.   Okay.  So he wrote the letter to Norcold,
2  putting them on notice, saying he potentially wanted to
3  retain some evidence; right?
4    A.   Correct.
5    Q.   Then when he asked the owners of the evidence
6  about retaining it, they said, pretty much, hell no, you
7  can't; correct?
8    A.   Pretty much.
9    Q.   Okay.
10    A.   But he was the one --
11    MR. LEGER:  Objection as nonresponsive.
12    Q.   We will go back to the diagram and the photos
13  in a minute.
14    Again, I don't want to beat a dead horse here --
15    MR. SCHALK:  Too late.
16  BY MR. LEGER:
17    Q.   -- but you can't point to me where the actual
18  Sourdillion valve is in this -- any of these photographs;
19  can you?
20    A.   Yes, I can, but I cannot photograph (sic)
21  those specific photographs showing the Sourdillion valve.
22    Using this diagram, again, as the basis of those
23  photographs, the Sourdillion valve is located at the front
24  of the unit.  We are looking at the back of the unit.
25    Q.   We have no photograph of the Sourdillion valve

Page 227

1  at the scene; do we?
2    A.   No.
3    Q.   Okay.  And you've never been to the scene?
4    A.   It should have been photographed.
5    Q.   Well, and who's the best person to talk to
6  about what was actually, assuming that is the pan on your
7  exhibit there, who are the best people to talk to about what
8  was actually contained in that pan?
9    MR. SCHALK:  Objection, calls for speculation.
10    THE WITNESS:  Well, Mr. Bailey should have called me
11  and asked me what he was looking for.  I would have told him
12  and given him the parts list showing the bottom pan itself,
13  all of the components as they relate to the cooling unit and
14  the rest of the refrigerator.
15    MR. LEGER:  Objection, nonresponsive.
16    Q.   Wouldn't you agree with me, sir, that the
17  individuals that were actually present at the scene are the
18  best people to talk to about what was actually -- what
19  components were actually underneath the cooling unit?
20    MR. SCHALK:  Objection, assumes facts.
21    THE WITNESS:  I did speak to Mr. Bailey and to Mr.
22  Waite.  Mr. Waite said that the only thing that they secured
23  specifically was the cooling unit and the burner box.
24  BY MR. LEGER:
25    Q.   Did Mr. Waite, at any time, tell you that

Page 228

1  these -- that the Sourdillion valve survived the fire?
2    A.   No.  He didn't know that what he was looking at,
3  and when I asked him, I provided him a copy of this diagram
4  to which he did not even know anything about it.
5    Q.   All right.  Did Tom Bailey ever tell you that
6  the Sourdillion valve survived the fire?
7    A.   No.
8    Q.   Okay.  Exhibit Number 12, what is that silver
9  splattering on that tubing right there?
10    A.   It's not silver, it's black, and that would
11  be, probably, most likely, the paint that goes on the top of
12  it.
13    Q.   Looks silver to me; that doesn't look silver
14  to you?
15    A.   That's black to me, sir.
16    Q.   Are you color blind?
17    A.   Are you?
18    MR. SCHALK:  Can I see it?
19  BY MR. LEGER:
20    Q.   Again, you can't ask me questions; do you
21  understand that?
22    A.   Sir, you are being very antagonistic, and you
23  have been threatening all this day.  I've done this as a
24  courtesy to you -- I'm about ready to walk off.
25    MR. SCHALK:  Let's --

Page 229

1  BY MR. LEGER:
2    Q.   You came here as a courtesy to me?
3    A.   Yeah.
4    MR. SCHALK:  Can we stop for a second?
5    THE WITNESS:  I never received a deposition notice.
6    MR. LEGER:  You can't ask me questions is what I'm
7  trying to tell you.
8    THE WITNESS:  Don't question my --
9    MR. LEGER:  You can't ask me questions; do you
10  understand that?
11    MR. SCHALK:  Chris, if we need to take a break, we
12  can do that.  Let's see if we can just finish this up.
13    THE WITNESS:  I would appreciate -- I'm speaking to
14  my counsel -- I'd appreciate if you'd interject because
15  questions about whether I'm color blind and things like that
16  are not appropriate.
17    MR. SCHALK:  Absolutely.
18    THE WITNESS:  Thank you.
19  BY MR. LEGER:
20    Q.   Well, hold that up and let's get a camera
21  shot.
22    Can you point to the splattered substance I was
23  referring to?
24    Actually, I will.
25    It's your testimony here today, under oath, that you

58 (Pages 226 to 229)

Page 230

1  are looking at that and you think that's black.
2      MR. SCHALK:  Objection, argumentative, asked and
3  answered, relevance.
4      THE WITNESS:  What I said was based upon the rest of
5  the stuff here, this is most likely the black paint that
6  goes over the top of the cooling unit.
7  BY MR. LEGER:
8      Q.  I asked you what color that was and you said
9  black.
10     A.  I said it's most likely the black paint that
11  goes over --
12     Q.  You are not sure, it's most likely?
13     A.  And you are guessing it's silver, so we are
14  both in the same boat.
15     MR. LEGER:  Objection, nonresponsive.
16     Q.  Hold that up to the ladies and gentlemen of
17  the jury.
18     That substance right here that I'm pointing at, I
19  asked you what color you thought that was, and I'll ask you
20  again:  What color do you think that substance is splattered
21  on that pipe?
22     MR. SCHALK:  Objection, asked and answered.
23     THE WITNESS:  Again, sir, the color I'm seeing right
24  hear is black in paint, which is similar to that.
25     MR. LEGER:  Can we get a close-up on that?

Page 231

1      THE VIDEOGRAPHER:  This is as good as I can get.
2  BY MR. LEGER:
3      Q.  Okay.  That's Deposition Exhibit Number 12.
4  It's actually the photo that has the exhibit sticker on it;
5  correct?
6      A.  That is Exhibit Number 12.
7      Q.  Okay.  If the Sourdillion valve aluminum alloy
8  casing were to melt in a fire, what type of coloration
9  substance would that leave?
10     A.  A silver color at the bottom of the pan in the
11  front portion of where the controls are, and it would leave
12  a pool of metal approximately -- well, it would leave a pool
13  of metal.
14     MR. LEGER:  Object to the nonresponsive portion.
15     Q.  You agree it would leave a silver substance?
16     A.  That's correct.  It's aluminum.
17     Q.  Okay.  Rather than spending an hour going
18  through Exhibit Number 9, would you at least agree with me,
19  sir, that -- well, scratch that.
20     If any of these components were contained, allegedly
21  by you, in the pan, that based upon these photos, you can
22  not specifically point those out to me; correct?
23     A.  I can specifically point out some of those
24  parts to you that we have already gone over.
25     Q.  Okay.  Any other parts that we've gone over

Page 232

1  can you specifically point out to me in the photographs?
2      A.  Give me a minute to look them over.
3      The base plate on 19 is visible on photographs, item
4  number 19.
5      Q.  Where is the base plate?  When you say "base
6  plate," what are you talking about?
7      A.  The entire plate, the bottom pan itself is the
8  base plate.
9      Q.  We've already talked about that.
10     A.  All right.
11     Q.  Earlier, you were talking about a bunch of
12  components that would be inside that base plate.  Can you
13  identify those components by looking at the photographs?
14     A.  I'm trying to do that.
15     Thermocouple, item number 17, Exhibit 14, it's this
16  part right here, and the capillary tube going back into the
17  metal pan, that survived the fire.
18     MR. LEGER:  Please mark that as an exhibit.
19     THE WITNESS:  I'll need to show him the picture.  He
20  asked for the picture.
21     MR. SCHALK:  He will mark that --
22     THE WITNESS:  Okay, in this picture here, you can
23  see at the very bottom of the absorber -- let me hold the
24  picture up.
25     THE VIDEOGRAPHER:  Okay.

Page 233

1      THE WITNESS:  Okay.  This is the bottom part of the
2  boiler itself where the fluid goes back up into the boiler,
3  and right in here, you can see the remains of the fuse,
4  which are items number 15, 16, and that's the plate for 17
5  that's located right there.
6  BY MR. LEGER:
7      Q.  Maybe -- hold on one second.  I can't --
8  I'm sorry, let's mark this as an exhibit.
9      Why don't you circle and identify what you are
10  saying is --
11     A.  It's right here.
12     Q.  Circle it.
13     MR. LEGER:  Okay, let's mark this as an exhibit,
14  please, and write on that exhibit what you are alleging that
15  part is.
16     THE WITNESS:  You want it in black or do you want it
17  in red?
18     MR. LEGER:  Right there, that's fine.
19     (Whereupon Exhibit Number 15 was marked for
20     identification.)
21     THE WITNESS:  I'm trying to find the best picture.
22  I'm sure that's a better picture right there of what
23  we are talking about.
24     Here's another picture.
25     So in Exhibit 15, that is actually item number 13,

59 (Pages 230 to 233)

Page 234

1  which is the terminal block, BG2 and BG3 --
2  BY MR. LEGER:
3      Q.  Wait, hold on.
4      A.  The part that I circled.
5      Q.  You have a fuse panel?
6      A.  Yeah, that's what that is.
7      Q.  Okay.  That circled part?
8      A.  It's the fuse holder -- excuse me, it's 16,
9  which is the plate that actually holds the fuses in place.
10     Q.  And how big is that?
11     A.  It's about this big.  There are generally two,
12 in the 462 model, there are two fuses, they are glass
13 cartridge fuses, they slide horizontally into the surface.
14     And in this photograph --
15     THE VIDEOGRAPHER:  Okay.
16     THE WITNESS:  Okay.  You can see the remains of the
17 electrical copper wiring going into the bottom side of the
18 refrigerator.  This is generally the control wiring itself
19 for the unit, from the AC wiring.
20 BY MR. LEGER:
21     Q.  What photograph is this?  Is this marked?
22     A.  No.
23     Q.  Let me ask you a question about this
24 photograph.
25     What is this pipe right here?  Is that a flared

Page 235

1  copper tubing?
2      A.  This pipe is the propone supply piping with
3  flared copper tubing and with arced wiring over the top of
4  it.
5      Q.  At the end of this flared copper tubing, would
6  there not be a brass flare nut?
7      A.  There would be.
8      Q.  Okay.  And it's not on that photograph;
9  correct?
10     A.  The photograph does not show a brass nut, no.
11     Q.  And again, the melting temperature of brass is
12 what?
13     A.  Melting temperature of brass, if it's pure, is
14 anywhere between yellow for 1700; red is 1852, I think is
15 what we said.
16     Q.  So you would agree with me at -- circle the
17 tip of that.
18     A.  Sure.
19     Q.  Label what would be there, brass flare nut;
20 correct?
21     A.  Well, I'm going to label what is shown in the
22 picture.
23     Q.  Okay.  Is that part of the photograph exhibit?
24     MR. SCHALK:  No.
25     THE WITNESS:  No.

Page 236

1      MR. LEGER:  Let's mark that.
2      MR. SCHALK:  16.
3      MR. LEGER:  16.
4          (Whereupon Exhibit Number 16 was marked for
5           identification.)
6  BY MR. LEGER:
7      Q.  And in photograph 16, you would agree with me,
8  sir, if that brass flare nut was consumed by the fire, the
9  temperature in that area would have exceeded 17-, 1800
10 degrees?
11     A.  That would be -- that would be a reasonable
12 approximation, yes.
13     Q.  Okay.  And that's Exhibit Number 16; correct?
14     A.  Correct.
15     I'm going to apologize right now to the court
16 reporter, I am mixing photos up and I hope I didn't just
17 bury some exhibits.
18     MR. SCHALK:  We'll find them.
19     THE WITNESS:  Okay, okay.
20     Those are the only components that I can
21 specifically identify with any absolute certainty on this --
22 these photographs compared to the parts list, separate from
23 the pan itself.
24 BY MR. LEGER:
25     Q.  Okay.  And that's this stack right here?

Page 237

1      A.  No -- yeah, this stack would be the
2  photographs we talked about earlier plus this stack.  So --
3      Q.  Okay.
4      A.  This connects to that gas fitting --
5      Q.  Let's keep them in order of the exhibits and
6  then we'll -- 11, 10 --
7      A.  15, 16.  That one we haven't marked yet.
8      Q.  Is that one of the photographs that you picked
9  out?
10     A.  Yes, it was marked in two spots.
11     Q.  13, 14, 15 -- this is the same photograph,
12 almost.
13     MR. SCHALK:  It's been marked, though.
14 BY MR. LEGER:
15     Q.  16 -- so I have 10 through 16.
16     MR. SCHALK:  Brad, did you want this marked --
17     MR. LEGER:  I don't need it, I don't need it marked.
18     MR. SCHALK:  Okay.
19     THE WITNESS:  Everything else would be located under
20 that cooling unit.
21 BY MR. LEGER:
22     Q.  Okay.  In Exhibit 10, from your parts list
23 here, what can you identify in Exhibit Number 10?
24     A.  Exhibit Number 10, we can identify part number
25 19, which is the base plate, the bottom pan itself, sitting

Page 238

1  right underneath the boiler and also underneath the chimney
2  flue itself.
3      Q.   And that's on Exhibit 10.  So we are talking
4  about just the pan?
5      A.   Just the pan.
6      Q.   Okay.
7      A.   So we know that survived post-fire.
8      MR. LEGER:  Well, objection, nonresponsive.
9      Q.   What can you identify on Exhibit Number 11?
10     A.   Exhibit Number 11 --
11     THE VIDEOGRAPHER:  Okay.
12     THE WITNESS:  -- you can identify the remains of the
13  bottom pan and the electrical wiring going into the
14  refrigerator bottom pan.
15  BY MR. LEGER:
16     Q.   Okay.  Exhibit Number 12, what can you
17  identify?
18     THE VIDEOGRAPHER:  Okay.
19     THE WITNESS:  The bottom pan here, we have the
20  bottom pan here, this is the cooling unit, this is the LP
21  supply piping to the flared end that we were just
22  discussing.
23  BY MR. LEGER:
24     Q.   And the cooling unit was collected by Farm
25  Bureau and it's currently in their custody; correct?

Page 239

1      MR. SCHALK:  Objection, assumes facts.
2      THE WITNESS:  Yes.
3  BY MR. LEGER:
4      Q.   Okay.  So is there anything in Exhibit Number
5  12 that you are alleging was not collected that should have
6  been?
7      A.   Yeah, the pan and the electrical going to the
8  pan is part of it.
9      Q.   Okay.
10     A.   Going to the control.
11     Q.   And that's the same thing you identified in
12  Exhibit Number 11?
13     A.   Correct.
14     Q.   The pan and the electrical?
15     A.   Correct.
16     Q.   So, so far, all I've heard is the pan and
17  electrical that should have been collected -- according to
18  you -- should have been collected and was not.
19     Pan, electrical.  What else?
20     A.   Okay.  And Exhibit 13 is the same as Exhibit
21  12.
22     Q.   Okay.
23     A.   Exhibit 14 is -- this is the remains of the
24  capillary; they did secure this.  They did not secure where
25  it went into the underside, into the pan itself.  It's

Page 240

1  terminated right there.
2      They did not go in and check out the rest of it,
3  because there's a piece that goes from here to the
4  Sourdillion valve.
5      Q.   And in Exhibit Number 14, Farm Bureau
6  collected the capillary?
7      A.   It was marked with a Farm Bureau evidence tag,
8  correct.
9      Q.   Okay.  And Farm Bureau apparently has
10  possession of the capillary?
11     A.   That's correct, I did see it when I was out
12  there.
13     Q.   And they have the wiring; correct?
14     A.   To this point.  It's a very small piece --
15  it's not wiring, it's a tube.
16     Q.   Do you know what was on the other end at that
17  point?
18     A.   There's a continuous piece, it's a tube that
19  goes all the way back to the Sourdillion valve.
20     Q.   Okay.  Do you know if that tubing was present
21  at the scene?
22     A.   Again, I can only go by the fact that if the
23  Sourdillion valve was the cause of the fire, the capillary
24  tube has to be there.
25     Q.   Do you have any photographs that show that it

Page 241

1  was there?
2      A.   No, they never took photographs of it to show.
3      MR. LEGER:  Objection to the nonresponsive part.
4      THE WITNESS:  Okay.
5  BY MR. LEGER:
6      Q.   So far --
7      A.   The exhibit --
8      Q.   Hold on.  So far, so I'm clear, the only thing
9  that I've heard you identify that was not collected that you
10  can identify in these photographs is the pan and some
11  electrical going into the pan.
12     A.   So far.
13     Q.   Okay.  And Exhibit Number 15 is the fuse
14  panel?
15     A.   Exhibit 15 is where -- the location where the
16  fuses are.  I'll show you that in a second on a closer view
17  on Exhibit 16.
18     Q.   Is that an actual depiction of the fuse panel
19  or are you just --
20     A.   No, you can see part of it in there, and then
21  you have Exhibit 16, which is a closer view.
22     Q.   Okay.  Let's see Exhibit 16.
23     A.   One second.
24     THE VIDEOGRAPHER:  I'm good.
25     THE WITNESS:  Okay, it's located right there.

61 (Pages 238 to 241)

1  BY MR. LEGER:
2      Q.   Is that --
3      A.   Those are the plastic covers for the fuses of
4  the 462 refrigerator, and that is on this pipe, part here,
5  which is the cover plate relayer in item number 17.
6      Q.   Is that an actual -- does that photograph
7  actually depict the fuse panel?
8      A.   It depicts the fuses, of their -- of the
9  remains.  These are the location of the fuses on this
10 laminar black plastic.
11     Q.   Does it actually depict the fuse panel?
12     A.   I just answered your question, sir.
13     This is the two cartridge fuses that sit in there,
14 they are about this long, they are glass fuses that go
15 horizontally into a hole with a black cap.
16     Q.   Okay.
17     A.   And what we are seeing there are the remains
18 of the two black caps that are intact.
19     Q.   Circle what you allege to be the fuse panel
20 and identify it.
21     A.   And then also in this photograph, you can see
22 the remains of copper wiring, which is the electrical wiring
23 going into the relighter pack, into the bottom plate.
24     Q.   Right, which you've already discussed.
25     Okay, so let me make sure I'm clear.

1  15, 16 -- we have the -- according to you, you've
2  identified some photographs at the panel and some electrical
3  wiring going into the panel; you allege that that was not
4  collected by Farm Bureau; correct?
5      A.   That was not collected in this case.
6      Q.   Okay.  And then there's -- I just have
7  electrical here.  Is that --
8      A.   There's twelve volt and 120 volt wiring going
9  into that cabinet.
10     Q.   Okay.
11     A.   None of it was collected.
12     Q.   Okay.  And what was that electrical made out
13 of?
14     A.   Copper.
15     Q.   And then Exhibit 16, you have identified some
16 fuses; correct?
17     A.   That's the location of the fuse caps, correct.
18     Q.   And it's your contention that those fuses were
19 not collected; correct?
20     A.   Correct.  The whole bottom pan was not
21 collected.
22     Q.   And you spent a good amount of time going
23 through all the photographs to identify any of these
24 components and -- from this diagram -- what is this, Exhibit
25 Number 9, I believe?

1      A.   Nine.
2      Q.   -- and those are the only components that you
3  can identify in the photographs that were taken in this case
4  at the scene; correct?
5      A.   These are the only items that I was able to
6  conclusively identify, correct.
7      Q.   Do you have any knowledge, whatsoever, sir, of
8  the burn patterns that would have been present on -- scratch
9  that.
10     Have you seen any burn patterns on the pan that to
11 you would indicate that the fire started somewhere else?
12     MR. SCHALK:  Objection, form.
13     THE WITNESS:  No.
14 BY MR. LEGER:
15     Q.   Okay.  Have you identified any burn patterns
16 on the pan?
17     A.   I've not rendered any opinions in this case
18 for burn patterns or otherwise.
19     Q.   Have you seen any burn patterns on the pan?
20     A.   I've seen some burn patterns on the pan as
21 evidenced in these exhibits that we talked about.
22     You have heavy oxidation of the bottom pan, but no
23 one took pictures of the pan itself without debris there to
24 identify any burn patterns.
25     Q.   Do you -- are you -- as you sit here today,

1  can you testify one way or another whether there were any
2  burn patterns on that pan that would assist in determining
3  the cause and origin in this case?
4      A.   No.
5      Q.   As you sit here today, can you conclusively
6  testify that there were any burn patterns on the electrical
7  components that you allege were not collected that would
8  assist you in determining the cause and origin of the fire
9  in this case?
10     MR. SCHALK:  Objection.
11     THE WITNESS:  I'm sorry, one more time?
12 BY MR. LEGER:
13     Q.   Can you, as you sit here today, conclusively
14 testify under oath that there are burn patterns on the
15 electrical components identified in these photographs,
16 Exhibit 16 through -- I'm sorry -- 10 through 16, that would
17 aid you and assist you in determining the cause and origin
18 of the fire in this case?
19     A.   The answer to that would be maybe, and the
20 reason why I say maybe is simply because that there are
21 signs of electrical activity that are documented in some of
22 the photos but nothing taken close up.
23     There were also signs, when I looked at the evidence
24 examined, of electrical arcing occurring.  But we need to
25 put that into context:  Was it refrigerator wiring or was it

Page 246

1  coach wiring?
2      Exhibit Number 16 is an example, on the end of the
3  flare tube.
4      Q.  Okay.  So as you sit here today, if you were
5  going to render an expert opinion in this case, can you say
6  one way or another whether the burn patterns, if there are
7  even any burn patterns on those electrical components, that
8  those would assist you in determining the cause and origin
9  of the fire in this case?
10     MR. SCHALK:  Calls for speculation.
11     THE WITNESS:  I would say that any analysis of burn
12 patterns would assist but it may or may not be relevant to
13 the case.
14 BY MR. LEGER:
15     Q.  Can you testify today -- here, today, under
16 oath, that in fact even are any burn patterns on those
17 electrical components?
18     A.  As I mentioned on Exhibit Number 16, right
19 here at the end of the flare tube, we have a section piece
20 of wire that shows the sign of a ball at the end that needs
21 to be examined to determine whether or not it's arc or melt.
22 That's a basic rule of fire investigation which was not
23 done, at this point, to my knowledge.
24     MR. LEGER:  Objection to the nonresponsive portion.
25     Q.  And in that circle where you just pointed to,

Page 247

1  the temperature was at least 17- to 1800 degrees Fahrenheit;
2  correct?
3      A.  It will be over 2,000 degrees with the copper
4  melting.
5      Q.  Thank you.  And the fuse panel, as you sit
6  here today, can you conclusively testify under oath that
7  there are burn patterns on the fuse panel that would assist
8  you in determining a cause and origin in this case?
9      A.  Yes.
10     Q.  Okay.  What were those burn patterns?
11     A.  Well, the fact that the plastic, the black
12 plastic cover is still remaining on there, plastic is
13 between five and 700 Fahrenheit.
14     We have 2,000 degree damage over here, we have 2,000
15 degree damage here, or a broken wire, we are not sure, but
16 the wire terminates.  So these are types of patterns that we
17 look for when we try to render opinions of origin and cause.
18     Q.  And you said there was at least 2,000 degrees
19 Fahrenheit in this area?
20     A.  Copper melts at 1981; we call it 2,000
21 degrees.
22     Q.  Can you circle that area right there --
23     A.  I'd be happy to.
24     Q.  -- where you said the temperature was 2,000
25 degrees Fahrenheit?

Page 248

1      A.  I said, or it was broken.
2      Q.  Okay.  Can you write that on there?
3      A.  I put wire inspect on it.
4      Q.  And --
5      A.  That circle.
6      Q.  Broken or 2,000 degrees Fahrenheit.
7      As you sit here today, sir, can you testify
8  conclusively, under oath, that there are burn patterns
9  contained on the interior of the pan that would assist you
10 in determining the cause and origin of this fire as it
11 relates to the Sourdillion valve?
12     A.  Yes, every fire has burn patterns, whether or
13 not there is actually fire damage, heat damage, or smoke
14 damage.
15     Q.  Have you seen the interior of the pan?
16     A.  I have not seen the interior of the pan
17 because it's not been documented, but the exterior of the
18 pan has, and there are patterns to it.
19     MR. LEGER:  Okay, object to the nonresponsive
20 portion.
21     Q.  If you -- if you have never seen the actual
22 pan, then how do you know what it looks like?
23     A.  I have not seen the pan in this case.  I have
24 seen the photographs of the pan in this case, and also my
25 examination of several other hundred Sourdillion valve

Page 249

1  issues.  I know what the components are, I know where they
2  are located, and I know what they're --
3      Q.  Is it your opinion today, here, under oath,
4  that an expert cannot determine the cause and origin of the
5  fire without the components that you allege were not
6  collected by Farm Bureau?
7      A.  The -- I'm going to have to say yes, because
8  there are many components that should have been collected
9  that weren't, there are other items of evidence that are
10 germane to this case that were supposed to be collected and
11 weren't, and as a result, with none of the evidence, there's
12 no reasonable conclusions that could be drawn.
13     MR. LEGER:  Objection, nonresponsive.
14     Q.  So it's your testimony here today that no fire
15 and cause and origin expert in this country could determine
16 the cause and origin of this fire based upon the eyewitness
17 testimony, based upon the inspection of the scene, the burn
18 patterns, and other information, that they cannot determine
19 a probable cause of fire in this case?
20     MR. SCHALK:  Object to form.
21     THE WITNESS:  Again, sir, I'm sure you can find
22 someone who can tell you whatever you want to hear, but
23 following 921 of the procedures we are supposed to use, the
24 answer to that would be no.
25 BY MR. LEGER:

63 (Pages 246 to 249)

Page 250

1    Q.   Okay.  And what procedure do you use under
2 NFPA 921 if some of the components are not available for
3 inspection?
4    A.   First of all, they should have been identified
5 at the scene and should have been at least notified in
6 writing about what they were.
7        Other parties should have been invited and they were
8 not.
9        Then when you get to the evidence itself, someone
10 has to take control of it.  In this case, it was Mr. Waite
11 took control of the evidence.
12       Mr. Bailey, regardless of whether you want to read
13 this or you want to believe what I was told, Mr. Bailey was
14 the one instructing Mr. Waite what to remove, and with all
15 the evidence in this case, then you can start rendering
16 opinions.
17       But right now, like I said, I have not been to the
18 scene, I have not eliminated anything in the scene, and I
19 have witness statements that are questionable.
20    Q.   Why are the witness statements questionable?
21 Have you investigated and interviewed those
22 witnesses?
23    A.   I've taken -- the answer to that is no.
24       I've taken the statements given to me by Mr. Bailey
25 in his report and the factual nature of what I have

Page 251

1 documented at the scene, and there are questions pertaining
2 to whether or not some of --
3    Q.   You've never been to the scene.  What did you
4 document at the scene?
5    A.   Documentation taken at the scene by Mr. Waite
6 and Mr. Bailey.
7    Q.   Let me get this straight.  You -- it's your
8 testimony that the eyewitness testimony in this case is
9 questionable because of what?
10   A.   Because there are statements that are
11 conflicting with documented facts in this case.
12   Q.   Okay.  How are the statements that we read
13 earlier conflicting with documents?  And what documents are
14 you referring to?
15   A.   The photographic documentation by Mr. Waite
16 and Mr. Bailey does not show any documentation of a
17 hundred-pound propane cylinder that I was able to see in
18 there.  There was no propane cylinder located near the RV,
19 and that propane cylinder was recently connected to the
20 trailer in lieu of the smaller tanks.
21   Q    And --
22   A.   On top of that --
23       (Inaudible overlapping talking.)
24   MR. SCHALK:  No, no, let him finish.
25   THE WITNESS:  On top of that propane cylinder to

Page 252

1 provide the propane to the coach, you have to have at least
2 a single stage regulator, two stages preferred.  It has to
3 be listed and approved for the application of connecting up
4 to a RV, as required by NFPA 1192.
5        The hose connection going from that regulator to the
6 RV, once connected up, has to be listed and approved per
7 that application NFPA 1192.  It has to be serviced and
8 maintained to provide eleven inches water column in
9 accordance with the manufacturer's specifications of the
10 refrigerator, the water heater, the furnace, and the stove.
11       And then in addition, it has to be made sure that it
12 operates within the propane tolerances of the 1192 code for
13 the coach itself.
14       Those are important pieces of evidence in this case
15 as pertaining to here, depending upon where the fire
16 occurred.
17 BY MR. LEGER:
18   Q.   Okay.  And have you talked to the witnesses
19 about all -- any of that?
20   A.   I have not talked to witnesses because I took
21 Mr. Bailey's statements, and once we had the statements and
22 he was not pursuing against Norcold, my involvement in the
23 case pretty much ended.
24   Q.   All right.
25   A.   Until we had the secondary inspection.

Page 253

1    Q.   Okay.  You were aware that there was a third
2 party involved in the case, the Vores and also Farm Bureau;
3 right?
4    MR. SCHALK:  Objection, asked an answered.
5    THE WITNESS:  The deVores are a party in this case
6 and Farm Bureau has the insurance coverage for the
7 structure, correct, but they are all related, as I
8 understand.
9    Q.   And Tom Bailey didn't represent Farm Bureau;
10 did he?
11   A.   No.
12   Q.   Tom Bailey didn't represent the Vores?
13   A.   It's my understanding that Mr. Bailey
14 represented the Smiths.
15   Q.   And why, if Tom Bailey told you he wasn't --
16 Tom Bailey is not a lawyer; is he?
17   A.   No.
18   Q.   And you say Tom Bailey told you he wasn't --
19 what -- with respect to Norcold?
20   A.   In the April 28, 2010, e-mail he sent to
21 myself and John Schlesman, he said he's not pursuing against
22 Norcold at this time, and we closed our file.
23   THE REPORTER:  He's not pursuing against Norcold --
24   THE WITNESS:  -- and we closed our file.
25   MR. SCHALK:  At this time.

64 (Pages 250 to 253)

Page 254

BY MR. LEGER:
1   BY MR. LEGER:
2        Q.   He's not pursuing what?
3        A.   He's not looking at Norcold to being the
4   responsible party in this case.
5        Q.   Did you, at that time, call Mike Waite and the
6   third party Vores to see if they were continuing on with
7   their claims against Norcold?
8        A.   No.  Mr. Bailey is the one that put Norcold on
9   notice.
10       Q.   Okay.  And thank god he did that; right?
11       A.   I always like to know when there's a fire.
12       Q.   Yeah, and I'm sure Norcold does, as well;
13  right?
14       A.   They would like to know when there's a fire in
15  some --
16       Q.   And Tom Bailey put you and Norcold on timely
17  notice; did he not?
18       MR. SCHALK:  Objection --
19       THE WITNESS:  Tom Bailey put Norcold on notice.  I
20  was advised of the Bailey notice.
21  BY MR. LEGER:
22       Q.   And earlier, you said you weren't hired as --
23       Maybe I misheard your testimony.  You said you
24  weren't hired as a cause and origin expert in this case.
25       A.   I was not retained as an expert in this

Page 255

1   deposition.
2        Q.   Maybe that's what you said, because I have an
3   e-mail here, you'll agree, that you were hired as a cause
4   and origin expert on March 10th, 2010, or March 11th?
5        A.   Correct.
6        Q.   Okay.
7        MR. LEGER:  Can we go off the record for a second?
8        THE VIDEOGRAPHER:  We are going off the record, the
9   time now is 3:39.
10       (Conversation held off the record.)
11       THE VIDEOGRAPHER:  We are back on the record, the
12  time now is 3:40.
13       MR. LEGER:  Mr. Bloom, I have no more questions for
14  you today.  Thank you for coming here today.
15       ---oOo---
16       CONT'D EXAMINATION
17  BY MR. SCHALK:
18       Q.   Just really quickly, Mr. Bloom, you referenced
19  some kind of sheet of notes that you discussed with
20  Mr. Leger.  Do you have that?
21       A.   This is it.
22       Q.   Can you just let me mark that as Exhibit 17?
23       A.   Okay.
24       MR. SCHALK:  That's all I have for you.  Thank you
25  very much, Mr. Bloom.

Page 256

1        (Whereupon Exhibit Number 17 was marked for
2             identification.)
3        THE VIDEOGRAPHER:  We are going off the record, the
4   time now is 3:41.
5        (Deposition concluded at 3:41 p.m.)

Page 257

1             DECLARATION UNDER PENALTY OF PERJURY
2
3
4
5        I hereby certify under penalty of perjury that I
6   have read the foregoing transcript of my deposition;
7   that I have made such corrections as appear noted
8   herein in ink, initialed by me; that my testimony as
9   contained herein, as corrected, is true and correct.
10
11       DATED this _____ day of _____, 2014,
12  at _____, _____.
13
14
15
16
17
18
19       _____
20             Deponent
21
22
23
24
25

Page 258

1              REPORTER'S CERTIFICATE
2    STATE OF OREGON      )
                          ) ss.
3    COUNTY OF JACKSON    )
4           I, LAURA L. SMITH, a Certified Shorthand Reporter
5    and Notary Public for the State of Oregon, do hereby
6    certify:
7           That the witness, CHRISTOPHER J. BLOOM, was present
8    at the time and place herein set forth and was by me sworn
9    to testify as to the truth;
10          That the said proceedings were recorded
11   stenographically by me and were thereafter transcribed under
12   my direction via computer-assisted transcription;
13          That the foregoing transcript is a true record of
14   the proceedings which then and there took place;
15          That I am a disinterested person to said action.
16          IN WITNESS WHEREOF, I have affixed my seal and
17   subscribed my name on February 14, 2014.
18
19
20
21
22
23
     _____
24       LAURA L. SMITH, Notary Public
         CSR NO. 97-0340
25

66 (Page 258)

REPORTER'S CERTIFICATE

STATE OF OREGON        )
                       )  ss.
COUNTY OF JACKSON      )

    I, LAURA L. SMITH, a Certified Shorthand Reporter and Notary Public for the State of Oregon, do hereby certify:

    That the witness, CHRISTOPHER J. BLOOM, was present at the time and place herein set forth and was by me sworn to testify as to the truth;

    That the said proceedings were recorded stenographically by me and were thereafter transcribed under my direction via computer-assisted transcription;

    That the foregoing transcript is a true record of the proceedings which then and there took place;

    That I am a disinterested person to said action.

    IN WITNESS WHEREOF, I have affixed my seal and subscribed my name on February 14, 2014.

LAURA L. SMITH, Notary Public
CSR NO. 97-0340

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LONNIE SMITH and CHERYL SMITH,
     Plaintiffs,

                      Case No.: 4:13-cv-10841-TGB-LJM

                      Hon. Terrence G. Berg
                      Hon. Laurie J. Michelson

v

NORCOLD, INC.; ALCOA, INC.;
 ALCOA ENERGY SERVICES, INC.; &
BURNER SYSTEMS, INC.
     Defendants.

---

## PLAINTIFFS' NOTICE OF ORAL DEPOSITION OF CHRIS BLOOM

---

To:    Defendants, NORCOLD, INC, ALCOA, INC & ALCOA ENERGY SERVICES, INC.,
through their attorney of record, Larry Davidson, Harvey Kruse, 1050 Wilshire Drive,
Suite 320, Troy Michigan 48084-1526.

    Please take notice that, under Federal Rule of Civil Procedure 30, Plaintiffs LONNIE

SMITH and CHERYL SMITH, will take the oral deposition of **CHRIS BLOOM** on

**MONDAY, FEBRUARY 3, 2014** at **10:00 a.m.,** at the address as follows:

### COURTYARD MEDFORD AIRPORT
### 600 Airport Road
### Medford, Oregon 97501

    1.    The deposition will be recorded stenographically and on videotape and will

continue from day to day until complete. The stenographic recording will be taken before

**Maxine Weinberg Agency**.

    2.    Under Federal Rules of Civil Procedure 30(b)(2) and 34, **CHRIS BLOOM** is

requested to produce the discoverable information at the deposition as set forth in **Exhibit A**.



EXHIBIT _cʃ_

_Bloom 2/3/14_

3.      The intention to videotape the deposition(s) is subject to change, so if any other party wishes to videotape the deposition(s), they need to make their own independent arrangements and give the proper notice of their intentions. The videotaping of the deposition(s) will be done by an operator with **Maxine Weinberg Agency**.

4.      The original of the videotape will remain in the above operator's possession, subject to the inspection of any party, at the above address upon reasonable notice.  In the event that any party wishes a copy of the videotape(s), it will be delivered to an independent videotape transfer company, for copying at that party's expense.


Respectfully submitted,


 /s/  Bradley L. Leger
Bradley L. Leger (TSB#24039899)
Email: bleger@legeradkins.com
Pierce M. Adkins (TSB#24043524)
Email: pmadkins@legeradkins.com
LEGER ADKINS, LLP
The Bellevue Tower
2323 S. Shepherd Dr., Suite 915
Houston, Texas 77019
(713) 574-5558
(713) 574-1894 (facsimile)

AND

Barry J. Goodman (P29906)
Email: bgoodman@goodmanacker.com
Larry R. Maitland II (P65363)
Email: lmaitland@goodmanacker.com
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor

Plaintiffs' Notice of Oral Deposition of Chris Bloom
*Lonnie Smith, et al. v. Norcold, Inc.*
Page 2

Southfield, Michigan 48075
(248) 483-5000
(248) 483-3131 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**
**LONNIE & CHERYL SMITH**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of **PLAINTIFFS'**

**NOTICE OF ORAL DEPOSITION OF CHRIS BLOOM** was served on all counsel of record

on this the 15th day of January, 2014.

/s/  Bradley L. Leger_____
Bradley L. Leger

*Sent Via Facsimile to (248)649-2316;*
*& Email: ldavidson@harveykruse.com*

Larry W. Davidson
HARVEY KRUSE
1050 Wilshire Drive
Suite 320
Troy, MI 48084-1526

**ATTORNEYS FOR DEFENDANTS**
**NORCOLD, INC, ALCOA, INC & ALCOA ENERGY SERVICES, INC.**

Plaintiffs' Notice of Oral Deposition of Chris Bloom
*Lonnie Smith, et al. v. Norcold, Inc.*
Page 3

## EXHIBIT A

## <u>DUCES TECUM LIST</u>

1. A copy of the deponent's current driver's license.
2. A copy of the deponent's current resume or curriculum vitae setting forth the deponent's background, experience, etc. and any other member of deponent's staff who has worked on this matter.
3. All documents and other tangible things in the deponent's file that in any way relate to the deponent's investigation into this matter (this request does not seek the deponent's opinions as to cause and origin).
4. Copies of any prior trial and/or deposition testimony given by deponent where an allegation was made concerning a fire in Norcold and/or Alcoa Refrigerators.
5. A list identifying by name, address and phone number each person with whom the deponent has in any way discussed, consulted, or communicated about this lawsuit or the facts it involves.
6. All correspondence, communications, or documents reflecting communications of any kind between the deponent and any Plaintiff, insurance company, investigator, fire department personnel, and/or fact witness in this matter.
7. All correspondence, communications, or documents reflecting communications of any kind between the deponent and John Schlesman, Tom Bailey, Jackie Bligh, and Michael Waite.
8. All correspondence, communications, or documents reflecting communications of any kind between the deponent and third parties regarding any Plaintiff.
9. Copies of any notices given to deponent by any Plaintiff and/or any representative of any Plaintiff.
10. Copies of any correspondence drafted by you regarding this incident (this request does not seek the deponent's opinions as to cause and origin).
11. Copies of any correspondence between you and any Defendant and/or Defendant's representatives in this lawsuit that in any way relates to Defendants' spoliation of the evidence claim and/or the retention and/or preservation of evidence in this matter.
12. All documents that have been prepared or generated by the deponent in anticipation of the deponent's deposition testimony, or in connection with the deponent's work on this case.
13. All notes, correspondence, memoranda, photographs, videotapes, audio recordings, documents, factual observations, supporting data, calculations, and other tangible things that form the basis, either in whole or in part, of the opinion of the deponent that all available components of the refrigerator at issue in this matter were not properly retained during any scene inspection.

Plaintiffs' Notice of Oral Deposition of Chris Bloom
*Lonnie Smith, et al. v. Norcold, Inc.*
Page 4

14. All correspondence, notes, reports, writings, or other documents and tangible things, including drafts, prepared by or furnished by or received by the deponent relating to Defendants' spoliation of the evidence claim and/or the retention and/or preservation of evidence in this matter.

15. All articles, books, treatises, journals, periodicals, pamphlets, and other documents upon which the deponent relies or to which the deponent has referred in connection with work on this case, or to which the deponent may refer to during his deposition testimony.

16. All field notes, relating to inspections, analysis, and work performed by the deponent in connection with this case.

17. Any and all test documents or testing materials produced, generated, or compiled as a result of the work done by the deponent or at the deponent's direction in regard to this lawsuit.

18. All other documents and tangible things, including transcripts of depositions and summaries of depositions, used, reviewed, examined, received, referred to, and/or consulted by the deponent from any source whatsoever in connection with the formation and/or rendition of each opinion that the deponent may express or testimony that he may offer during the trial of this suit or by way of deposition testimony relating to Defendants' spoliation of the evidence claim and/or the retention and/or preservation of evidence in this matter.

19. A complete list of publications, books, text, and other articles written by the deponent.

20. A list of all cases in which the deponent has appeared by way of deposition or trial testimony. Such list should state the style of the case, the cause number, the court in which the case was pending, and the attorneys of record.

21. All documents relating to the compensation of or fee arrangement between Defendants and the deponent and the services to be rendered by the deponent, including all fee agreements, retention agreements, billing records, time records, statements, and invoices.

Plaintiffs' Notice of Oral Deposition of Chris Bloom
*Lonnie Smith, et al. v. Norcold, Inc.*
Page 5



**OREGON** CLASS C

**DRIVER LICENSE**

**4057738** Expires 08-05-2016
BLOOM, CHRISTOPHER JOSEPH

DOB 08-05-1968  Issue Date 07-22-2008

| Endorsements | Sex M | Record Created 1983 |
| Restrictions D | Height 5'11" | Weight 240 |

**BLOOM, CHRISTOPHER JOSEPH**
**2654 E GREGORY RD**
**WHITE CITY, OR 97503**



EXHIBIT  w/
2
Bloom 2/3/14
PENGAD 800-631-6989

2-1





CLASS: C - Any single vehicle with a GVWR of not more than 26,000 pounds with the proper endorsements. Any emergency vehicle operated by a firefighter.

**RESTRICTIONS**
D - anatomical donor

Upon my death,
I want to be an
anatomical donor.

2-2



# Chris Bloom

Rev 11/07

2654 E Gregory Rd, White City, Oregon 97503
**(541) 826-6522  (541) 826-6588Fax**

**Http://CJBFire.com**
CJBFIRE@CHARTER.NET

OR PI: 1993509
OPSST: 33394
AZ PI: 9312006
FL PI: C2500269

## QUALIFICATIONS

Mr. Bloom has more than 23 years experience in the field as a fire consultant, determining the cause and origin of fires.  He has highly specialized expertise with fires involving Recreational Vehicles, Automobiles, Propane, Welding & Cutting Operations, and others.  His experience includes the examination and/or case analysis and review of over several thousand fires throughout the United States, England, Canada, and Mexico.

Mr. Bloom has been a featured expert on a high-profile case covered by the CBS News-48 Hours national television program, and both a featured fire expert and consultant on recent episodes of Court-TV's Forensic Files.

Mr. Bloom has taught numerous courses on Fire Investigation at the college level.  He has taught Vehicle Fire Investigation for the California Dept of Justice, and currently provides limited consultation support for both NTSB and NHTSA on vehicle fire issues.  Mr. Bloom has also been the featured expert teaching several State Chapters of the International Association of Arson Investigators on the topic of Basic and Advanced Motorhome and Recreational Vehicle Fire Investigation and Vehicle Fire Investigation.  Mr. Bloom has provided additional support, in the form of consultation and contributing author, to NFPA 921, Kirk's Fire Investigation, and other leading industry Technical Reference Manuals.

Mr. Bloom's training materials on Basic Vehicle Fire Investigation has been  requested by over 192 different federal, state, and local public jurisdictions and private agencies, from 10 different countries.

Mr. Bloom also serves and actively participates on three National Fire Protection Association Technical Committees and one ASTM Technical Committee, assisting in the drafting of new codes and revisions reflecting the up-to-date standards in the industry.



EXHIBIT
3
Bloom 2/3/14
PENGAD 800-631-6989



**CJB FIRE CONSULTANT**

# Chris Bloom

© 2007

2654 E Gregory Road, White City Oregon 97503
**(541) 826-6522  (Office)**
**(541) 826-6588 (fax)**
**(541) 944-6926 (Cell)**
Http://CJBFire.com
CJBFIRE@CHARTER.NET

OR PI 1999369/DPSST JA596
AZ PI 9312006
FL PI C2300249

The following is only a short summary of Mr. Bloom's Expertise.  A complete CV detailing all information is available upon request.

## PROFESSIONAL  EXPERIENCE
**CJB Fire Consultants**, Grants Pass, Oregon - March 1992 to Present
**Ashland Fire Department,** Ashland, Oregon - November 1996 to January 2007
**Corvallis Fire Department**, Corvallis, Oregon - January 1991 to September 1993
**Bloom Fire Investigation**, Grants Pass, Oregon - September 1983 to March 1992

## CERTIFICATIONS AND AWARDS
**Oregon Dept Public Safety Standards Training**
  —Private Security & Investigators Policy Committee Board Member– Government Appointment
**Licensed Private Investigator -** Arizona, Oregon,  Florida, Alaska Business License
**Certified Fire and Explosion Investigator**,  National Association of Fire Investigators
**Oregon State University**, *Bachelor of  Science Degree-June 1993*
**IAAI District President**, Southern Oregon (Rogue Valley) District, 1997-1998
**Volunteer of the Year,** Corvallis Fire Department, 1992
**SOLETEC-1995,**  Southern Oregon Law Enforcement Training & Education Center, Reserve Police Officer Training

## EXPERT WITNESS
Trial Certified Expert:      **State of Oregon**
                                    **State of Georgia**

## PROFESSIONAL AFFILIATIONS
National Fire Protection Association (NFPA)
National Association of Fire Investigators (NAFI)
International Association of Arson Investigators- (IAAI)  **Oregon, Colorado,  Nebraska**
International Association of Arson Investigators- **(IAAI) International**
**IASIR, International Association Security Investigative Regulators**
Sigma Pi Fraternity, **Alumnus - *Oregon State University***

## PUBLICATIONS
* Contributing Author of  a portion of **Kirk's Fire Investigation,  4th & 5th Editions.**
* Contributing Author of a portion of **NFPA 921—2001 & upcoming 2008 Editions,** involving *Recreational Vehicle Fires*
* Contributing Consultant of *Ignition Handbook*
* Co-Author of book, *Motorhome & Recreational Vehicle Fire Investigation, 1st and 2nd Edition*
* *RV Refrigerator Compartment Fires*
* *NFPA 921 & Fire Investigation*
* *Fire Investigation Using "The Scientific Method*
* Co-author *Fire Investigation Ethics & Product Liability*
* *Welding & Cutting Practices*
* *Aerial Photography & Fire Investigation*
* *Faulty Workmanship or Rodents?*
* Co-author **"SLIPPERY" Issues in Aquarium Fire Losses**
* *Understanding Heat Soak*
* Co-Author of **Ford Ignition Switch Fires**
* *Plastics & Vehicle Fire Investigation*
* *R-134 Refrigerant & Fire Investigation*
* *Photography of Vehicle Fires*

AUG-15-2006  01:22    PATTERSON PLANNING    212 599 5165    P.03/16

**EXHIBIT** ___4___

# LeBoeuf, Lamb, Greene & MacRae
## L.L.P.
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

| | | |
|---|---|---|
| NEW YORK | | LONDON |
| WASHINGTON, D.C. | | (A LONDON-BASED |
| ALBANY | **One Gateway Center** | MULTINATIONAL PARTNERSHIP) |
| BOSTON | **420 Fort Duquesne Boulevard** | PARIS |
| CHICAGO | **Suite 1600** | BRUSSELS |
| HARRISBURG | | JOHANNESBURG |
| HARTFORD | **Pittsburgh, PA 15222-1437** | (PTY) LTD. |
| HOUSTON | (412) 594-2300 | MOSCOW |
| JACKSONVILLE | FACSIMILE: (412) 594-5237 | RIYADH |
| LOS ANGELES | | (AFFILIATED OFFICE) |
| NEWARK | E-MAIL ADDRESS: BENJAMIN.FERRON@LLGM.COM | BISHKEK |
| PITTSBURGH | WRITER'S DIRECT DIAL: (412) 594-2316 | ALMATY |
| SALT LAKE CITY | WRITER'S DIRECT FACSIMILE: (412) 594-5237 | BEIJING |
| SAN FRANCISCO | | |

RECEIVED
AUG - 7 2006
JAMES E. WYNNE

August 3, 2006

<u>**VIA CERTIFIED MAIL**</u>

Richard Cicchillo, Jr., Esq.                     Sourdillon Inc.
Kilpatrick Stockton, LLP                          529 Rollins Industrial Drive
Suite 2800, 1100 Peachtree Street          P.O. Box 1150
Atlanta, Georgia  30309-4530                 Ringgold, Georgia  30736

Delta (Springbok) France, S.A.
c/o Corporate Service Company
2711 Centerville Road, Suite 400
Wilmington, Delaware  19808



EXHIBIT 4
4
B/oom 2/3/14

Re:   <u>Norcold Recall</u>

Dear Mr. Cicchillo and others:

　　We write on behalf of our client Alcoa Energy Services, Inc. f/k/a Norcold, Inc.,
formerly a division and subsidiary of the Stolle Corp. n/k/a Alcoa Home Exteriors, Inc., and their
ultimate parent corporation, Alcoa Inc. (collectively referred to as "Alcoa")[1]. As previously
referenced in correspondence from Pam Leyden dated February 3, 2003, this letter addresses the
issue of the defective gas control valves supplied to Norcold, Inc. and its predecessors by
Sourdillon, Inc. I have assumed responsibility for this matter from Ms. Leyden who has left our
firm.

　　In Mr. Cicchillo's letter of March 17, 2003, he indicated that the liabilities
associated with these products were retained by Delta (Springbok) France, S.A. ("Springbok").
To be sure that this letter is directed to the correct individuals or entities, I have addressed it to

---

[1] Norcold, Inc. sold all of its assets to NA Acquisition Corp. effective February 6, 1997. Norcold, Inc. subsequently
changed its name to Alcoa Energy Services, Inc., while NA Acquisition Corp. is believed to have changed its name
to Norcold, Inc. The entity currently known as Norcold, Inc. is the administrator of a recall campaign discussed
herein, as the current manufacturer of Norcold refrigerators. Alcoa is contractually obligated to reimburse Norcold,
Inc. for costs associated with that recall campaign.

AUG-15-2006  01:23           PATTERSON PLANNING                    212 599 5105    P.04/16

R. Cicchillo, Jr., Esq.
Sourdillon Inc.
Delta (Springbok) France, S.A.
August 3, 2006
Page 2

Mr. Cicchillo, Sourdillon, Inc. and Delta (Springbok) France, S.A. Please advise if this letter
should be directed to any other individual or entity.

Ms. Leyden's letter referenced a recall campaign currently underway to replace
defective Sourdillon gas valves that were incorporated into various Norcold refrigerator models
manufactured between January 1987 and May 1995.[2] The costs incurred by Alcoa in connection
with that recall have been in excess of $4.6 million through March 2006. Such costs include the
administration of the recall as well as the actual cost of removing and replacing the defective
valves with new valves.

It is our understanding that as of August 7, 2003, based on a letter of that same
date from Ms. Leyden to Mr. Cicchillo and James Wynne, it was apparently believed that some
additional testing needed to be done to confirm the necessity of the recall. Our recent review of
the file revealed no such testing to have been performed since that date and no final conclusion
reached as to the request for indemnity.

Our client retained a consultant, Richard O. Lewis of Lewis Engineering &
Consulting, Inc., to perform additional testing of the suspect valves in order to determine
whether the recalled valves actually leak and thus whether a recall was appropriate. A copy of
Mr. Lewis' report is enclosed, including photographic documentation of the testing performed.

Mr. Lewis performed testing of 100 randomly selected valves returned through
the recall program to Norcold, Inc. at its plant in Sidney, Ohio. Mr. Lewis' report shows that 21
of the 100 tested valves had gas leaks, and that 15 of those leaks were characterized as severe.
Even a slight leak could allow the valve to continue to supply gas to the refrigerator while
leaking gas into the rear of the refrigerator compartment if used in a recreational vehicle. All of
the valves have been retained and can be made available for further testing if you or your
client(s) so desires.

Mr. Cicchillo will recall that Ms. Leyden proposed in her August 7, 2003 letter to
have one of the returned units not previously involved in a fire independently tested. The testing
of 100 units as performed by Mr. Lewis provides a far more detailed picture with respect to the
actual and anticipated failure rate of the valves in question. Moreover, when the results of Mr.
Lewis' testing are combined with the materials previously supplied by Norcold, Inc. (related to
inadequate levels of anti-ozonant in the rubber gasket in the valve), it is clear that the recall of
these valves was and is justified.

Alcoa therefore renews its demand that Sourdillon Inc. and/or Delta (Springbok)
France, S.A. indemnify, discharge and hold harmless Alcoa from any costs and expenses
associated with the recall of the defective Sourdillon valves, including attorneys' fees. This
demand is again made based upon the contracts between Sourdillon and Alcoa and/or its
subsidiaries/divisions which were in effect at the time the defective valves were originally

---

[2] Model Nos. 442, 443, 452, EV452, 453, 462, EV462, 463, EV463, 482, EV482, 483, EV483, 874 and 875.

AUG-15-2006  01:24        PATTERSON PLANNING                          212 599 5105     P.05/16

R. Cicchillo, Jr., Esq.
Sourdillon Inc.
Delta (Springbok) France, S.A.
August 3, 2006
Page 3

supplied to Alcoa by Sourdillon.  Section 14 of the various purchase orders issued by Alcoa for
these defective valves provides:

> Seller [Sourdillon] shall defend, indemnify, and hold
> harmless Purchaser [Alcoa] against all damages, claims or
> liabilities and expenses (including attorneys' fees) arising
> out of or resulting in any way from any defect in the goods
> or services purchased hereunder or from any act or
> omission of Seller, its agents, employees or subcontractors.
> This indemnification shall be in addition to the warranty
> obligations of Seller.

In addition to the costs associated with the recall program itself, Alcoa has
incurred several million dollars in defense and settlement costs associated with claims and
lawsuits resulting from fires and/or explosions caused by the allegedly defective valves.
Additionally, there remain a number of pending claims and lawsuits in which it is alleged that a
defective Sourdillon gas valve resulted in a fire or explosion.  Alcoa further demands that
Sourdillon and/or its successor agree to reimburse those defense and settlement costs incurred to
date and to assume responsibility for the defense and indemnity of Alcoa with respect to the
pending claims and potential future claims.

If Sourdillon or its successor refuses to assume responsibility for the costs being
incurred in connection with the defective valves sold to Alcoa, Alcoa will consider Sourdillon to
be in breach of its contractual obligations to Alcoa and it will have no recourse other than to
resort to those remedies provided by law and equity to recover the recall campaign costs and past
defense and settlement costs.  At a minimum, failing satisfactory resolution of this matter, we
consider that joining Sourdillon, Inc. and/or Delta (Springbok) France, S.A. as an additional
defendant in each pending and future lawsuit would be necessary and prudent.

Please respond in writing within ten days of your receipt of this letter and indicate
whether you are willing to work toward a prompt and proper resolution of this matter.

I look forward to hearing from you.

Very truly yours,

Benjamin J. Ferron

Enclosure
cc (w/ encl.):   James E. Wynne, Esq.

AUG-15-2006  01:24        PATTERSON PLANNING                    212 599 5105      P.06/16

## REPORT OF FINDINGS:
## LABORATORY INVESTIGATION OF SOURDILLON GAS VALVES
## REMOVED VIA RECALL FROM NORCOLD RV REFRIGERATORS

### BACKGROUND

Lewis Engineering and Consulting, Inc., (LEC), Gainesville, Florida, was requested by the law firm of LeBoeuf, Lamb, Greene & MacRae, LLP, Pittsburgh, Pennsylvania to examine two Sourdillon gas control valves that had been removed from Norcold gas/electric RV refrigerators. Information was provided regarding a recall program enacted by Norcold for replacement of all Sourdillon gas control valves installed in Norcold refrigerator Models 442, 443, EV452, 453, EV462, 482, EV482, 874 and 875 manufactured in the period from January, 1987, through May, 1995. Norcold issued recall notices in 2002 to RV owners, dealers and service centers, and distributors announcing the recall program and the affected model refrigerators. The notice advised that a defect in the rubber seal within the valve could result in a leak, and potentially a fire in the recreational vehicle where the refrigerator was installed.

In addition to the two valves and the recall notices, test reports were received for review that contained analytical data from several laboratories. Each laboratory had been submitted examples of Sourdillon gas control valves. The test results were principally chemical analyses of the polymer stem seals addressed in the recall notices.

One of the two valves received by LEC had been removed from a Model 462 refrigerator during a recall replacement in June, 2005. On the outer surface, the valve appeared to be in good condition, and was stamped "94 20" in the aluminum alloy body of the valve. The second had been involved in a fire incident in an RV which was equipped with a Model 462 gas/electric Norcold refrigerator. It appeared darkened by soot on all exposed surfaces. Photographs accompanying that valve were date stamped November 4, 2002. The body of the valve contained a stamp of "90 16."

Upon receipt, both valves were inspected in the LEC laboratory. The fire damaged valve was inspected on the outside only and otherwise left in the as-received condition. The recall valve was inspected and disassembled to allow detailed examination of all component parts of the control valve. Exposing of the lower portion of the regulating stem fitted with the subject polymer seals required drilling of aluminum alloy rivets to allow removal of the stamped steel



AUG-15-2006  01:25        PATTERSON PLANNING                    212 599 5105    P.07/16

LABORATORY INVESTIGATION OF SOURDILLON GAS/ELECTRIC            Page 2 of 4
CONTROL VALVES REMOVED DURING NORCOLD RV REFRIGERATOR
RECALL PROGRAM

bracket to which is fitted a micro-switch for electric operation control, and the metal diaphragm
for temperature regulation via the bulb capillary tube. With those components removed, the
regulating stem and lower seal can be visually inspected. It was observed under the light stereo
microscope that the lower seal contained a pattern of cracks through the thickness of the seal
material.

Based upon a discussion of these findings, the client requested that a protocol be
proposed for testing of additional valves that had been removed during the recall program. It had
been further reported that a total of 16,620 valves, from a total potential replacement population
of 196,255 valves, had been replaced as of May, 2005. In order to develop a test protocol based
upon a statistical sampling strategy, LEC was authorized to retain the services of Dr. R.L.
Scheaffer, consulting statistician, to assist in development of a sampling protocol.

Dr. Scheaffer's recommendations provided a basis for selecting an initial sample size for
testing. Based upon the total number of potential valves affected by the recall and the number
replaced as of May, 2005, he recommended a sample size of 800 valves from the total of 16,620
available to insure a margin of error of 3 percent or less.

## VALVE TEST PROTOCOL

Lewis Engineering proposed to conduct a visual examination and leak pressure test on an
initial series of recalled valves. The leak pressure test would be performed by installing a valve
in a relatively simple test rig whereby a standard regulated propane gas pressure of nominally 11
inches of water pressure could be applied at the inlet end. A direct current voltage would be
applied at the thermocouple input to effect a means of simulating a heated thermocouple input to
maintain the primary control valve open. The outlet fitting from the valve would then be
connected to a gas manometer to measure exit pressure and allow monitoring for leaks. An
AirCheck® Model M-100 pocket propane gas detection instrument would also be used to check
for significant gas leaks. Each valve would be photographically documented via still
photography during testing and a video camera would be used to fully record the testing process.

Due to logistics of shipping, handling and storing the recalled gas valves, LEC requested
that 100 randomly selected valves be sent for an initial round of tests. The test program was
authorized and 100 valves were received October 4, 2005 divided into two large corrugated
shipping boxes. Each valve was received in a small shipping box that had been employed in the
recall program to distribute replacement valves to service centers, and for return of the recalled

AUG-15-2006  01:25          PATTERSON PLANNING                     212 599 5185       P.08/16

LABORATORY INVESTIGATION OF SOURDILLON GAS/ELECTRIC          Page 3 of 4
CONTROL VALVES REMOVED DURING NORCOLD RV REFRIGERATOR
RECALL PROGRAM

valves to Norcold. A computer monitor generated copy of the warranty claim form accompanied each valve which identified the model and serial number of the refrigerator from which the valve had been removed, the repair date, and a variety of information regarding the RV and the service center where the recall repair was performed.

Lewis Engineering assigned a random valve number to each valve which was recorded on the box, and recorded salient information regarding the refrigerator model, the year of manufacture of the valve stamped in the valve body and the repair date. This information appears in the tabulated test results in Appendix A.

## VALVE TEST PROCEDURE

The following is a detailed description of the test procedure employed for each valve:

1.  Connect the inlet and outlet gas lines to the fittings in the valve.
2.  Install the thermocouple simulation fitting to allow energizing of the main control valve to maintain it in the open position during testing.
3.  Connect a positive electrical lead from a 9 volt battery current limited via a 36 ohm, 50 W precision resistor, to the thermocouple simulation fitting.
4.  Connect the negative electrical lead from the 9 volt batter to the case of the valve.
5.  Turn on the main valve at the 20 pound propane tank.
6.  Push in and turn on the Sourdillon selector switch and safety valve.
7.  Check all connections for leaks via the pocket sniffer.
8.  Check gas pressure indicated by the manometer.
9.  If no leaks detected via pocket sniffer, turn off propane tank valve to "lock in" gas pressure.
10. Monitor manometer meniscus level for three minutes to monitor for low level leak.
11. Record results and remove valve from test; return valve to shipping box.

## VALVE TEST RESULTS

The leak test rig is shown in **Figure 1** with valve No.6 installed. A close view of valve No.6 showing the connections to the valve during the leak test is shown in **Figure 2**. Of the 100 valves received for testing, two could not initially be tested. Valve No.13 had a damaged inlet

4:13-cv-10841-TGB-LJM   Doc # 43-3   Filed 03/13/14   Pg 84 of 95   Pg ID 684

Case: 3:07-cv-00274-MRM Doc #: 2-4 Filed: 07/30/07 Page: 7 of 14 PAGEID #: 7
AUG-15-2006  01:26       PATTERSON PLANNING                   212 599 5105      P.09/16

LABORATORY INVESTIGATION OF SOURDILLON GAS/ELECTRIC          Page 4 of 4
CONTROL VALVES REMOVED DURING NORCOLD RV REFRIGERATOR
RECALL PROGRAM

fitting which could not be satisfactorily sealed to the supply hose from the propane tank. The
fitting was subsequently removed, and a new fitting installed in its place. With that modification,
the valve was able to be tested. A second valve, No.99, was received without the thermocouple
inlet bushing as shown in the photograph in Figure 3. In the absence of that bushing, the
thermocouple simulator fitting could not be installed. As a result, valve No.99 was excluded
from the test program.

Test results for the 99 total valves successfully tested are included in the table in
Appendix A. Summarizing, those results are as follows:

1.  Fifteen valves were found to have severe leaks detected by a comparatively rapid
    loss of gas pressure from the system when the propane tank valve was closed, by
    detection of a gas leak via the pocket sniffer, and typically by an audible
    indication of a gas leak.

2.  Of those fifteen, valve No.12 showed evidence of soot staining suggesting having
    been exposed to a flash fire prior to removal during the recall program.

3.  Six valves were found to have slight leaks indicated by a measurable drop in
    manometer meniscus level after three minutes with the system pressure isolated
    from the closed propane tank valve, but with no indication of a leak via the pocket
    sniffer.

None of the valves tested were disassembled in any way. Each was preserved in the as-
received and as-tested condition. Each valve tested was photographically recorded as installed in
the leak test system, and a video recording was made of the entire testing process. That
information is being provided in electronic format.

Prepared and submitted by

Richard O. Lewis, P.E.
MARCH 29, 2006

COPY

L3254 Norcold valve test 032906

AUG-15-2006   01:26        PATTERSON PLANNING            212 599 5105      P.10/16

# APPENDIX A

## Sourdillon Valve Test Results and Identification Data

AUG-15-2005  01:26        PATTERSON PLANNING              212 599 5105    P.11/16

**Sourdillon Valve Test     Date: October - November 2005          Test Results**

| Assigned Valve ID | Refrig Serial No. | Refrig Model | Valve Year | Repair Date | No Leak | Slight By Manometer Only | Severe Leak |
|---|---|---|---|---|---|---|---|
| 1 | A116686 | 462L | 1989-41 | 7/22/2004 | ✓ | | |
| 2 | A114126 | 875EG2 | 1989-41 | 9/26/2003 | ✓ | | |
| 3 | A302182 | 462L | 1991-36 | 10/8/2004 | ✓ | | |
| 4 | A100883 | 462L | 1991-24 | 8/19/2003 | ✓ | | |
| 5 | 29410 | 462L | 1990-36 | 9/20/2003 | ✓ | | |
| 6 | A310128 | 462L | 1991-43 | 11/20/2004 | | | Sniffer detection |
| 7 | A107112 | 482L | 1990-36 | 8/11/2003 | | 0.05in H2O in 3 min. | |
| 8 | A102293 | 482L | 1988-48 | 8/19/2003 | ✓ | | |
| 9 | A107030 | 482L | 1988-13 | 8/18/2003 | ✓ | | |
| 10 | A100855 | 452R | 1990-12 | 8/18/2003 | | | Sniffer detection |
| 11 | A114518 | 875EG2 | 1990-12 | 8/19/2003 | ✓ | | |
| 12 | A100559 | 462L | 1991-38 | 9/9/2003 | | | Sniffer detection, suspect exposed to fire |
| 13 | 42878 | 462L | 1991-29 | 8/15/2003 | ✓ | | |
| 14 | A115378 | 462L | 1994-35 | 10/30/2003 | ✓ | | |
| 15 | 3336 | 452R | 1988-29 | 8/6/2003 | ✓ | | |
| 16 | A108544 | 462BK | 1990-05 | 1/15/2004 | ✓ | | |
| 17 | A101819 | 462L | 1988-07 | 8/3/2004 | ✓ | | |
| 18 | A107221 | 462L | 1990-29 | 8/13/2004 | ✓ | | |
| 19 | A301337 | 462L | 1992-03 | 9/24/2004 | ✓ | | |
| 20 | A100791 | 462L | 1990-16 | 8/12/2003 | | | Sniffer detection |
| 21 | A108799 | 462L | 1991-47 | 3/22/2004 | ✓ | | |
| 22 | A108957 | 462L | 1989-45 | 3/25/2004 | | 0.50in H2O in 3 min. | Sniffer Detection |
| 23 | A101690 | 462L | 1991-29 | 6/20/2004 | | | Sniffer Detection - Lost all gas pressure |
| 24 | A104671 | 462L | 1994-06 | 8/25/2004 | ✓ | | |
| 25 | A101717 | 462L | 1989-41 | 5/15/2004 | ✓ | | |
| 26 | 12805 | 875EG2 | 1987-42 | 10/14/2003 | ✓ | | |
| 27 | A100219 | 462L | 1993-18 | 8/10/2003 | ✓ | | |
| 28 | 99537 | 462L | 1993-46 | 9/8/2003 | ✓ | | |

AUG-15-2005  01:27        PATTERSON PLANNING                    212 599 5105        P.12/16

| Assigned Valve ID | Refrig Serial No. | Refrig Model | Valve Year | Repair Date | No Leak | Slight By Manometer Only | Severe Leak |
|---|---|---|---|---|---|---|---|
| 29 | 45596 | 462L | 1991-29 | 8/12/2003 | ✓ | | |
| 30 | A111833 | 875EG2 | 1990-07 | 9/30/2003 | ✓ | | |
| 31 | A106169 | 875EG2 | 1991-02 | 8/15/2003 | ✓ | | |
| 32 | A111576 | 462L | 1990-06 | 10/16/2003 | | 0.15in H$_2$O in 3 min. | |
| 33 | A309127 | 462L | 1989-42 | 11/17/2004 | ✓ | | |
| 34 | 48762 | 462L | 1991-36 | 8/14/2003 | | | Sniffer Detection Intermittent. P to 0.0 in 1.20 min. |
| 35 | A302121 | 462L | 1990-27 | 9/28/2004 | ✓ | | |
| 36 | A312055 | 462L | 1995-18 | 10/13/2004 | ✓ | | |
| 37 | A100843 | 462L | 1991-24 | 8/15/2003 | ✓ | | |
| 38 | A101031 | 462L | 1990-17 | 1/6/2003 | ✓ | | |
| 39 | A301411 | 462L | 1992-06 | 10/15/2004 | | 0.05in H$_2$O in 3 min. | |
| 40 | A106496 | 875EG2 | 1989-42 | 9/30/2004 | ✓ | | |
| 41 | A111625 | 462L | 1990-36 | 8/15/2003 | | | Sniffer Detection Continuous. P to 0.0 in 1.30 min. |
| 42 | A312457 | 875EG2 | 1987-23 | 11/23/2004 | ✓ | | |
| 43 | A102648 | 462L | 1990-36 | 9/27/2004 | | | Sniffer Dection - Severe. P to 0.0 in 10 sec. |
| 44 | A100075 | 462L | 1990-13 | 9/9/2003 | ✓ | | |
| 45 | 8767 | 462L | 1991-08 | 9/23/2004 | ✓ | | |
| 46 | A109554 | 462L | 1990-06 | 11/5/2003 | | | Sniffer Dection.  Max P = 0.04in H2O. No capillary tube on valve. |
| 47 | 10801 | 462L | 1991-30 | 11/24/2003 | ✓ | | |
| 48 | A114960 | 462L | 1990-26 | 9/4/2003 | | | Sniffer Detection. P to 0.0 in 20 sec. |
| 49 | A110666 | 442L | 1993-43 | 9/11/2003 | ✓ | | |
| 50 | A107383 | 462L | 1988-35 | 9/25/2003 | ✓ | | |
| 51 | A117516 | 875EG2 | 1987-42 | 8/27/2003 | ✓ | | |
| 52 | A102935 | 452R | 1992-06 | 9/8/2004 | ✓ | | |
| 53 | A115595 | 462L | 1994-49 | 9/19/2003 | ✓ | | |
| 54 | A302770 | 462L | 1991-28 | 11/23/2004 | ✓ | | |

AUG-15-2006  01:27       PATTERSON PLANNING                    212 595 5105    P.13/16

| Assigned Valve ID | Refrig Serial No. | Refrig Model | Valve Year | Repair Date | No Leak | Slight By Manometer Only | Severe Leak |
|---|---|---|---|---|---|---|---|
| 55 | 15981 | 482L | 1991-38 | 10/8/2004 | ✓ | | |
| 56 | A308614 | 482L | 1991-29 | 11/10/2004 | ✓ | | |
| 57 | 11915 | 482L | 1991-36 | 8/27/2004 | ✓ | | |
| 58 | 7991 | 452R | 1990-29 | 9/7/2004 | ✓ | | |
| 59 | 10674 | 482L | 1991-29 | 8/24/2004 | ✓ | | |
| 60 | 6531 | 482L | 1990-23 | 9/28/2004 | ✓ | | |
| 61 | 38727 | 462L | 1991-20 | 8/28/2003 | | 0.10in $H_2O$ in 3 min. | |
| 62 | A115125 | 462L | 1995-13 | 9/18/2003 | ✓ | | |
| 63 | 80929 | 462L | 1992-30 | 8/4/2003 | ✓ | | |
| 64 | 56169 | 462L | 1992-03 | 9/24/2003 | ✓ | | |
| 65 | 1558 | 482L | 1988-25 | 8/22/2003 | ✓ | | |
| 66 | A104253 | 462L | 1995-13 | 9/30/2003 | ✓ | | |
| 67 | A100214 | 462L | 1990-23 | 8/13/2003 | ✓ | | |
| 68 | A114560 | 452R | 1991-30 | 6/4/2003 | ✓ | | |
| 69 | A100958 | 452R | 1989-41 | 9/17/2003 | ✓ | | |
| 70 | 33206 | 462L | 1990-45 | 9/18/2003 | | 0.15in $H_2O$ in 3 min. | |
| 71 | 3913 | 482L | 1989-38 | 8/6/2004 | ✓ | | |
| 72 | A107067 | 462L | 1993-14 | 4/30/2004 | ✓ | | |
| 73 | A116685 | 462L | 1994-20 | 7/26/2004 | | | Sniffer detection |
| 74 | 21437 | 875EG2 | 1990-27 | 12/15/2003 | | | Sniffer detection |
| 75 | A302221 | 462L | 1990-42 | 9/27/2004 | | | Sniffer detection |
| 76 | A100713 | 462L | 1991-29 | 10/23/2003 | ✓ | | |
| 77 | 26658 | 462L | 1988-26 | 10/27/2004 | ✓ | | |
| 78 | 15636 | 875EG2 | 1988-22 | 9/29/2003 | ✓ | | |
| 79 | 16703 | 482L | 1992-09 | 10/8/2003 | ✓ | | |
| 80 | 2630 | 452R | 1988-49 | 9/22/2003 | ✓ | | |
| 81 | A302141 | 482L | 1991-43 | 10/5/2004 | ✓ | | |
| 82 | 43171 | 462L | 1991-29 | 8/22/2003 | ✓ | | |
| 83 | A115124 | 462L | 1991-36 | 9/18/2003 | ✓ | | |

AUG-15-2006  01:28      PATTERSON PLANNING                    212 599 5105      P.14/15

| Assigned Valve ID | Refrig Serial No. | Refrig Model | Valve Year | Repair Date | No Leak | Slight By Manometer Only | Severe Leak |
|---|---|---|---|---|---|---|---|
| 84 | A105832 | 482BK | 1991-45 | 10/8/2004 | ✓ | | |
| 85 | A104770 | 462L | 1993-18 | 8/6/2004 | ✓ | | |
| 86 | A115194 | 462L | 1989-49 | 10/15/2003 | ✓ | | |
| 87 | A303099 | 462L | 1990-05 | 10/7/2004 | ✓ | | |
| 88 | 4685 | 462L | 1991-30 | 9/23/2004 | | 0.15in H$_2$O in 3 min. | |
| 89 | A300481 | 463L | 1993-51 | 9/22/2004 | ✓ | | |
| 90 | A101051 | 462L | 1990-36 | 8/17/2004 | ✓ | | |
| 91 | 1223 | 462L | 1991-29 | 9/24/2003 | ✓ | | |
| 92 | A300889 | 463L | 1991-38 | 10/26/2004 | ✓ | | |
| 93 | A104283 | 462L | 1992-02 | 12/11/2003 | ✓ | | |
| 94 | A106073 | 462L | 1988-10 | 11/17/2003 | ✓ | | |
| 95 | A301580 | 462L | 1991-23 | 9/10/2004 | ✓ | | |
| 96 | A312193 | 482L | 1990-42 | 11/2/2004 | ✓ | | |
| 97 | A104620 | 462L | 1990-36 | 8/26/2004 | | | Max. 1in H$_2$O across valve - sniffer detection, severe leak |
| 98 | 26390 | 462L | 1990-27 | 9/2/2004 | ✓ | | |
| 99 | A300247 | 463L | 1988-35 | 8/13/2004 | | Missing thermocouple fitting - no test | |
| 100 | 26688 | 462L | 1990-29 | 8/28/2003 | ✓ | | |

AUG-15-2006  01:28      PATTERSON PLANNING                212 599 5105      P.15/16

## NORCOLD/SOURDILLON GAS CONTROL VALVE STUDY



**Figure 1.** Overall view of test rig with valve No. 6 installed.



**Figure 2.** Close view of valve No. 6 during leak test.

AUG-15-2006  01:29    PATTERSON PLANNING                    212 599 5103         P.16/16

**NORCOLD/SOURDILLON GAS CONTROL VALVE STUDY**



**Figure 3.** Close view of valve No. 99 showing missing thermocouple inlet bushing;
valve could not be leak tested.



You replied on 3/10/2010 1:01 PM.

From:     GStrasburg@thetford.com
To:       Tom Bailey
Cc:       John.Schlesman.2@SRSConnect.com; AFogt@norcold.com
Subject:  YLB LP 96859, Lonnie Smith v. Alcoa/Norcold, 3/2/10

**From:** AFogt@norcold.com [mailto:AFogt@norcold.com]
**Sent:** Tuesday, March 09, 2010 5:23 PM
**To:** Schlesman, John J (SRS)
**Cc:** GStrasburg@thetford.com; DRoberts@norcold.com
**Subject:** Fw: YLB LP 96859, Lonnie Smith v. Alcoa/Norcold, 3/2/10

John,

The complete file has been scanned and attach to this email

Thanks

Allan Fogt
Norcold Inc

----- Forwarded by Allan Fogt/Norcold on 03/09/2010 05:24 PM -----

From:   "Schlesman, John J (SRS)" <john_Schlesman2@srsconnect.com>
To:     <AFogt@norcold.com>
Date:   03/09/2010 02:47 PM
Subject: YLB LP 96859, Lonnie Smith v. Alcoa/Norcold, 3/2/10

Allan I am in receipt of the attached claim without any paper work. Please forward everything you have on matter

Thank you

John J Schlesman Jr  SCLA
Account Consultant-Remote
Specialty Risk Services  LLC

Sent:   Wed 3/10/2010 9:42 AM

EXHIBIT
5
Bloom 2/3/14
PENGAD 800-631-6989

Respond   Actions   Junk e-mail   Options   Find

From:   Tom Bailey [tgbailey@rvmarineinvestigations.com]   Sent:   Wed 3/10/2010 8:12 PM
To:   'Chris Bloom, C3IFireConsultant'
Cc:
Subject:

Message   Lonnie Smith Fire.doc (37 KB)

Chris,

I attached the notice for your file   I know by the time you read this you will still be tired from the trip so I will keep it short.

Thanks for the way you are handling this.   You will have everything I have.

Kindest regards

Tom

T.G. BAILEY CFI CCT CMI CGC
RV & MARINE INVESTIGATIONS OF AMERICA, LLC
PO DRAWER 4301
ENTERPRISE (N. ORLANDO), FLORIDA 32725
407-688-9800

*Certified Fire Investigations-Certified Infrared Thermography-Certified Marine Investigations-Certified Appraisals-Certified Industrial Hygiental Analysis-Certified Accident Reconstruction-Certified General Contractor*

"Origin & Cause Investigations-Water Intrusion Detection & Determination-Environmental Hazard Detection-Accident Causes and Reconstruction"

Note:  To  protect  against  computer  viruses,  e-mail  programs  may  prevent  sending  or  receiving  certain  types  of  file  attachments.   Check  your  e-mail
security  settings  to  determine  how  attachments  are  handled.

---------------------------

Note: This e-mail transmission from RV & Marine Investigations of America, LLC is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, work product protected, confidential, and exempt from disclosure under applicable law. If the reader of this transmission is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. Improper retention of this e-mail and any attachment(s) to this e-mail could subject you to legal action under pertinent federal and state statutes, and result in civil and criminal penalties. If you have received this communication in error, please notify RV & Marine Investigations of America LLC immediately by telephone (407) 688-9800, then return the original transmission to us at the above address via the U.S. Postal Service

You replied on 3/10/2010 1:46 PM.

From:       Schlesman, John J. (SRS) [John.Schlesman2@srsconnect.com]
To:         Tom Bailey
Cc:         jbigh@5rvsmi.com
Subject:    RE: Yours: INDIV-177-0310, Ours: YLB LP 96859

Tom:

I am in receipt of your below email and voice mail and thank you for same.

I have hired a cause and origin expert (Chris Bloom) to contact you and coordinate the scene inspection.

I will report back to you after my receipt of his report.

Thank you

John J. Schlesman Jr. SCLA
Account Consultant-Remote
Specialty Risk Services LLC
Eastern Region
P O Box 9
Greensburg, PA 15601
Telephone     1 800 551 0271 x55050
E-Facsimile   860 723 8051
Email         John.Schlesman2@SRSConnect.com

From: Tom Bailey [mailto:tbailey@rvmarineinvestigations.com]
Sent: Wednesday, March 10, 2010 11:46 AM
To: Schlesman, John J (SRS)
Subject: RE: Yours: INDIV-177-0310, Ours: YLB LP 96859

TO BAILEY et al et al et al

You replied on 3/10/2010 7:55 PM.

**From:** Bligh, Jackie [bligh-j5@orsm.com]
**To:** Tom Bailey; michael.waite@rehmann.com; 'Schlesman, John J (SRS)'
**Cc:** srstenervore@gmail.com; billhunter@netscape.com; 'Cheryl Smith'
**Subject:** RE: Fire Investigation Notice

**Sent:** Wed 3/10/2010 3:44 PM

Tom

My concern is the second paragraph in your letter. We will not allow you to take possession of any part of the trailer that cannot be tested on site. They would have to be put in the custody of Kirby, Bailey & Assoc. They can make arrangements for storage of the goods if necessary. If destructive testing is necessary that issue would be discussed at that time.

Thanks

Jackie Bligh

**From:** Tom Bailey [mailto:tgbailey@rvmarineinvestigations.com]
**Sent:** Wednesday, March 10, 2010 10:10 AM
**To:** Bligh, Jackie; michael.waite@rehmann.com; 'Schlesman, John J (SRS)'
**Cc:** srstenervore@gmail.com; billhunter@netscape.com; 'Cheryl Smith'
**Subject:** Fire Investigation Notice
**Importance:** High

See attachment

T.G. BAILEY CFI CT CMI CGC
RV & MARINE INVESTIGATIONS OF AMERICA, LLC
PO DRAWER 4301
ENTERPRISE (N. ORLANDO), FLORIDA 32725
407-688-9800

Certified Fire Investigations-Certified Infrared Thermography-Certified Marine Investigations-Certified Appraisals-Certified Industrial Hygenial Analysis-Certified Accident Reconstruction-Certified General Contractor