UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LONNIE SMITH, et al.,

        Plaintiffs,

    v.                                Case No. 13-10841

NORCOLD, INC., et al.                HON. TERRENCE G. BERG

        Defendants.

_____/

### ORDER DENYING DEFENDANTS' MOTION FOR
### SANCTIONS DUE TO SPOLIATION OF EVIDENCE (DKT. 43)

This case involves a product liability claim by Plaintiffs Lonnie and Cheryl Smith ("Plaintiffs") against the manufacturer of a refrigerator that allegedly caught fire inside a motorhome stored in Plaintiffs' barn, destroying the barn and property stored in it. Defendants Norcold, Inc., Alcoa, Inc. and Alcoa Energy Services, Inc. ("Defendants") deny that their product was responsible for the fire.

Currently before the Court is the Defendants' March 13, 2014 motion seeking to dismiss Plaintiffs' case as a sanction for causing the spoliation of evidence. (Dkt. 43, p. 3.) Defendants argue that dismissal is appropriate because: (1) Plaintiffs' case rests entirely on the theory that a defective Sourdillion gas valve (the "Valve") in a Norcold refrigerator caused a fire that resulted in the loss of Plaintiffs' personal property; (2) Plaintiffs failed to document or preserve the Valve or "the control panel that houses it" after the fire; thus (3) Defendants are prejudiced because they cannot examine the Valve "or its housing." (*Id.* at 1-2.)

Plaintiffs counter that the Valve and any related components were destroyed in the fire. Plaintiffs further maintain that what Defendants characterize as the Valve's control panel is actually the refrigerator's bottom pan that contained the Valve and its "housing." (Dkt. 50, p. 1) According to Plaintiffs, this bottom pan was in fact documented but is irrelevant to this case. (*Id.* at 13). Moreover, Plaintiffs assert that even if the Valve and its related components had survived the fire, Plaintiffs were not in control of the fire scene or the evidence collected there. (*Id.* at 2.) Plaintiffs argue, therefore, that they had no opportunity to spoil evidence with the culpable mental state required to merit spoliation sanctions. (*Id.*)

Defendants requested an evidentiary hearing during the March 19, 2014 telephonic status conference convened by the Court. Plaintiffs requested that the Court hold a motion hearing without allowing the presentation of evidence. Consequently, the Court ordered supplemental briefing on whether an evidentiary hearing was necessary. (Dkt. 51, p. 3.) Having carefully reviewed the parties' briefs concerning Defendants' motion for sanctions and the request for an evidentiary hearing, the Court finds that oral argument will not significantly aid the decision making process and an evidentiary hearing is unnecessary. Thus, under E.D.Mich. LR 7.1(f)(2), no evidentiary or motion hearing will be held.

Because Defendants failed to show that Plaintiffs were ever in control of the fire scene or that the Valve and any related components even survived the fire, they have not established that Plaintiffs were negligent in failing to collect or document these refrigerator components. Moreover, even if Plaintiffs had been negligent, the

extreme sanction of dismissal is not warranted here. Defendants' spoliation motion (Dkt. 43) will therefore be DENIED. The parties agreed on March 24, 2014 to "attend a private mediation in good faith within 30 days of the Court's order" should the Court deny Defendants' spoliation motion. (Dkt. 47, p. 2.) Accordingly, the parties are ORDERED to attend private mediation under the terms of their stipulated agreement. (Dkt. 47.)

## I.   FACTUAL BACKGROUND

Plaintiffs, residents of Croswell, Michigan, stored a 1992 Gulfstream Conquest motorhome in a barn on their property. (Dkt. 1, ¶¶ 1-2, 10, 13; Dkt. 50, p. 2.) Visiting guests occasionally stayed in the motorhome. (Dkt. 43, Ex. A, p. 10.) The actual owners of the motorhome were S. Renee Steiner-Vore and Jeff Vore, who are not parties in this case. (Dkt. 50, p. 2.) Mr. and Mrs. Vore insured the motorhome through Farm Bureau Insurance, a third-party insurer. (Dkt. 50, Ex. A.) The motorhome was equipped with a Norcold Model 462 refrigerator. (Dkt. 1, ¶ 10.)

On March 2, 2010, the motorhome caught fire, resulting in the complete loss of the motorhome along with Plaintiffs' barn and its contents. (Dkt. 50, p. 2.) Three fire investigators subsequently became involved in this case. Plaintiffs hired fire investigator Thomas Bailey directly. (Dkt. 57, Ex. A at 20:12-22.) Fire investigator Michael Waite was hired by Farm Bureau Insurance to investigate the "[t]he [motorhome] portion of the fire" only.[1] (Dkt. 57, Ex. D at 10:10-17.) On March 8,

---

[1] The record does not disclose precisely when Mr. Bailey or Mr. Waite was retained. Given that Mr. Bailey contacted Farm Bureau Insurance, Mr. Waite, and Defendants on March 8, 2010 regarding the fire scene, both Mr. Bailey and Mr. Waite must have been hired soon after the fire which occurred on March 2, 2010. (*See* Dkt. 50, Ex. E.)

2010, Mr. Bailey sent Defendants and Farm Bureau Insurance a request for an expedited inspection because of "the potential for disturbance of the scene" due to weather or other factors. (Dkt. 43, Ex. B-2, pp. 3-4.) Defendants subsequently hired fire investigator Chris Bloom on March 10, 2010. (Dkt. 43, Ex. B-1 at 48:2-5.)

In his March 8, 2010 letter, Mr. Bailey asserted that "any items removed [from the scene] will be tested on site if possible" and if not, Mr. Bailey's company, RV and Marine Investigations of America, L.L.C., would "retain those items until such time as testing is available." (Dkt. 43, Ex. B-2, pp. 3-4.) However, Farm Bureau Insurance claims adjuster Jackie Bligh responded to Mr. Bailey's letter via email on March 10, 2010 stating that, as the motorhome's insurer, Farm Bureau Insurance "will not allow [Mr. Bailey] to take possession of any part of the trailer that cannot be tested on site." (Dkt. 50, Ex. F.) Moreover, any such parts "would have to be put in the custody of Kirby, Bailey & Assoc. [sic]," an investigation firm representing Farm Bureau Insurance that is not involved in this case, for storage. (*Id.*) Any necessary destructive testing of evidence would have to first be discussed with Farm Bureau Insurance. (*Id.*)

On March 25, 2010, Mr. Bailey (for Plaintiffs) and Mr. Waite (for Farm Bureau Insurance, the carrier for the owners of the motorhome) conducted the initial multiparty inspection of the fire scene. (Dkt. 43, Ex. B-1 at 187:15-20.) Farm Bureau Insurance Adjuster Bligh was also present. (Dkt. 50, Ex. G, p. 12.) Mr. Bloom, Defendants' fire investigator, was unable to participate because of "another scheduled inspection." (Dkt. 43, Ex. B-1 at 187:21-24.) Mr. Bailey and Mr. Waite

both took photographs of the scene and located evidence jointly. (Dkt. 57, Ex. A at 29:10-31:5, 48:6-21; Dkt. 57, Ex. D at 1:14-25.) According to Mr. Bailey, approximately 300 to 500 photographs were taken at the scene during the initial multiparty inspection. (Dkt. 57, Ex. A at 47:20-22, 69:8-9.)

At the scene, the motorhome's electrical wiring as well as the Norcold refrigerator's coil were tested and excluded as causes of the fire. (Dkt. 43, Ex. A, p. 12.) The coil, cooling unit and burner assembly were collected. (Dkt. 57, Ex. A at 47:3-7; Dkt. 43, Ex. B-1 at 74:14-16.) According to Mr. Waite, the refrigerator's bottom pan was not collected but loose debris from that area of the fire scene was. (Dkt. 57, Ex. D at 39:22-40:8.) Mr. Waite retained and stored that evidence on behalf of Farm Bureau Insurance. (Dkt. 57, Ex. A at 29:10-18; Dkt. 51, Ex. D at 51:10-25.)  In contrast, Mr. Bailey testified that the "pan debris" was "gone through" and "there was nothing in the pan debris that would necessitate retaining, wood, some wiring, screws, that would be all that I recall."  (Dkt. 47, Ex. A at 47:8-17.)

According to Mr. Bailey and Mr. Waite, whatever was not collected from the scene during the initial inspection was preserved there for future inspections. (Dkt. 57, Ex. A at 98:23-99:2; Dkt. 57, Ex. D at 57:19-23.) There was a second multiparty scene investigation on May 12, 2011, where Mr. Bailey for the Plaintiffs and Mr. Waite for Farm Bureau Insurance tested the cooling unit collected on March 25, 2010 and disqualified it as the cause of the fire. (Dkt. 43, Ex. B-1 at 193:9-195:11; Dkt. 43, Ex. B-3, p. 15.) The Defendants' fire investigator, Mr. Bloom, was unable to attend this second inspection due to inclement weather. (Dkt. 43, Ex. B-1 at 134:5-

13.) A third inspection was scheduled for July 18, 2011 but cancelled because Mr. Bloom was unable to attend. (Dkt. 50, Ex. K.)

In the end, Mr. Bloom never did inspect the scene or interview any eyewitnesses in this case. However, on August 16, 2011, Mr. Bloom traveled to Michigan on behalf of Defendants where he inspected and photographed all the evidence Mr. Bailey and Mr. Waite collected and stored during the initial investigation.[2] (Dkt. 43, Ex. B-1 at 145:17-146:10, 150:10-19, 210:1-2.) This examination of evidence did not take place at the fire scene, but at a storage facility in Michigan. (Dkt. 43, Ex. A at 74:7-25.)

Mr. Bailey released his report of the investigation on May 14, 2010. (Dkt. 57, Ex. A at 64:3-8; Dkt. 50, Ex. G, p. 17.) In it, Mr. Bailey attributed the fire to "a failure of the Sourdillion LP gas valve" in the refrigerator that "allowed highly volatile liquefied petroleum gas to escape, puddle and be ignited by the operating burner." (Dkt. 50, Ex. G, p. 16.) At some point prior to the release of Mr. Bailey's report, Defendants had announced a voluntary recall that included Norcold Model 462 refrigerators.[3] (*See* Dkt. 43, Ex. A, pp. 15-16.) These refrigerators were recalled to replace their gas valves in order to avoid a risk of fire. (*See id.*) Mr. Bailey did not

---

[2] Ms. Bligh, Mr. Bailey, Mr. Waite, and Mr. Bloom were present at this examination. (Dkt. 57, Ex. D at 30:15-21.) Evidence was removed from shrink wrap and Mr. Bloom photographed what had been collected. (Dkt. 43, Ex. A at 146:3-12.) According to Mr. Waite, neither Mr. Bloom nor anyone else suggested returning to the scene to try to locate and retrieve the Valve or any other potentially missing evidence. (Dkt. 57, Ex. D at 64:18-25.) Mr. Bailey concurs, stating that had Mr. Bloom requested to visit the scene to locate and inspect remaining evidence, "it would have been done." (Dkt. 57, Ex. A at 101:1-102:11.)

[3] The record does not reveal when the recall was first announced but Mr. Bailey includes it in his May 14, 2010 report as supporting evidence for his theory of causation. (Dkt. 50, Ex. G, p. 16-23.) The voluntary recall is apparently ongoing. Norcold, *Product Recalls*, http://www.norcoldrecall.com/ (last visited Nov. 10, 2014.)

locate or identify the Valve when he first inspected the scene, but was aware of the Valve's potential defect.[4] (Dkt. 57, Ex. A at 44:6-10; 89:13-16.)

From the evidence presented in the record, the investigators were unable to locate either the Valve itself or any of its related componentry.  Not having been found, these items were not documented or removed from the scene. No fire investigator mentions having observed the Valve either at the scene, in photographs taken of the scene, or at the subsequent examination of collected evidence. (*See* Dkt. 57, Ex. A at 93:4-9; Dkt. 57, Ex. D at 66:18-22; Dkt. 43, Ex. B-1 at 215:2-14.) While acknowledging that "we don't know what survived the fire," Mr. Bloom nevertheless states that the Valve and approximately 28 related components "could have and should have survived the fire" and "would have fallen in the [bottom] pan" documented in photographs taken at the scene by Mr. Bailey or Mr. Waite (Dkt. 43, Ex. B-1 at 178:25-179:14, 213:3-216:23.) Mr. Bloom has not examined the interior of the bottom pan but he postulates that these components including the Valve probably survived the fire and are in the pan because the pan survived.[5] (*Id.* at 248:15-18.)

Mr. Bailey states that the Valve was not present in the pan on March 25, 2010 and that it did not survive the fire because it was made of aluminum and would

---

[4] According to Mr. Bailey, a fire occurs when there is "a failure in the valve where the LP gas is leaking and the LP gas makes contact with the vapors with the flame…" (Dkt. 57, Ex. A at 38:23-39:2.)

[5] Mr. Bloom maintains that because "the bottom pan exists and that the electrical is still there and that we have some gas fittings that are still there" it can be assumed that "there are other things that are still there." (Dkt. 43, Ex. B-1 at 213:7-10.) The bottom pan was not collected during the initial investigation because neither Mr. Bailey nor Mr. Waite thought it was relevant to the case given the lack of burn marks on it. (Dkt. 57, Ex. A at 33:1-23, 41:2-15, 45:3-24; Dkt. 57, Ex. D at 66:23-67:2.)  As mentioned, Mr. Bailey states that the debris inside the pan "was gone through and there was nothing in the pan debris that would necessitate retaining." (Dkt. 57, Ex. A at 47:8-17.)

have been consumed. (*See* Dkt. 57, Ex. A at 44:8-10, 46:10-25, 89:24; 92:23-93:14.)
Mr. Bloom agrees that the Valve was made of aluminum, but asserts that the fire
was not sufficiently hot to consume the Valve's brass fittings, copper tubing, and
steel spring components.[6] (Dkt. 43, Ex. B-1 at 160:9-11, 175:21-176:9.) Therefore,
the Valve and "the screws for the mounts, all of that would have survived the fire,
they would have fallen in the [bottom] pan" documented in photographs taken at
the fire scene. (*Id.* at 179:5-14.) According to Mr. Bloom, the parties cannot know
with certainty what survived the fire because the scene was not documented
properly; specifically that the interior of the pan was not photographed. (*Id.* at
213:3-10; 248: 15-18.) Mr. Bailey counters in his affidavit that the bottom pan was
searched and did not "contain any components of the refrigerator at issue in this
case." (Dkt. 50, Ex. M ¶ 13.)  Mr. Bloom offers no explanation as to why neither he,
nor any other inspector employed by Defendants, made an effort to examine,
photograph, or document the steel pan or any of its possible contents.

   Although Mr. Waite noted that the fire's "most probable cause would be the
refrigerator," he ultimately did not make a final determination because neither a
mechanical nor electrical engineer was available during the inspection to eliminate
other possible causes. (Dkt. 57, Ex. D at 32:20-25, 59:8-11.) Mr. Waite was

---

[6] Defendants do not specify which of the Valve's approximately 28 related components should have
been retained or documented. Defendants do not explain what any of the related components, or the
steel pan that held them, could have shown regarding whether the Valve was defective. When asked
directly about the evidentiary value of the "bottom pan or control assembly," Mr. Bloom asserts that
examining the Valve itself would reveal whether it or "the steel next to it" was damaged. (Dkt. 43,
Ex. B-1 at 200:4-23.) As for the components, Mr. Bloom merely states that "[t]here's a lot of burn
patterns that can be interpreted from this area with these 28 to 27 components." (*Id.*) Whatever the
alleged importance of the related componentry, Defendants maintain that it is the Valve that is "the
key evidence in this case" without which Defendants cannot put on their defenses. (Dkt. 52, p. 2.)

unfamiliar with the refrigerator's valve component at the time of the initial inspection and states that he relied on Mr. Bailey's expertise with regard to the refrigerator. (*Id.* at 15:14-18, 33:4-35:7, 70:8-12.) Mr. Bloom has not made a determination regarding the cause of the fire in this case. (Dkt. 43, Ex. B-1 at 84:1-21.)

## II.   ANALYSIS

Defendants seek to have Plaintiffs' case dismissed because they allege that Plaintiffs failed in their duty to identify, document or preserve the Valve or its related components.[7] (Dkt. 43, p. 3.) Plaintiffs took hundreds of photographs of the fire scene. (Dkt. 57, Ex. A at 47:20-22, 69:8-9.) Moreover, Plaintiffs counter that they did not have control of the scene and, even if they had, the Valve could not be documented or preserved because it did not survive the fire. (Dkt. 50, p. 2.) Finally, the bottom pan and surrounding area were searched and some loose debris was collected, but none of the related components were found. (Dkt. 50, Ex. M ¶13; Dkt. 57, Ex. D at 39:22-40:8.) Plaintiffs further contend that they had no mal-intent, and their conduct does not merit the extreme sanction of dismissal. (*Id.*)

---

[7] Defendants rely in part on a Michigan Court of Appeals case, *Citizens Ins. Co. of America v. Juno Lighting, Inc.*, 635 N.W.2d 379 (Mich. Ct. App. 2001), in support of their assertion that dismissal is appropriate in this case. (Dkt. 43, p. 8.) While federal law controls here, this case is easily distinguishable. In *Juno Lighting*, Plaintiff's fire investigator did not inform Defendant of the fire investigation and the scene was not preserved because the damaged house was soon repaired. 635 N.W.2d at 238. Here, not only were Defendants informed of the multiparty fire investigation and given ample opportunity to hire their own expert beforehand, the scene was apparently preserved indefinitely after the fire to allow for subsequent inspections. (Dkt. 43, Ex. B-2, pp. 3-4; Dkt. 57, Ex. A at 98:23-99:2.)

## A. Legal Standard

Federal law of spoliation governs in this case. *See Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, 06-13143, 2009 WL 998402 at *1 (E.D. Mich. Apr. 14, 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). A federal court has "broad discretion to craft proper sanctions for spoliated evidence." *Adkins,* 554 F.3d at 651. Such sanctions include "dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Id.* at 653.

Rather than impose bright-line rules, the Sixth Circuit allows for "a case-by-case determination whether sanctions are necessary, and if so, what form they must take." *Automated Solutions Corp. v. Paragon Data Sys., Inc.,* 756 F.3d 504, 516 (6th Cir. 2014). In *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540 (6th Cir. 2010), the Sixth Circuit adopted a fact-specific inquiry guided by a conjunctive three-factor test that must be satisfied before a district court can sanction a litigant for spoliation of evidence:

> First, the party with control over the evidence must have had an obligation to preserve it at the time it was destroyed. Second, the accused party must have destroyed the evidence with a culpable state of mind. And third, the destroyed evidence must be relevant to the other side's claim or defense.

*Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x 380, 383-84 (6th Cir. 2013) (citing *Beaven*, 622 F.3d at 553). While the Sixth Circuit has not explicitly articulated the

required standard of proof for the party seeking sanctions, other courts have made it clear that these factors must be established by a preponderance of the evidence. E.g., *Byrd*, 518 F. App'x at 383-84; *Dilworth v. Goldberg*, No. 10-2224, 2014 WL 998422 at *1 (S.D.N.Y. Mar. 17, 2014); *Town & Country Bank, Inc. v. State Auto Prop. & Cas. Ins. Co.*, No. 12-957, 2014 WL 495168 at *2 (D. Utah Feb. 6, 2014); *Linnebur v. United Tel. Ass'n, Inc.*, No. 10-1379, 2012 WL 2370110 at *1 (D. Kan. June 21, 2012); *Tetsuo Akaosugi v. Benihana Nat. Corp.*, No. 11-01272, 2012 WL 929672 at *3 (N.D. Cal. Mar. 19, 2012).

As discussed in greater detail below, it is clear that Defendants are unable to meet the first and second *Beaven* factors. As to the third *Beaven* factor, there is no dispute that Plaintiffs' claim rests on the failure of the Valve and that its alleged loss or destruction is relevant to the defense. (Dkt. 1, ¶ 10.) As to the first and second factors, Defendants' primary argument is that Plaintiffs were negligent in their failure to preserve the Valve or its related components and are thus responsible for its loss. Although Defendants have produced some evidence regarding the collection of evidence at the fire scene, this proof is not sufficient to establish that the Valve or any of its components survived the fire or that Plaintiffs ever had custody and control of the fire scene or the evidence collected at the initial multiparty inspection. Moreover, because there is no evidence that the Valve or its components survived the fire, there is also no evidence showing that Plaintiffs lost, failed to preserve, or destroyed any of these items with any "culpable state of mind." Finally, even if Plaintiffs were negligent failing to collect or document the Valve or

its components at the fire scene, such a degree of fault would not merit the severe sanction of dismissal.

## B. Application of the *Beaven* Spoliation Factors

### 1. *Plaintiffs' Control of the Evidence*

The parties dispute whether Plaintiffs had control of the scene in the wake of the fire and thus should have secured the Valve and its related components. To satisfy this factor, Defendants must first show that Plaintiffs "had an obligation to preserve [the spoliated evidence] at the time it was destroyed" because "[i]t goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it." *Coach, Inc. v. Dequindre Plaza, L.L.C.*, No. 11-14032, 2013 WL 2152038 at *7 (E.D. Mich. May 16, 2013). At the same time, however, "the duty to preserve evidence does not extend to evidence which is not in a litigant's possession or custody and over which the litigant has no control." *Id.* at *8 (quoting *MacSteel Inc. v. Eramet N. Am.*, No. 05-74566, 2006 WL 3334019 at *4 (E.D. Mich. Nov. 16, 2006)).

While it may be true that Plaintiffs had some input in determining which components of the refrigerator were collected and stored by Farm Bureau Insurance, the record demonstrates that Plaintiffs were not in control of the fire scene. Farm Bureau Insurance was the motorhome's insurer. (Dkt. 50, Ex. A.) As the insurer, upon receipt of Mr. Bailey's request for a multiparty inspection, Farm Bureau immediately asserted its authority over the motorhome portion of the fire scene, sent its own representative to collect and store evidence from the motorhome,

12

and exercised custody and control over that evidence. It retains such control over the collected evidence to this day.[8]

Mr. Waite acknowledges that he collected and documented the evidence on behalf of Farm Bureau Insurance, who controlled the fire scene as the insurer. (Dkt. 57, Ex. D at 46:8-49:21.) Ms. Bligh informed Mr. Bailey and Defendants via email on March 10, 2010 that Mr. Bailey would not be allowed "to take possession of any part of the trailer that cannot be tested on site" and Farm Bureau Insurance would collect, take possession of and store any such evidence. (Dkt. 50, Ex. F.) Any destructive testing of evidence would have to be approved by Farm Bureau Insurance. (*Id.*) Other than Mr. Waite, all inspectors needed to obtain permission from Farm Bureau Insurance prior to inspecting the fire scene. (Dkt. 43, Ex. B-1 at 116:10-117:22; Dkt. 57, Ex. D at 46:2-7.) Moreover, any subsequent inspection of the evidence collected from the fire scene had to be arranged through Mr. Waite, and must still be so arranged. (*See* Dkt. 43, Ex. B-1 at 74:7-16; Dkt. 57, Ex. A at 100:11-16; Dkt. 57, Ex. D at 30:19-25.)

Defendants argue that Plaintiffs alone dictated what evidence was retained and therefore exercised sufficient control to create a duty to preserve the Valve and its related components. (Dkt. 52, p. 2.) While Mr. Bailey acknowledges that he was not prevented from selecting evidence to be collected, he also states that he was not

---

[8] Mr. Waite and Mr. Bailey both state in their depositions that, to the best of their knowledge, the fire scene was preserved indefinitely for future inspections. (*See* Dkt. 57, Ex. A at 98:17-99:2, 105:8-107:13; Dkt. 57, Ex. D at 52:16-53:13.) Mr. Waite asserts that as far as he is aware, "nothing had been removed from the trailer or the barn since the fire" and whatever was not collected or preserved "was covered and left at the scene." (Dkt. 57, Ex. D at 53:3-13.) The question of who is currently in control of the motorhome fire scene is not clear. Mr. Waite suggests in his deposition that the fire scene "was turned back over to the Vores and the Smiths" but "it would be appropriate for anyone that's going to go back out there to contact the other investigators." (*Id.* at 53:17-54:4.)

"calling the shots." (Dkt. 57, Ex. A at 43:14-44:7, 48:6-16.) Mr. Waite characterizes

the inspection as a joint effort. (Dkt. 57, Ex. D at 15:14-15.)

In support of their contention, Defendants rely solely on Mr. Bloom's deposition.

(*Id.*) Mr. Bloom asserts that Mr. Bailey was "running the show," but also

acknowledges that Mr. Bailey was "not allowed to maintain the custody" of any

evidence. (Dkt. 43, Ex. B-1 at 138:4-16.) However, Mr. Bloom was not present at any

of the onsite inspections and acknowledges that his version of events is only what

he was told. (*Id.*) Without more, the Court cannot give significant weight to

Defendants' argument.

Defendants also maintain that when the offending party does not have custody

of the evidence, control alone is sufficient to establish a duty to preserve. (Dkt. 52,

pp. 3-4.) In this Circuit, a duty to preserve evidence has been found where the

evidence was destroyed while in the custody of a third party, but under

distinguishable circumstances. In *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x

453 (6th Cir. 2012), a fire was attributed to a defective fan/light assembly. The

assembly was collected during a formal site investigation and examined later by all

parties. *Id.* at 456. The assembly was then stored with a third-party administrator

who, in an effort to avoid incurring storage fees, deliberately discarded the evidence

without consulting the parties. *Id.* The district court held that Plaintiffs were

negligent and, although Defendants requested a series of spoliation sanctions,

imposed only a permissive adverse-inference instruction. *Id.* at 458-59. On appeal,

14

Plaintiffs did not contest that they were negligent but did dispute whether the sanction imposed was appropriate. *Id.* at 458. The Sixth Circuit affirmed. *Id.*

The circumstances of this case are not analogous. In *Arch*, the defective assembly clearly survived the fire, and it was collected and eventually destroyed. *Id.* at 456. Here, as discussed below, there is no evidence that the Valve or its related components survived the fire – no one who has examined the fire scene claims that they did – and thus there is no evidence that the Valve or its related components was ever present in an identifiable condition at the fire scene at all, let alone collected and stored by Farm Bureau Insurance.[9] In addition, there are no allegations here that any identified and stored evidence was purposely discarded or destroyed. Finally, in *Arch*, the defendants explained what tests could have been performed on the discarded evidence and how the results would have affected the ongoing litigation. *Id.* Defendants in this case have offered no such detail.[10]

---

[9] Mr. Waite asserts that some "loose debris" was collected in the area of the bottom pan where the Valve and its related components were apparently housed, but does not know if any of the Valve's components were among this debris. (Dkt. 57, Ex. D at 39:22-40:8.) This debris was available for inspection by Mr. Bloom who did not identify either the Valve or any of its components during his examination. (*See* Dkt. 43, Ex. B-1 at 145:17-146:10, 150:10-19, 210:1-2.) Mr. Bailey testified that the "pan debris" was "gone through" and "there was nothing in the pan debris that would necessitate retaining, wood, some wiring, screws, that would be all that I recall." (Dkt. 47, Ex. A at 47:8-17.) Only Mr. Bloom, who never inspected the fire scene, claims that the Valve and its components probably survived the fire and would have fallen into the bottom pan, but he is not certain. (*See* Dkt. 43, Ex. B-1 at 175:2-8, 213:3-10.) Mr. Bloom bases his opinion on photographs of the refrigerator's bottom pan taken at the fire scene by Mr. Bailey and Mr. Waite, neither of whom claims to have seen the Valve or its related components. (*Id.* at 179:5-24.) There are no photographs depicting the Valve or its related components; there are photographs of the exterior of the bottom pan that, according to Mr. Bloom, would contain any components that survived the fire. (Dkt. 43, Ex. B-1 at 197:11-24.) For reasons that are unclear, Mr. Bloom had never visited the site to retrieve the bottom pan and look inside it.

[10] Defendants assert that without the remains of the Valve or "the related componentry," they cannot "ascertain burn patterns." (Dkt. 52, pp. 7-8.) It is not clear, however, why such burn patterns would constitute conclusive evidence or what examining "the related componentry" would reveal. (*See* Dkt. 43, Ex. B-1 at 200:4-23.)

In *Coach*, *Inc. v. Dequindre Plaza*, a manufacturer of designer goods sued the owners of a Flea Market where alleged counterfeit merchandise was being sold. During a raid, several items were seized by local police but retained by the plaintiff's private security firm. *Id.* at *3-6. The defendants sought to examine some of the seized items, but the security firm had shredded the products. *Id.* at *5. Although sanctions were ultimately not imposed, the court found that the plaintiff had a duty to preserve the evidence because of the plaintiff's relationship with the security firm gave it control over the evidence despite not being in possession of it at the time of its destruction. *Id.* at *9, 15.

The relationship between Plaintiffs and Farm Bureau Insurance is distinguishable. Mr. Waite retains control and custody of all the evidence collected during the initial multiparty investigation on behalf of Farm Bureau Insurance. (Dkt. 57, Ex. D at 24:22-25:13.) The fire scene is apparently still preserved, although the motorhome is apparently under the control of Farm Bureau Insurance or its owners, Mr. and Mrs. Vores. (*See* Dkt. 57, Ex. D at 52:16-53:4.) Farm Bureau Insurance does not represent Plaintiffs. Plaintiffs have no control over the preservation of any evidence in possession of Farm Bureau Insurance or over any of the motorhome debris which is still preserved at the fire scene. Plaintiffs do not have sufficient control over the refrigerator fire scene and the collected evidence to warrant a finding that Plaintiffs have a duty to preserve that evidence. Thus, Defendants have not satisfied the first *Beaven* spoliation factor.

## 2. *Plaintiffs' Culpability*

Defendants argue that Plaintiffs' case merits dismissal because Plaintiffs were negligent in their failure to identify, collect or preserve the Valve and its related components. (Dkt. 52, p. 5.) In this Circuit, Defendants "must show that the evidence was destroyed with a culpable state of mind." *Adkins*, 692 F.3d at 504. Defendants can establish a "culpable state of mind" by showing that "the evidence was destroyed knowingly even if without intent to breach a duty to preserve it, or negligently." *Beaven,* 622 F.3d at 554. While spoliation sanctions have been imposed in cases of ordinary negligence,[11] the Court must strike a balance between a spoliation sanction's functions of fairness and punishment. *Byrd*, 518 F. App'x at 385. Thus the choice of an appropriate sanction should correspond to the offending party's degree of culpability, with more severe sanctions reserved for parties who exhibit bad faith. *Id*.

Because Defendants have not established, beyond mere speculation, that the Valve and its related components survived the fire and were lost or destroyed through Plaintiff's actions, they have not shown that Plaintiffs were negligent.

---

[11] In the Sixth Circuit, courts have imposed an adverse inference or rebuttable presumption as a sanction for negligent conduct, and also sometimes in cases of bad faith. *E.g.*, *Beaven*, 622 F.2d at 553-556 (affirming a non-rebuttable adverse inference for negligent spoliation of a folder); *Arch*, 509 F. App'x at 458-59 ("a permissive adverse-inference instruction is adequate punishment for Plaintiffs' negligent conduct."); *In re Black Diamond Min. Co., LLC*, 514 B.R. 230, 242 (E.D. Ky. 2014) ("Generally, a permissive or rebuttable adverse inference instruction is adequate punishment for negligent spoliation."); *McCarty v. Covol Fuels No. 2, LLC*, 978 F.Supp.2d 799, 814 (W.D. Ky. Oct. 16, 2013) ("The usual sanction for spoliation of evidence is an adverse inference instruction to the jury which generally requires bad faith."); *Flagg v. City of Detroit*, No. 05-74253, 2011 WL 4634249 at *19-20 (E.D. Mich. Aug. 3, 2011) (a permissive adverse inference instruction is necessary because of "the severity of the City's malfeasance.")

According to Defendants' investigator, Mr. Bloom, the Valve and at least some of its related components must have survived because the bottom ban that housed them was photographed at the fire scene. (Dkt. 43, Ex. B-1 at 212:9-21.)

Mr. Bailey asserts that he did not identify the Valve or request its collection during the initial investigation because it was "consumed in the fire" (Dkt. 57, Ex. A at 44:8-10.) Furthermore, Mr. Bailey states that the bottom pan and the surrounding area were searched but neither the Valve nor any of its related components were found. (Dkt. 50, Ex. M at ¶ 13.) Mr. Waite notes that "several parts" were destroyed by fire and could not be collected. (Dkt. 57, Ex. D at 67:3-11.)

Defendants rely on the testimony of Mr. Bloom, their fire inspector, despite the fact that he has never inspected the apparently still-preserved fire scene. According to Mr. Bloom, the Valve and its related components "would have been at the bottom of the refrigerator" and any surviving componentry including the Valve "would have fallen in the [bottom] pan." (*Id.* at 179:9-14, 212:9-21.) Between 20 and 25 photographs exist of the exterior of the refrigerator's bottom pan. (*Id.* at 212:13-14.) Mr. Bloom has not seen the interior of the pan where he claims the remains of the Valve and any related components would be. (*Id.* at 248:15-18.) Mr. Bloom, however, argues that because the bottom pan survived, "you have to assume that there are other things that are still there." (*Id.* 213:3-10.) Furthermore, Mr. Bloom states that "some logical deductions can be made" that the Valve was "at least slightly damaged" even though "there's no documentation of whether it's still partially intact or completely destroyed" after the fire. (*Id.* at 205:10-17.)

18

Mr. Bailey and Mr. Waite searched the trailer debris including the refrigerator's bottom pan and the surrounding area without recognizing the Valve or any of its related components. (*See* Dkt. 57, Ex. A at 46:6-25, 74:5-15; Dkt. 57, Ex. D at 16:16-24, 18:8-13, 39:22-40:8.) In fact, no witnesses claim to have seen the Valve or its debris and no photographs, even those taken of the area where the Valve and these components would have been, show the Valve, related components or recognizable pieces of them. (*See* Dkt. 43, Ex. B-1 at 171:5-8, 220:14-221:7; Dkt. 57, Ex. A at 60:10-25; Dkt. 57, Ex. D at 66:18-22.) The extant photographs apparently only show the exterior of the bottom pan. (Dkt. 212:15-21.) While Defendants would be free to explore this issue with Mr. Bloom, Mr. Bailey and Mr. Waite at trial, their suspicion that the Valve and any related components survived the fire based on Mr. Bloom's speculation about what might have fallen into the bottom pan is not sufficient to justify outright dismissal of this lawsuit.

Furthermore, even if there was evidence of the Valve or any of its related components being found at the scene – and Plaintiffs were negligent for not documenting or collecting this componentry – dismissal is not warranted in this case. Defendants assert that "the only appropriate remedy [in this case] is dismissal of Plaintiffs' claims" and suggest no alternative sanctions. (Dkt. 43, p. 2.) Dismissal, however, is a severe and extreme sanction. Defendants do not cite, nor could the Court find, a single case in the Sixth Circuit where dismissal was imposed as a spoliation sanction for ordinary negligence. *Cf, e.g., Byrd*, 518 F. App'x at 385 (overturning grant of summary judgment as too severe where Plaintiffs negligently

destroyed evidence). Under the law of this Circuit, dismissal is typically justified only in circumstances of bad faith. *E.g.*, *id.*at 386. When the conduct at issue is less culpable, dismissal may still be appropriate but only to avoid circumstances where "*significant* prejudice results from the evidence's destruction." *Id.* (emphasis added.)

Defendants claim that they are significantly prejudiced without the Valve because they cannot show that it was not the cause of the fire. (Dkt. 43, p. 1.) In considering relative prejudice arising from the lack of this evidence, it should be remembered that the Valve and its related componentry are equally important evidence to all parties, yet *no party* has been able to examine any of these parts. Plaintiffs, therefore, do not benefit significantly from the absence of the Valve and its componentry at the Defendants' expense because *no party* has been able to test or examine these parts in an effort to determine their role, if any, in causing the fire. Finally, Defendants have not been blindsided by Plaintiffs' theory of causation; they became aware of Plaintiffs' theory of causation in May 2010, and Defendants' own ongoing voluntary recall targeting these valves was launched prior to the release of Plaintiffs' report.[12]

### III.   CONCLUSION

For the reasons stated above, Defendants' motion for sanctions due to spoliation of evidence (Dkt. 43) is **DENIED**. The parties are hereby **ORDERED** to attend

---

[12] Defendants state that they "closed their file" on this case after receiving an email dated April 28, 2010 from Mr. Bailey stating that Mr. Bailey was not considering Defendants as possible negligent parties. (Dkt. 59, pp. 5-6.) As a result, Defendants claim that they had no notice that they were possibly responsible for the fire until Plaintiffs' counsel called them in January 2011. (*Id.* at 6.) Even if Defendants trusted the assertions of Mr. Bailey, who was not Plaintiffs' legal representative, Defendants were notified anew when they received Mr. Bailey's report stating Plaintiffs' theory of causation clearly implicating Defendants less than one month after the April 28 email.

private mediation within 30 days of this order under the terms of their March 24, 2014 stipulated agreement.

**SO ORDERED**.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  November 10, 2014

### Certificate of Service

I hereby certify that this Order was electronically submitted on November 10, 2014, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
Case Manager